2015-1071

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ATLAS IP, LLC,

Plaintiff - Appellant,

v.

MEDTRONIC, INC.,

Defendant - Appellee,

MEDTRONIC USA, INC.,

Defendant - Appellee,

MEDTRONIC MINIMED, INC.,

Defendant - Appellee.

Appeal from the United States District Court for the Southern District of Florida in case no. 13-CV-23309, Judge Cecilia M. Altonaga

## BRIEF OF PLAINTIFF-APPELLANT
## ATLAS IP, LLC

George C. Summerfield
Rolf O. Stadheim
Robert M. Spalding
STADHEIM & GREAR LTD.
400 North Michigan Avenue
Suite 2200
Chicago, Illinois 60611
Telephone: (312) 755-4400
Facsimile: (312) 755-4408

*Attorneys for Plaintiff-Appellant,*
*Atlas IP, LLC*

October 22, 2014

# CERTIFICATE OF INTEREST

Pursuant to Fed. Cir. R. 47.4, plaintiff-appellant, Atlas IP, LLC, certifies the following:

(1)    The full name of every party or *amicus* represented by me is: Atlas IP, LLC.

(2)    The name of the real party in interest represented by me is: Atlas IP, LLC.

(3)    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

(4)    The names of all law firms and the partners or associates that appeared for the party or amicus no represented by me in the trial court or agency or are expected to appear in this court are:

George C. Summerfield
Rolf O. Stadheim
Robert Spalding
Stadheim & Grear Ltd.
400 North Michigan Avenue
Suite 2200
Chicago, Illinois 60611

Curtis David Carlson
Carlson & Lewittes PA
1 SE Third Avenue
Suite 1200
Miami, Florida 33131

*/s/ George C. Summerfield*
George C. Summerfield

i

# TABLE OF CONTENTS

*Page(s)*

CERTIFICATE OF INTEREST                                              i

TABLE OF CONTENTS                                                   ii

TABLE OF AUTHORITIES                                               iv

ABBREVIATIONS                                                       v

STATEMENT OF RELATED CASES                                          1

JURSIDICTIONAL STATEMENT AND STANDARD OF REVIEW                     2

STATEMENT OF THE ISSUE                                              3

STATEMENT OF THE CASE                                               4

STATEMENT OF FACTS                                                  5

A.    The '734 Patent                                               5

B.    The Prosecution History                                       7

C.    Claim Construction                                            9

D.    Summary Judgment                                             10

E.    Reconsideration                                              11

SUMMARY OF ARGUMENT                                                12

ARGUMENT                                                           13

A.    The Tenets of Claim Construction                             13

1.    Tenet 1                                                      14

# TABLE OF CONTENTS (cont'd)

*Page(s)*

2.    Tenet 2                                                        16

3.    Tenet 3                                                        17

4.    Tenet 4                                                        17

B.    The Prosecution History Evidences the Error of          18
      the Court's Construction

C.    The Court's Claim Construction was not Harmless          19

CONCLUSION AND RELIEF SOUGHT                                    20

# TABLE OF AUTHORITIES

***Cases***                                                                                    ***Page(s)***

*3M Innovative Props. Co. v. Tredegar Corp.,*                                           13, 17
725 F.3d 1315 (Fed. Cir. 2013)

*Atlas IP, LLC v. St. Jude Medical, Inc.,*                                                   9
Case No. 14-cv-21006 (S.D. Fla.)

*Arlington Indus. v. Bridgeport Fittings, Inc.,*                                        13, 17
632 F.3d 1246 (Fed. Cir. 2011)

*GE Lighting Solutions, LLC v. AgiLight, Inc.,*                                         13, 15
750 F.3d 1304 (Fed. Cir. 2014)

*Hill-Rom Servs. v. Stryker Corp.,*                                                    14, 18
755 F.3d 1367 (Fed. Cir. 2014)

*Lighting Ballast Control LLC v. Philips Elecs. North Am. Corp.,*                        2
744 F.3d 1272 (Fed. Cir. 2014) (*en banc*)

*Rexnord Corp. v. Laitram Corp.,*                                                         17
274 F.3d 1336 (Fed. Cir. 2001)

***Statutes and Other Authorities***

28 U.S.C. § 1295                                                                          2

# ABBREVIATIONS

"The '734 Patent" - U.S. Patent No. 5,371,734

"The '415 Application" – U.S. App. Ser. No. 08/011,415

"Natarajan" – U.S. Patent No. 5,241,542

"Claim Construction Order" – *Atlas IP, LLC v. St. Jude Medical, Inc., et al.*, 14-cv-21006, Order on Claim Construction (S.D. Fla. July 30, 2014) [ECF Docket No. 73]

"Summary Judgment Order" – *Atlas IP, LLC v. Medtronic, Inc.*, No. 13-cv-23309, Order (S.D. Fla. Oct. 17, 2014) [ECF Docket No. 260]

"Reconsideration Order" – *Atlas IP, LLC v. Medtronic, Inc.*, No. 13-cv-23309, Order (S.D. Fla. Oct. 8, 2014) [ECF Docket No. 243]

"Atlas" – plaintiff-appellant Atlas IP, LLC

"Medtronic" – defendant-appellees Medtronic, Inc., Medtronic USA, Inc., and Medtronic Minimed, Inc.

"St. Jude" – defendants St. Jude Medical, Inc. and St. Jude Medical S.C., Inc. in *Atlas IP, LLC v. St. Jude Medical, Inc., et al.*, 14-cv-21006 (S.D. Fla.)

"The 'Establishing' Limitation" - the hub establishing repeating communication cycles

"The 'Transmitting' Limitation" - the hub transmitting information to the remotes to establish the communication cycle

## STATEMENT OF RELATED CASES

There are no other appeals in or from the same civil action in the district court that have previously been before this or any other appellate court. Co-pending matters that may be affected by this appeal include *Atlas IP, LLC v. St. Jude Medical, Inc.*, No. 14-cv-21006-CMA (S.D. Fla.), *Atlas IP, LLC v. Biotronik, Inc.*, No. 14-cv-20602 (S.D. Fla.), *Atlas IP, LLC v. Medtronic, Inc., et al.*, No. 14-cv-22065 (S.D. Fla.), and *Atlas IP, LLC v. Boston Scientific Corp., et al.*, No. 14-cv-02856 (D. Minn.), and *St. Jude Medical, Inc., et al. v. Atlas IP, LLC,* IPR No. 2014-00916 (Pat. Tr. App. Bd.)

## JURISDICTIONAL STATEMENT AND STANDARD OF REVIEW

This Court's jurisdiction over this appeal is governed by 28 U.S.C. § 1295(a)(1).   As this appeal is directed to the district court's improper claim construction, the standard of review is *de novo*.  *Lighting Ballast Control LLC v. Philips Elecs. North Am. Corp.*, 744 F.3d 1272, 1285 (Fed. Cir. 2014) (*en banc*).

## STATEMENT OF THE ISSUE

Whether the district court erred in construing the "Establishing" and "Transmitting" Limitations in claim 21 of the '734 Patent as requiring that the hub define and transmit "in advance" information regarding "the starting time and duration" of the claimed communication cycles and their constituent intervals, and thereafter granting summary judgment of non-infringement in light of such construction.

## STATEMENT OF THE CASE

On September 12, 2013, Atlas filed suit in the United States District Court for the Southern District of Florida asserting infringement of the '734 Patent.  On July 30, 2014, in a co-pending matter regarding the '734 patent, the district court construed the limitation "the hub establishing repeating communication cycles" to mean "the hub defining in advance the starting time and duration for each repeating communication cycle."  The district court also construed the limitation "the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle" to mean "the hub transmitting to the remotes information necessary to know in advance the starting time and duration of the communication cycle and of each of two or more predeterminable intervals during each communication cycle."  The district court then applied these constructions in the matter below.

Based upon these constructions, and upon reconsideration, the district court granted Medtronic summary judgment of non-infringement on October 17, 2014. The district court entered final judgment in favor of Medtronic on that same day.

4

## STATEMENT OF FACTS

### A.    The '734 Patent

The '734 Patent, entitled *Medium access control protocol for wireless network*, issued on December 6, 1994 from an application that was filed on January 29, 1993.  '734 Patent at 1 [A101].  As the district court noted, the invention of the '734 patent relates to a protocol for the more efficient access to, and use of, a common transmission medium:

> The claimed invention of the '734 Patent relates to a 'medium access control protocol (MAC) protocol for wireless, preferably radio frequency (RF), LAN-type network communications among a plurality of resources, such a[s] battery powered portable computers.' Within such a network, '[o]ne of the communicators functions as a hub and the remaining communicators function as a remotes.'  'The hub establishes repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames,' or information.  'The hub transmits control information to the remotes to establish the communication cycle and to establish a plurality of predeterminable intervals during each communication cycle.  The intervals allow the hub and the remotes to anticipate transmitting and receiving frames, thereby allowing the remotes to power off their receivers and transmitters to achieve a considerable savings in power consumption without degrading communications.

Summary Judgment Order at 2 [A8] (internal citations omitted).

Asserted claim 21 of the '734 Patent, with the language relevant to this Appeal highlighted, reads, in relevant part:

> A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each

communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

\*    \*    \*

the hub *establishing* repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes *to establish* the communication cycle and a plurality of predeterminable intervals during each communication cycle,

'734 Patent [A138], col. 50, lines 39-58.[1]

The following language from other claims of the '734 Patent, which independently addresses communication cycle length and starting time, is relevant to the disputed language "the hub establishing repeating communication cycles" from claim 21:

**<u>Claim 1</u>**

[T]he hub transmitting a frame containing the ***cycle establishing information which establishes both an outbound portion of the communication cycle when the hub transmits frames to the remotes and an inbound portion of the communication cycle when the remotes transmit frames to the hub***, the frame containing the cycle establishing information ***also establishing the predetermined intervals during the outbound and inbound portions of the communication cycle*** when each remote is allowed to transmit and receive (*id.* [A136], col. 45, lines 20-30);

_____

[1] Unless otherwise stated, all emphasis is provided.

**Claim 12**

[T]he hub allocating ***a predetermined amount of time*** for a transmission opportunity in each transmission opportunity, the predetermined amount of time of the transmission opportunity being for a remote to transmit frames to the hub (*id.* [A138], col. 49, lines 6-10);

**Claim 14**

[T]he hub establishing ***the length*** of each communication cycle (*id.* [A138], col. 49, lines 63-64);

[T]he hub transmitting a frame containing information ***describing the length*** of the communication cycle prior to the end of the communication cycle whose length is established (*id.* [A138], col. 49, lines 65-68); and

**Claim 34**

[T]he hub transmitting information to the remotes during a first communication cycle ***to establish the length*** of the first communication cycle and ***to establish the time*** for the beginning of the next subsequent second communication cycle (*id.* [A140], col. 54, lines 28-32).

The foregoing makes clear that certain claims of the '734 Patent expressly require that the hub define the length and starting time of communication cycles. Asserted claim 21 is not one of them.

**B.     The Prosecution History**

As originally filed, certain claims of the '734 patent application (which did not include asserted claim 21) were rejected as obvious in light of Natarajan. Office Action (Jan. 14, 1994) at 1 [A342].   According to the Examiner, in

Natarajan, "the base station of hub broadcast [*sic*] messages allocating communication opportunities for the current frame hence assigning transmission opportunities to the mobile stations (remotes)." *Id.* at 3 [A344]. Further, "the mobile stations (remotes) transmit frame requests during interval C to request transmission opportunity allocations." *Id.*

> In response, claim 1 was amended to add, *inter alia*, the following language:

> The hub transmitting a frame containing the cycle establishing information which establishes both an outbound portion of the communication cycle when the hub transmits frames to the remotes and an inbound portion of the communication cycle when the remotes transmit frames to the hub, the frame containing the cycle establishing information also establishing the predetermined intervals during the outbound and inbound portions of the communication cycle when each remote is allowed to transmit and receive.

Amendment and Response to Examiner's First Action (May 16, 1994) at 2-3 [A349-A350].

Claim 21 began as a dependent claim depending from claim 1. *See id.* at 13 [A360]. The Examiner objected to claim 21 without stating a basis for such objection. Office Action (Jan. 14, 1994) at 1-3 [A342-A344]. The applicant "assumed that the objection arises because [claim 21] depend[s] upon rejected preceding claims." Amendment and Response to Examiner's First Action (May 16, 1994) at 30 [A377]. The claim was therefore amended to appear in independent form. *Id.* at 13-14 [A360-A361]. However, the afore-quoted amendment language from claim 1 was not included in claim 21. The claim was allowed and issued

8

without such a limitation.  '734 Patent [A138-A139], col. 50, lines 39 – col. 51,

line 9.

> In arguing for the patentability of claim 1 as amended, the applicant stated:

> In the manner now set forth in amended claim 1 a frame communicates the cycle establishing information *to define the intervals for outbound and inbound intervals* and the specific intervals when the transmitters and receivers of the individual remotes are to powered [*sic*].

Amendment and Response to Examiner's First Action (May 16, 1994) at 32-33

[A379-A380].

## C.    Claim Construction

In a co-pending matter, *Atlas IP, LLC v. St. Jude Medical, Inc.,* No. 14-cv-

21006-CMA (S.D. Fla.), the district court conducted claim construction for

disputed terms of the '734 Patent.  Claim Construction Order at 1 [A40].  Atlas

proposed construing the term "establishing" according to its plain meaning, which

does not include requiring "that the hub *define* anything about the communication

cycle."  *Id.* at 10 [A49] (emphasis in original).

The district court, however, issued an order construing, *inter alia*, the

"Transmitting" and "Establishing" Limitations of the '734 Patent in the manner

proposed by St. Jude in the co-pending case (and relied upon by Medtronic in the

instant case):

| LIMITATION | CONSTRUCTION |
|---|---|
| the hub establishing repeating communication cycles | The hub defining in advance the starting time and duration for each repeating communication cycle (Claim Construction Order at 12 [A51]). |
| the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle | The hub transmitting to the remotes information necessary to know in advance the starting time and duration of the communication cycle and of each of two or more predeterminable intervals during each communication cycle (*Id.* at 13 & 14 [A52 & A53]). |

The district court applied its claim construction from the co-pending matter to the proceeding below.  Summary Judgment Order at 3 [A9], n.1.

**D.    Summary Judgment**

The devices accused of infringement below included Medtronic cardiac implants (remotes), and cardiac programmers and monitors (hubs) that communicate wirelessly.  Summary Judgment Order at 3-4 [A9-A10].  Medtronic moved for summary judgment on several liability and damage issues.  *Id.* at 1 [A7].  Among the bases for summary judgment was the purported failure of the accused devices to satisfy the "Establishing" and "Transmitting" Limitations, as defined by the district court.  *Id.* at 18-21 [A24-A27].  After adopting its claim construction from the co-pending St. Jude case, the district court ruled that, because the accused "hub also has the capability to terminate a communication cycle by sending an end-session message . . . [t]he evidence viewed in the light most favorable to the

non-moving party, suggests the accused hubs . . . have the capability to establish the communication cycle." *Id.* at 21 [A27].  The district court denied Medtronic's motion for summary judgment of non-infringement on claim 21 [A38].

## E.     Reconsideration

Medtronic then moved for reconsideration of that ruling, arguing "the duration of a communication cannot be known in advance, that is before the communication begins for the establishing limitation or before the intervals where the remote transmits to the hub for the transmitting limitation."  Reconsideration Order at 2-3 [A3-A4].  On reconsideration, the district court held on reconsideration that, because the accused hub devices "do not transmit an end-session message" "in advance," per the district court's construction of the "Establishing" and "Transmitting" Limitations, the accused products "do not satisfy each limitation of Claim 21." *Id.* at 5 [A6].

## SUMMARY OF ARGUMENT

The district court erroneously construed the "Establishing" and "Transmitting" Limitations of claim 21 of the '734 Patent as requiring that the hub define and transmit "in advance" information regarding "the starting time and duration" of communication cycles and their constituent intervals.  In doing so, the district court violated four basic tenets of claim construction: 1) the failure to employ ordinary meaning; 2) rendering claim language superfluous; 3) importing the express limitation from one claim into another; and 4) reading a specification embodiment into a claim.  As summary judgment of non-infringement was based upon such erroneous claim construction, summary judgment was also erroneous.

## ARGUMENT

### A.    The Tenets of Claim Construction

There are several tenets of claim construction implicated by the district court's construction of the "Establishing" and "Transmitting" Limitations:

**Tenet 1**    A court only departs from the plain meaning of a claim term where the patentee has acted as his own lexicographer by clearly setting forth a definition of the disputed claim term or where he has disavowed the full scope of the claim term using clear and unmistakable statements of disclaimer (*GE Lighting Solutions, LLC v. AgiLight, Inc*., 750 F.3d 1304, 1309 (Fed. Cir. 2014));

**Tenet 2**    A court is to give meaning to each part of a claim so as to avoid rendering any part superfluous (*3M Innovative Props. Co. v. Tredegar Corp*., 725 F.3d 1315, 1329 (Fed. Cir. 2013));

**Tenet 3**    The omission from one claim of a limitation expressly included in another claim means that such limitation is not included in the former claim (*Arlington Indus. v. Bridgeport Fittings, Inc*., 632 F.3d 1246, 1254 (Fed. Cir. 2011) ("Claim 1 recites a 'spring metal adaptor being less than a complete circle,' while claim 8 omits the less than a complete circle modifier . . . This difference indicates that, unlike the

adaptor of claim 1, the spring metal adaptor of claim 8 can be either a complete circle or an incomplete circle"));

**Tenet 4**    Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction (*Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014).

In construing the "Establishing" and "Transmitting" Limitations to require that the hub define and transmit "in advance" information regarding "the starting time and duration" of communication cycles and their constituent intervals, the district court violated each of the foregoing tenets.

### 1.    Tenet 1

As the district court recognized, the issue regarding the proper construction of "establishing" was whether that term should have its ordinary meaning (Atlas's position), as opposed to giving the term a specialized meaning that "is more faithful to the '734 Patent's description of the 'present invention'" and that "accords with other 'critical parts of the specification.'"  Claim Construction Order at 10-11 [A49-A50].

In eschewing the ordinary meaning of "establishing," the district court cites to two passages from the '734 Patent specification to support a construction that

deviates from the ordinary meaning. *Id.* at 11-12 [A50-A51]. The first cited passage reads "[d]ue to the defined intervals of the communication cycle and the information defined by the hub." '734 Patent [A116], col. 5, lines 54-55. The second passage, which describes the embodiment depicted in Figure 3, reads "[a]ll intervals of the communication cycle 70 take place within the limits of predesignated assigned times established by the hub." *Id.* [A120], col. 13, lines 12-14. Neither of these statements, however, constitutes a "clear and unmistakable" statement warranting the deviation from the ordinary meaning of "establishing." *See GE Lighting*, 750 F.3d at 1309.

Atlas urged that the plain meaning of "establishing" is "initiating." Claim Construction Order at 10 [A49]. The district court never took issue with initiating as the ordinary meaning of establishing. Rather, the district court actually stated that this definition is ***under-inclusive***, "because 'predesignated assigned times' cannot be 'initiated by the hub.'" Claim Construction Order at 12 [A51]. This, of course, assumes that the proper construction of "establishing" requires predesignating assigned times, which, in turn, requires deviating from the ordinary meaning of that term. Further, nothing precludes a hub from initiating a communication cycle in addition to predesignating assigned times. As discussed below with regard to other claims, that is precisely what the hub does in those

claims.  In any event, it is incongruous to characterize the ordinary meaning of a term as "under-inclusive."

    **2.**    **Tenet 2**

Several claims of the '734 Patent, in addition to the "Establishing" and "Transmitting" Limitations, contain limitations directed to defining the lengths and starting times of communication cycles, including:

- Claim 1 ("the hub transmitting a frame containing the cycle establishing information which establishes both an outbound portion of the communication cycle when the hub transmits frames to the remotes and an inbound portion of the communication cycle when the remotes transmit frames to the hub");

- Claim 12 ("the hub allocating a predetermined amount of time for a transmission opportunity");

- Claim 14 ("the hub establishing the length of each communication cycle; and the hub transmitting a frame containing information describing the length of the communication cycle); and

- Claim 34 ("the hub transmitting information to the remotes during a first communication cycle to establish the length of the first communication cycle and to establish the time for the beginning of the next subsequent second communication cycle").

In construing the "Establishing" and "Transmitting" Limitations to require the hub defining and transmitting "in advance" information regarding "the starting time and duration" of communication cycles and their constituent intervals, the district court improperly rendered the afore-referenced limitations—which are directed to defining the length of a communication cycle, the timing of such

definition, and the transmission of such information—superfluous. *See 3M*, 725 F.3d at 1329. It is of no moment that these limitations appear in claims other than asserted claim 21, as "a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) (citations omitted).

### 3. Tenet 3

As noted above with regard to Tenet 2, claims of the '734 Patent other than claim 21 contain limitations that expressly require that the hub define and transmit "in advance" information regarding "the starting time and duration" of communication cycles and their constituent intervals. The omission of such limitations from claim 21 mandates the conclusion that such limitations are ***not*** part of claim 21. *See Arlington Indus.*, 632 F.3d at 1254. The district court erred in importing these limitations via the construction of the "Establishing" and "Transmitting" Limitation.

### 4. Tenet 4

As noted above with regard to Tenet 1, in construing the "Establishing" and "Transmitting" Limitations in the manner it did, the district court relied upon the description set forth in Figure 3 of the '734 patent. Such construction, then, improperly imported a specification embodiment into claim 21 as a limitation. *See*

*Hill-Rom*, 755 F.3d at 1372.

**B.    The Prosecution History Evidences the Error of the Court's Construction**

Certain claims of the '734 application, not including claim 21, were originally rejected as obvious in light of Natarajan.    '415 Application, Office Action (Jan. 14, 1994) at 1 [A342].  In response, claim 1 was amended to add, *inter alia*, the following language:

> The hub transmitting a frame containing the cycle establishing information which establishes both an outbound portion of the communication cycle when the hub transmits frames to the remotes and an inbound portion of the communication cycle when the remotes transmit frames to the hub, the frame containing the cycle establishing information also establishing the predetermined intervals during the outbound and inbound portions of the communication cycle when each remote is allowed to transmit and receive.

'415 Application, Amendment and Response to Examiner's First Action (May 16, 1994) at 3 [A350].

In arguing for the patentability of claim 1 as amended, the applicant stated:

> In the manner now set forth in amended claim 1 a frame communicates the cycle establishing information ***to define the intervals for outbound and inbound intervals*** and the specific intervals when the transmitters and receivers of the individual remotes are to powered [*sic*].

*Id*. at 32-33 [A379-A380].

The applicant expressly opted ***not*** to include the afore-quoted language in claim 21 in order to obtain broader patent coverage than that afforded by claim 1.

*See* '734 Patent [A138-A139], col. 50, lines 39 – col. 51, line 9.  It was, therefore, no accident that such language was omitted from claim 21.  This further supports the conclusion that the district court erred in reading claim 21 to require that the hub define and transmit "in advance" information regarding "the starting time and duration" of communication cycles and their constituent intervals.

## C.    The Court's Claim Construction was not Harmless

On reconsideration, the district held that, because the accused hub devices "do not transmit an end-session message" "in advance," per the district court's construction of the "Establishing" and "Transmitting" Limitations, the accused products "do not satisfy each limitation of Claim 21."  Reconsideration Order at 5 [A6].  The district court thereafter granted judgment in Medtronic's favor and dismissed the action.  Judgment [A1].  The district court's erroneous construction of the subject limitations, then, led to summary judgment of non-infringement, and such erroneous construction was not harmless.  The error requires correction on appeal.

## CONCLUSION AND RELIEF SOUGHT

The district court erred in construing the "Establishing" and "Transmitting" Limitations of the '734 Patent to require the hub defining and transmitting "in advance" information regarding "the starting time and duration" of communication cycles and their constituent intervals. Such construction contravened four basic tenets of claim construction, and must be vacated on appeal. The term "establishing" should be given its ordinary meaning, and the constructions of the "Establishing" and "Transmitting" Limitations should be amended accordingly. Finally, summary judgment of non-infringement based upon the district court's erroneous claim construction should be vacated as well.

Respectfully submitted,

*/s/ George C. Summerfield*
George C. Summerfield
Rolf O. Stadheim
Robert M. Spalding
STADHEIM & GREAR, LTD.
400 North Michigan Avenue
Suite 2200
Chicago, Illinois 60611
Telephone: (312) 755-4400
Facsimile: (312) 755-4408

*Attorneys for Plaintiff-Appellant,*
*Atlas IP, LLC*

Date:  October 22, 2014

**ADDENDUM**

**ADDENDUM**

Judgment                                                                                      A1
(Docket No. 261) (October 17, 2014)

Order on Motion for Reconsideration                                           A2-A6
(Docket No. 260) (October 17, 2014)

Order on Summary Judgment Motion                                         A7-A39
(Docket No. 243) (October 8, 2014)

Order on Claim Construction                                                     A40-A63
(Atlas IP, LLC v. St. Jude Medical, Inc. et al.)
(Civil Action No. 1:14-cv-21006)
(Docket No. 73) (July 30, 2014)

Docket Sheet for Atlas IP, LLC v. Medtronic, Inc. et al.        A64-A100
(Civil Action No. 1:13-cv-23309)

U.S. Patent No. 5,371,734                                                      A101-A143

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  13-23309-CIV-ALTONAGA

ATLAS IP, LLC,

       Plaintiff,

v.

MEDTRONIC, INC., *et al.*,

       Defendants.

_____/

## FINAL JUDGMENT

**THIS CAUSE** came before the Court on the Order of October 17, 2014 [ECF No. 260], in which the Court granted the Motion for Reconsideration . . . [ECF No. 248] filed by Defendants, Medtronic, Inc.; Medtronic USA, Inc.; and Medtronic Minimed, Inc.  Pursuant to Federal Rule of Civil Procedure 58, it is

**ORDERED AND ADJUDGED** as follows:

1.    Final Judgment is entered in favor of Defendants, Medtronic, Inc.; Medtronic USA, Inc.; and Medtronic Minimed, Inc., and against Plaintiff, Atlas IP, LLC. Plaintiff shall take nothing by this action.

2.    The Court retains jurisdiction over this cause and over the parties for the purposes of entering all further post-judgment orders that are just and proper.

**DONE AND ORDERED** in Chambers at Miami, Florida this 17th day of October, 2014.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.  13-23309-CIV-ALTONAGA

ATLAS IP, LLC,

      Plaintiff,

v.

MEDTRONIC, INC., *et al.*,

      Defendants.

_____/

## ORDER

    **THIS CAUSE** came before the Court on Defendants, Medtronic, Inc.; Medtronic USA, Inc.; and Medtronic Minimed, Inc.'s (collectively, "Medtronic['s]") Motion for Reconsideration . . . ("Motion") [ECF No. 248], filed October 10, 2014.  Medtronic seeks reconsideration of the October 8, 2014 Order [ECF No. 243] granting in part and denying in part Medtronic's Motion . . . for Summary Judgment on Liability and Damages ("Medtronic's Summary Judgment Motion") [ECF No. 148].  Plaintiff, Atlas IP, LLC ("Atlas") filed a response in Opposition to Medtronic's Motion for Reconsideration ("Response") [ECF No. 249], to which Medtronic replied ("Reply") [ECF No. 257].  The Court has carefully considered the parties' written submissions, the record, oral arguments, and applicable law.

    "Courts have distilled three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice."  *Instituto de Prevision Militar v. Lehman Bros., Inc.*, 485 F. Supp. 2d 1340, 1343 (S.D. Fla. 2007) (quoting *Cover v. Wal-Mart Stores, Inc.*, 148 F.R.D. 294, 295 (M.D. Fla. 1993)) (internal quotation marks omitted).  The reconsideration decision is granted only in

extraordinary circumstances and is "committed to the sound discretion of the district judge." *Tristar Lodging, Inc. v. Arch Specialty Ins. Co.*, 434 F. Supp. 2d 1286, 1301 (M.D. Fla. 2006) (quoting *Am. Home Assur. Co. v. Glenn Estess & Assocs., Inc.*, 763 F.2d 1237, 1238–39 (11th Cir. 1985)) (internal quotation marks omitted). A motion for reconsideration cannot be used "to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (citation and internal quotation marks omitted).

Medtronic asserts Atlas fails to demonstrate the accused devices satisfy the "establishing"[1] and "transmitting"[2] limitations of Claim 21 of U.S. Patent Number 5,371,734 (the "'734 Patent") [ECF No. 63-1] required to prove infringement. (*See* Mot. 2). The Court previously construed the words "the hub establishing repeating communication cycles" to mean "the hub defining *in advance* the starting time and duration for each repeating communication cycle." (July 30 Claim Constr. Order 12 (emphasis added)).[3] Medtronic insists the duration of a communication cannot be known in advance, that is, before the communication cycle begins for the establishing limitation or before the intervals where the remote transmits to the hub for the

---

[1] The establishing limitation of the '734 Patent provides "the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames." ('734 Patent, col. 50, ll. 52–54).

[2] The transmitting limitation states:

> the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

('734 Patent, col. 50, ll. 55–62).

[3] The Court construed the '734 Patent in the related case *Atlas IP, LLC v. St. Jude Medical, Inc.*, No. 14-cv-21006-CMA (S.D. Fla. July 30, 2014) [ECF No. 73] ("July 30 Claim Construction Order").

transmitting limitation (*see* Mot. 3).  Medtronic further observes an end-session message is sent only for its cardiac devices, not the diabetes devices.  (*See id.* 2).  To the extent an end-session message is integral to satisfying the establishing and transmitting limitations, Medtronic requests the Court grant summary judgment of non-infringement regarding the diabetes devices.  (*See id.*).  Medtronic thus urges the Court reconsider its October 8 Order to correct clear error and prevent manifest injustice.  (*See id.* 5).

While Atlas accuses Medtronic of failing to sufficiently distinguish between the cardiac and diabetes devices in its summary judgment briefing (*see* Resp. 2), it does not deny the diabetes devices do not send an end-session message where the insulin pump indefinitely transmits Periodic Data Update messages (*see* Reply 1–2; *see generally* Resp.).  Atlas also insists the devices can satisfy the establishing and transmitting claim limitations irrespective of whether they send an end-session message.  (*See* Resp. 2–4).  Regarding any ambiguity with the terms "in advance," Atlas stresses additional claim construction of the Court's prior claim construction Order is not necessary, nor is it a ground for reconsideration.  (*See id.* 5).  In its Response, Atlas does not elaborate on its previously proposed definition of "in advance."

The Court focuses its analysis on whether a trier of fact could find the accused devices satisfy the establishing and transmitting limitations.  At issue is the Court's construction of these limitations, in particular how the phrase "in advance" is defined.  (*See* Mot. 3–4, 7–8; Resp. 5). The Court has reviewed the constructions proposed by the parties in briefing and at oral argument.  The Court noted in the October 8 Order that Medtronic's position is a communication "cycle's duration must be known in advance, that is, before the communication cycle commences."  (Oct. 8 Order 20 n.12 (citing Sept. 11, 2014 Hr'g Tr. 73:6–14; 89:22–24; 90:1–

3

5)).  In contrast, Atlas defined "in advance" to mean "before the remotes transmit to the hub."[4]

(*Id.* (citing Sept. 11, 2014 Hr'g Tr. 84:8–9)).

According to Medtronic, even if the Court adopts Atlas's construction, "[t]he cardiac implant device (alleged 'remote') begins transmitting to the cardiac base device (alleged 'hub') immediately after the Open Session Request. . . . As a result, the end-session message cannot occur before the remote transmits to the hub."  (Mot. 7 (alterations added; internal citation and footnote call number omitted) (citing Oct. 8 Order 5)).   Atlas does not directly address Medtronic's argument regarding the timing of an end-session message as applied under Atlas's own interpretation of "in advance."  Atlas instead argues no end-session message is required in order to satisfy the establishing and transmitting limitations.  (*See* Resp. 3–4).  The Court, however, denied summary judgment on the basis the accused hubs had the capability to establish a communication cycle — "the hub defining in advance the starting time and duration for each repeating communication cycle" (July 30 Claim Constr. Order 12) — if a trier of fact could find a hub knows in real-time the duration of the communication cycle (*see* Oct. 8 Order 21).  (*See also* Reply 2–3).  This understanding is not consistent with the parties' competing proposed constructions of "in advance."

_____

[4] At oral argument, Atlas explained:

> What does the term "in advance" mean?  Well, we believe that given what the claims are all about, i.e., the efficient use of bandwidth and allowing remotes to know when they can power up and power down the transmitters and receivers, 'in advance' means before the remotes transmit [sic] to the hub.  So the question is, is the information from the hub to the remote allowing them to know how long the communication cycle was going to be, transmitted in advance of the time that the hub — the remotes are going to transmit back to the hub?  And the answer is clearly yes.  And I don't think there is any dispute about that.  The open-session request initiates the communication cycle.  So there have been no intervals, yet, in which the remotes are allowed to transmit data back to the hub.  So the 'in advance' part of the transmitting limitation is met by the accused devices, as well.

(Sept. 11, 2014 Hr'g Tr. 84:4–18).

4

Federal Circuit Appendix
A5

As Medtronic makes clear in the present Motion, under either party's construction of "in advance," the accused devices do not transmit an end-session message before the remotes transmit to the hub (Atlas's construction), nor do they do so before the communication cycle begins (Medtronic's construction).  (*See* Mot. 7–8; Reply 1–3).  The accused products therefore do not satisfy each limitation of Claim 21.  *See Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001) ("A patentee claiming infringement must present proof that the accused product meets each and every claim limitation." (citation omitted)).  Accordingly, the accused devices cannot be said to infringe Claim 21 of the '734 Patent.

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Medtronic's Motion for Reconsideration **[ECF No. 248]** is **GRANTED**.  Summary judgment of non-infringement is granted in Medtronic's favor as to Claim 21.  Final Judgment for Defendants, Medtronic, Inc.; Medtronic USA, Inc.; and Medtronic Minimed, Inc. will be entered by separate order.  The Clerk of Court is directed to **CLOSE** this case, and any pending motions are **DENIED** as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida this 17th day of October, 2014.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

5

Federal Circuit Appendix
A6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.  13-23309-CIV-ALTONAGA

ATLAS IP, LLC,

      Plaintiff,

v.

MEDTRONIC, INC., *et al.*,

      Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on Defendants, Medtronic, Inc.; Medtronic USA, Inc.; and Medtronic Minimed, Inc.'s (collectively, "Medtronic['s]") Motion . . . for Summary Judgment on Liability and Damages ("Motion") [ECF No. 148], filed under seal August 5, 2014, with a Statement of Undisputed Material Facts.  (*See* Mot. ¶¶ 1–37 ("Defendants' SMF")). Plaintiff, Atlas IP, LLC ("Atlas"), filed a sealed response in Opposition to Defendants' Motion for Summary Judgment ("Response") [ECF No. 169], accompanied by a Response to Defendants' Statement of Facts ("Plaintiff's SMF") [ECF No. 174].  Medtronic filed a sealed Reply . . . ("Reply") [ECF No. 190].  On September 11, 2014, the Court heard oral argument on the Motion.  (*See* [ECF No. 213]).  The Court has carefully considered the parties' written submissions, the record, oral arguments, and applicable law.

## I. BACKGROUND

This case involves a patent infringement claim for wireless communication protocols used in medical devices related to United States Patent Number 5,371,734, titled "Medium access control protocol for wireless network" (the "'734 Patent") [ECF No. 63-1].  (*See*

*generally* Amended Complaint [ECF No. 63]). Atlas is the owner by assignment of the '734 Patent, and it alleges one count of patent infringement regarding claims 6, 11, and 21 of the Patent. (*See id.* ¶¶ 2, 29–31). The '734 Patent was issued on December 6, 1994. (*See* '734 Patent 1). Michael A. Fischer ("Fischer") is the sole named inventor of the '734 Patent. (*See id.*). The '734 Patent expired prior to the filing of this action. (*See* Defs.' SMF ¶ 28; Pl.'s SMF ¶ 28).

The claimed invention of the '734 Patent relates to a "medium access control (MAC) protocol for wireless, preferably radio frequency (RF), LAN-type network communications among a plurality of resources, such a[s] battery powered portable computers." ('734 Patent, col. 5, ll. 10–14 (alteration added)). Within such a network, "[o]ne of the communicators functions as a hub and the remaining communicators function as remotes." (*Id.* at Abstract (alteration added)). "The hub establishes repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames," or information. (*Id.* at col. 5, ll. 44–47). "The hub transmits control information to the remotes to establish the communication cycle and to establish a plurality of predeterminable intervals during each communication cycle." (*Id.* at col. 5, ll. 47–50). "The intervals allow the hub and the remotes to anticipate transmitting and receiving frames, thereby allowing the remotes to power off their receivers and transmitters to achieve a considerable savings in power consumption without degrading communications." (*Id.* at Abstract). The invention "obtains significant reductions in battery power drain by permitting the receivers as well as the transmitters of the communicator stations to be powered off during a majority of the time, but selectively and predictably powered on to send or receive relevant communications." (*Id.* at col. 5, ll. 28–33).

Federal Circuit Appendix
A8

Atlas asserts claims 6, 11, and 21 (the "Asserted Claims") of the '734 Patent.  (*See generally* Mot.; Resp.).  These claims are independent but share the following limitations:

A communicator for wirelessly transmitting frames to and receiving frames from at least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect pre-determined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the [*sic*] communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

the hub establishing the length of each communication cycle; and

the hub transmitting a frame containing information describing the length of the communication cycle whose length is established.

(Am. Compl. ¶ 4 (quoting '734 Patent, col. 49, ll. 31–68 (representative "Claim 14"))).[1]

The Medtronic devices accused of infringement include implantable cardiac defibrillator or monitor, or implantable pulse generator ("cardiac implant" or "cardiac patient") devices, such

---

[1] The Court previously construed the '734 Patent in the related case *Atlas IP, LLC v. St. Jude Medical, Inc.*, No. 14-cv-21006-CMA (S.D. Fla. July 30, 2014) [hereinafter "July 30 Claim Construction Order"].

3

as a defibrillator or pacemaker, operating with a CareLink 2090 programmer, or a 2490 or 2020 monitor ("cardiac base" or "cardiac monitor" devices); and a Paradigm REAL-Time Revel insulin pump ("insulin pump") operating with a mySentry monitor to provide continuous glucose monitoring. (*See* Expert Report of Mark Lanning Regarding Noninfringement . . . ("Lanning Report") 24, 33 [ECF No. 148-14]); Corrected Opening Expert Report of J. Nicholas Laneman, dated June 16, 2014 ("Laneman Report") 10 [ECF No. 148-3]; Mot. 10).

The cardiac implant devices operate pursuant to short-range, Telemetry B and Conexus Wireless Telemetry ("Telemetry C") communication protocols,[2] while the insulin pump device operates pursuant to a Paradigm protocol. (*See* Declaration of Gary P. Kivi . . . ("Kivi Declaration") ¶¶ 4–6; Defs.' SMF ¶¶ 1–3; Pl.'s SMF ¶¶ 1–3). A cardiac base device operates as a hub for a Group, as it can "broadcast to all cardiac patient devices within range, initiate communication cycles, transmit downlink telemetry, and receive uplink telemetry from all such devices." (Laneman Report 11). The accused telemetry protocols are implemented in firmware in the accused devices. (*See* Lanning Report 32). The Telemetry B and C protocols cannot designate at a later time an accused cardiac implant to operate as an external monitor or programmer and vice-versa. (Defs.' SMF ¶¶ 1–2; Pl.'s SMF ¶¶ 1–2).

A cardiac base device initiates a communication cycle by transmitting a downlink frame to a patient device. (*See* Laneman Report 13). The cardiac implant device is designed to turn its receiver on and poll for downlink telemetry periodically. (*See* Lanning Report 30). The patient device powers on its receiver every 250 milliseconds and during a three-bit period processes any

---

[2] The Telemetry B and C protocols operate similarly, apart from several key differences. (*See* Laneman Report 21–22). Telemetry B's range is approximately six inches. (*See* Lanning Report 29). As a result, "a programming head, or wand, must be placed and remain directly over the patient's implanted device" for the communications to be operational. (*Id.*). Telemetry C is the next generation protocol, operating wirelessly and having a longer range. (*See id.* 31).

Federal Circuit Appendix
A10

signals transmitted by the base device. (*See* Laneman Report 13). If the patient device does not receive a signal consisting of three consecutive zeros, it powers down until the next polling time. (*See id.*). If the device is operating with Telemetry B, the instrument head or wand must be placed over the patient's implanted cardiac device to be within range. (*See* Lanning Report 30).

A cardiac base device broadcasts an identification request ("ID Request"), and an in-range patient device responds by uplinking its device identification ("Device ID") information, including model and serial numbers — six bytes of data. (*See* Laneman Report 13–14; Lanning Report 30 ("If the implant detects a valid downlink signal, it will transmit its information back to the instrument.")). After receiving the cardiac patient Device ID, the cardiac base device issues an Open Session Request; a communication session does not commence until the Open Session Request is issued.[3] (*See* Laneman Report 14; Lanning Report 30 ("The clinician can initiate a session by transmitting an Open Session request.")). Downlink messages, which can generally perform memory read or memory write operations or control the communication system, are transmitted from the cardiac base device to the implant. (*See* Lanning Report 30). The intervals for downlink transmission can be calculated because "the downlink frame lengths and transmission rate are predetermined and known." (Laneman Report 16). A cardiac patient device responds to an Open Session Request from a base device and begins uploading waveform data at an uplink interval of 32 milliseconds. (*See id.* 14). Uplink transmissions sent from the cardiac implant to the base device can be "'requested,' in response to a downlink message, or 'unrequested,' on the occurrence of a device event." (Lanning Report 30).

For the diabetes devices, the insulin pump and monitor form a Group, with the pump functioning as the hub and the monitor as the remote. (*See* Laneman Report 26). The mySentry

---

[3] Telemetry C does not require a wand to be activated; rather, Telemetry C can be activated when a Device ID downlink transmission is wirelessly received by the cardiac implant. (*See* Lanning Report 31).

monitor includes a color viewing screen, continuous (plugged-in) power supply, and an outpost that transmits information from the pump to the monitor.  (*See* Lanning Report 34).  The Paradigm protocol cannot designate an accused insulin pump to operate as a mySentry monitor and vice-versa.  (Defs.' SMF ¶ 3; Pl.'s SMF ¶ 3).  A mySentry monitor is designed to monitor one Paradigm insulin pump at a time.  (*See* Lanning Report 35).

The pump sends a Pump ID message to establish communication between it and a monitor — a "marriage" message.  (*Id.*; *see* Laneman Report 26).  Transmissions between an insulin pump and monitor occur at a fixed transmission rate of 16,385 bites per second.  (*See* Laneman Report 26).  Approximately every five minutes, the pump sends the monitor a fixed 42-byte Periodic Data Update with monitoring information concerning glucose levels.  (*See id.* 26–27; Lanning Report 35–36).  The pump sends a Periodic Data Update indefinitely, even if the monitor does not communicate with it.  (*See* Lanning Report 36).  A monitor within range ignores a Periodic Data Update until a Pump ID message is sent and received.  (*See* Laneman Report 26–27).  This then "establish[es] a communication session between the pump and monitor."  (*Id.* 26 (alteration added)).

Once communications are established between a pump and monitor, the monitor performs a "cyclical redundancy check" to verify the information it receives from the pump.  (*Id.* 27).  The monitor responds to a Periodic Data Update with an acknowledgement ("ACK") or non-acknowledgement ("NAK") message ("ACK/NAK" message).  (*See id.*).  An ACK/NAK message has a fixed length and data transmission rate.  (*See id.* 27–28).  The interval during which the Periodic Data Update is sent can be determined based on the known byte length and transmission rate.  (*See id.* 27).  These periodic broadcasts repeat until the battery life in the pump and/or monitor expires.  (*See id.* 26).

6

Federal Circuit Appendix
A12

Medtronic does not sell or lease its in-home cardiac monitors or cardiac programmers. (*See* Defs.' SMF ¶¶ 10–11; Pl.'s SMF ¶¶ 10–11). Nor does Medtronic sell cardiac implant devices together with monitors or programmers, or Paradigm insulin pumps together with mySentry monitors. (*See* Defs.' SMF ¶¶ 12–13; Pl.'s SMF ¶¶ 12–13).

Medtronic developed and sold products supporting Telemetry B and C more than six years before Atlas filed this lawsuit. (*See* Defs.' SMF ¶ 18; Pl.'s SMF ¶ 18). Medtronic received Food and Drug Administration ("FDA") approval to market its Marquis implantable cardiac defibrillator supporting Telemetry B in March 2002, and Concerto and Virtuoso line of implantable devices supporting Telemetry C in 2006. (*See* Defs.' SMF ¶¶ 18, 20; Pl.'s SMF ¶¶ 18, 20).

After the '734 Patent was issued on December 6, 1994, Digital Ocean, Inc. ("Digital Ocean") became an assignee of the '734 Patent. Digital Ocean produced a product line known as "Grouper." (*See* Deposition of Michael A. Fischer, June 13, 2014 ("Fischer Deposition") 138:7–140:18 [ECF No. 170-12]). The Patent inventor, Fischer, testified the Grouper product line was marked with the number of the '734 Patent. (*See id.* 138:17–19; 139:22–140:7). Fischer explained he became aware of the marking requirements in December 1992 when the industrial design of the enclosures, the promotion materials, and the labeling were being defined. (*See id.* 138:22–129:2). He met with Digital Ocean in Kansas to provide the marketing and industrial design teams information regarding the required labeling and to verify products were marked patent-pending or had the patent number. (*See id.* 139:6–8). According to Fischer, Digital Ocean was "very good at . . . execution on the fulfillment side[,]" making the probability products were not marked very low. (*Id.* 140:13–18 (alterations added)).

Digital Ocean marked a prototype, even though it was not legally required to do so. (*See*

Federal Circuit Appendix
A13

*id.* 142:5–15).[4] Fischer possesses this marked Manta prototype product. (*See id.*). In 1999, Choice-Intersil Microsystems, Inc. acquired the '734 Patent and later merged into and became a subsidiary of Conexant, Inc. (Defs.' SMF ¶¶ 24–25; Pl.'s SMF ¶¶ 24–25).

Medtronic now seeks summary judgment of non-infringement on Claims 6, 11, and 21 of the '734 Patent. Medtronic first argues Atlas does not establish direct infringement pursuant the requirements of 35 U.S.C. section 271(a). (*See* Mot. 10–14). Medtronic challenges whether the accused cardiac and diabetes devices satisfy each of the Patent's claim limitations. (*See id.* 15–25). Medtronic also asserts Atlas's claims are invalid for indefiniteness. (*See id.* 25–26). Finally, Medtronic asserts Atlas's claim is barred by the affirmative defenses of laches and non-compliance with the Patent-Marking Statute, 35 U.S.C. section 287(a). (*See id.* 26–30). The Court addresses each of Medtronic's arguments in turn.

## II. LEGAL STANDARDS

Patent infringement analysis consists of two steps: "claim construction to determine the scope and meaning of the asserted claims, and a comparison of the properly construed claims with the allegedly infringing device or method to determine whether the device or method embodies every limitation of the claims." *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454, (Fed. Cir. 1998)). "Whether an accused device . . . infringes a claim either literally or under the doctrine of equivalents is a question of fact." *Id.* (quoting *Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n*, 109 F.3d 726, 731 (Fed. Cir. 1997)).

Under Federal Rule of Civil Procedure 56(a), "'summary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-

---

[4] This excerpt of Fischer's Deposition is available at docket entry number 148-3.

Federal Circuit Appendix
A14

movant, there is no genuine issue whether the accused device is encompassed by the claims.'" *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed. Cir. 2001) (quoting *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999)). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks omitted)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, at *2 (S.D. Fla. Jul. 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (alterations and internal quotation marks omitted)). "[T]he plain language of Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting *Celotex*, 477 U.S. at 322 (alterations and internal quotation marks omitted)).

### III. ANALYSIS

Atlas asserts the following combinations of products directly infringe the '734 Patent: a

cardiac implant device operating with a CareLink programmer, a cardiac implant device operating with a CareLink monitor, and a Paradigm insulin pump device operating with a mySentry monitor. (*See* Mot. 10; Defs.' SMF ¶¶ 10–13; Pl.'s SMF ¶¶ 10–13; *see generally* Am. Compl.).

### A. Direct Infringement

Atlas brings one count of direct patent infringement under 35 U.S.C. section 271(a)[5] regarding claims 6, 11, and 21.[6] "'[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.'" *Ricoh Co., Ltd v. Quanta Computer Inc.*, 550 F.3d 1325, 1334 (Fed. Cir. 2008) (alteration added) (quoting 35 U.S.C. § 271(a)). "In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) (citing *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1275–76 (Fed. Cir. 2004)).

The parties frame their direct infringement arguments in terms of infringing system

---

[5] Medtronic contends "Atlas did not allege indirect infringement, because it is undisputed that Medtronic had no knowledge of the patent prior to Atlas filing suit and the patent expired months before suit was filed." (Mot. 2). Atlas's Response is silent as to any indirect infringement claims, including contributory infringement claims or inducement. (*See generally* Resp.).

[6] Following the Court's indefiniteness ruling in the July 30 Claim Construction Order, Atlas withdrew its infringement allegation for claim 6 regarding the "allocating" limitation. (*See* Resp. 15 n.3). Nevertheless, Medtronic moves for summary judgment on this ground, as "Atlas has not yet dismissed its claim of infringement of claim 6." (Reply 10). Based on the Court's finding of indefiniteness, summary judgment of non-infringement is granted as to claim 6.

Federal Circuit Appendix
A16

claims, rather than method claims.[7] (*See* Sept. 24, 2014 Hr'g Tr. 11:16–19 ("[W]e don't infringe

because it is a system claim . . . ."), 32:18–23 ("These aren't method claims . . . . So to argue that

a method step is required for infringement, it's just wrong as a matter of law.") (alterations

added)).[8] Similarly, the parties limit their arguments to Medtronic's infringement by *making*,

*selling*, and *offering to sell* the accused products, as opposed to Medtronic's *use* of the products.[9]

(*See* Defs.' SMF ¶¶ 8–9; Pl.'s SMF ¶¶ 8–9; Mot. 11). *See NTP, Inc.*, 418 F.3d at 1319

("Congress has consistently expressed the view that it understands infringement of method

claims under section 271(a) to be limited to use.").

Medtronic argues it does not infringe under section 271(a) because it does not make or

sell the system, only its components, and even if it did make the system, there is no infringement

until the system is turned on and operational. (*See* Mot. 11–12; Reply 2–3; Sept. 24, 2014 Hr'g

Tr. 35:14–18; 36:3–37:17). Medtronic asserts any alleged direct infringement would be by the

doctor or patient who makes and uses the system, not Medtronic. (*See* Mot. 12; Reply 4; Sept.

24, 2014 Hr'g Tr. 73:17–74:10). In response, Atlas contends Medtronic manufactures all of the

elements to make the accused system, and "combination" is not required for infringement of the

system claims to occur. (Resp. 2). Rather, the claims define "the environment in which" a

---

[7] "The law is unequivocal that the sale of equipment to perform a process is not a sale of the process within the meaning of section 271(a)." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005) (quoting *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993)).

[8] The Court does not reach Medtronic's argument the patent is indefinite because the claims recite both a system and a method for using that system given all parties agree this case involves only a system claim. (*Compare* Mot. 8 (citing *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (2005)) *with* Sept. 24, 2014 Hr'g Tr. 11:16–19; 32:18–23; 37:4–8). Moreover, in *IPXL Holdings, L.L.C.*, the claim found to be indefinite involved input from a third party user, unlike the present case. (*See* Resp. 16 (citing *IPXL Holdings, L.L.C.*, 430 F.3d at 1384)).

[9] "The use of a claimed system under section 271(a) is the place at which the system as a whole is put into service, *i.e.*, the place where control of the system is exercised and beneficial use of the system obtained." *NTP, Inc.*, 418 F.3d at 1317 (citation omitted).

single communicator device must function. (*Id.* 1). In arguing its manufacture of system components does not infringe, Medtronic cites *Deepsouth Packing Co., Inc. v. Laitram Corp.*, 406 U.S. 518 (1972); *Centillion Data Sys., LLC v. Qwest Comms. Int'l, Inc.*, 631 F.3d 1279 (Fed. Cir. 2011); and *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005). (*See* Mot. 12). These cases, however, are distinguishable.

In *Deepsouth*, the defendant only manufactured component parts of an unfinished product. *See* 406 U.S. at 528–29 (finding no direct infringement where defendant manufactured unassembled machines for export to be assembled outside the United States). The Supreme Court focused on "the whole operable assembly of a system claim for infringement in *Deepsouth*." *NTP, Inc.*, 418 F.3d at 1317 (citing *Deepsouth*, 406 U.S. at 528–29). By comparison, Medtronic makes the accused devices to support an operable system.[10] (*See* Mot. 11–12 (citing J. Nicholas Laneman's Deposition, July 7, 2014 ("Laneman Dep.") 252:25–253:7 [ECF No. 148-2]); Laneman Report 9 ("accused [products] include devices manufactured and sold by the Medtronic family of companies . . . ."); Defs.' SMF ¶¶ 15–16; Pl.'s SMF ¶¶ 15–16).

In *Centillion*, the court found the defendant only manufactured part of the claimed system. *See* 631 F.3d at 1288 ("In order to 'make' the system under [section] 271(a), [the defendant] would need to combine all of the claim elements — this it does not do. The customer, not [defendant], completes the system by providing the 'personal computer data processing means' and installing the client software." (alterations added)). In this case, Medtronic makes all of the accused devices that form the system, and no third party component parts are required.

---

[10] Medtronic does not dispute it makes or manufactures the accused products — "'components of the system,' such as the individual implant devices, programmers, or monitors" — arguing only that it does not "make[] the entire accused system." (Mot. 11; *see generally* Reply).

In *Cross Medical*, the claim involved a limitation requiring "a lower bone interface [be] operatively joined to said bone segment." 424 F.3d at 1299 (alteration added). The court construed the "operatively joined" limitation to require the accused device to have contact with the bone to infringe. *Id.* at 1311. Because the defendant "does not itself make an apparatus with the 'interface' portion in contact with bone, [the defendant] does not directly infringe." *Id.* (alteration added). Rather, the device does not contact bone until the surgeon implants it. *See id.* at 1312. In *Cross Medical*, having only the capability to infringe was insufficient given the "operatively joined" limitation. (*See* Resp. 1). In contrast, the claim limitations of the '734 Patent do not expressly require the devices be combined into a system and/or turned on to infringe.

Atlas compares the claims at issue to those in *Uniloc USA, Inc. v. Microsoft Corp.*, where the court construed the claim as defining "the environment in which that registration station [device] must function." 632 F.3d 1292, 1309 (Fed. Cir. 2011) (alteration added). As in *Uniloc USA, Inc.*, Atlas argues there is no claim requiring an actual combination of components. In that case the claim involved "only one party" who "makes or uses the remote registration station." *Id.* at 1309 ("Microsoft *does* make and use the remote registration station in the environment required by the claims, when the MD5 and SHA1 generate a remote license unique ID." (emphasis in original)).

In response to Atlas's environment argument, Medtronic simply reiterates its earlier interpretation the '734 Patent claims require a system of devices operating together. (*See* Reply 3 (citing *Nazomi Comms. Inc. v. Nokia Corp.*, 739 F.3d 1339, 1345 (Fed. Cir. 2014))). Medtronic insists to infringe, the devices "must be combined to provide the claimed capability" (*id.*), comparing this case to *Nazomi Communications Inc.*, where the accused products did not

13

infringe because the claims required "a hardware-software combination that must perform the described functions." 739 F.3d at 1345. In that case, the requisite hardware was part of both accused devices and was not functional without the purchase and installation of JTEK software. *See id.* The court distinguished the case from a line of other cases in which the hardware or software described in the claim — "standing alone" — had the capability to perform the claim limitations. *Id.* at 1345 n.3. Furthermore, the court considered the installation of JTEK software a "'modification' of the accused products" that precluded a finding of infringement. *Id.* at 1345 (distinguishing *Silicon Graphics, Inc. v. ATI Technologies, Inc.*, 607 F.3d 784, 794 (Fed. Cir. 2010) ("In addition to the actual use of the product described, infringement of an apparatus claim occurs when the invention is, among other things, made or sold in the United States. 35 U.S.C. § 271. Thus, even absent its use (or performance), . . . an apparatus claim directed to a computer that is claimed in functional terms is nonetheless infringed so long as the product is designed 'in such a way as to enable a user of that [product] to utilize the function . . . without having to modify [the product].'" (alterations added and in original))). Here, no modification to the accused devices is required to operate the system.

The Court finds Atlas's argument persuasive in defeating summary judgment. The preamble and claims "describe capabilities that an accused device must have"; in other words, they describe the communicator devices through which "the claimed process and system operate[]." *Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1374 (Fed. Cir. 2011) (alterations added). The claim in *Advanced Software Design Corporation* described a "system for validating . . . a negotiable financial instrument . . . comprising: a scanner . . . and a data processing device programmed [to validate by decrypting or re-encrypting]." *Id.* (internal quotation marks omitted; alterations in original). Even though the preamble included the phrases

14

"'in which selected information . . . is encrypted [and then] printed'" and 'wherein the selected information is encrypted [and then] printed,'" the claim did not include an encrypting computer or printer. *Id.* at 1375 (alterations in original) ("There is no reason why a preamble cannot describe a financial instrument in terms of the steps required to create it, and that is exactly what the preambles of the asserted claims do. Although the terms 'in which' and 'wherein' set off the limitations on the claim environments less clearly than the language in *Uniloc USA, Inc.*, it remains the case that the asserted claims of the '110 patent recite a process or system for validating checks, not for encrypting and printing them."). In *Advanced Software Design Corporation*, the district court did not address any difference between making and using a claimed system.

"A communicator for wirelessly transmitting frames to and receiving frames from at least one additional communicator" describes the purpose of the communicator device and the Group system in which it operates. ('734 Patent, Col. 49, ll. 31–33). As in *Advanced Software Design Corporation* and *Uniloc USA, Inc.*, Medtronic manufactures all of the devices as finished products capable of infringement when paired together. *See Advanced Software Design Corp.*, 641 F.3d at 1374; *Uniloc USA, Inc.*, 632 F.3d at 1309 (explaining while a device may require two parties to function, it "could nevertheless be infringed by the single party who uses" it, and finding "only one party, [defendant], makes or uses" the device (alteration added)). Requiring more would erase any distinction between a claim for *making* a system and one for *using* a system — one in which "the system as a whole is put into service." *NTP, Inc.*, 418 F.3d at 1317.

The court in *Uniloc USA, Inc.* also rejected the defendant's argument the claim required a third party's (end-user's) participation to infringe, distinguishing the case from a surgeon implanting a device in *Cross Medical*, where the claim required the device have bone contact to

Federal Circuit Appendix
A21

infringe. The claim language in *Uniloc USA, Inc.* — describing "A remote registration station incorporating remote licensee unique ID generating means, said station forming part of a registration system . . . including local licensee unique ID generating means . . ." — focuses "exclusively on the 'remote registration station,'" that "forms part of a 'registration system.'" 632 F.3d at 1309 (alterations in original). Treating the infringement claim like the one in *Cross Medical Products* "'would be akin to importing a method step into this software system — something the language of Claim 19 does not support.'" *Id.* (citation omitted). Here, as in *Uniloc USA, Inc.*, that "other parties are necessary to complete the environment in which the claimed element [accused system] functions does not necessarily divide the infringement between the necessary parties." *Id.* (alterations added).

Because Medtronic makes the allegedly infringing devices, the Court does not reach the issue of whether Medtronic sells the accused products.

**B. Whether Accused Systems Meet the Claim Limitations**

"A patentee claiming infringement must present proof that the accused product meets each and every claim limitation." *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001) (citation omitted). "To infringe an apparatus claim, the device must meet all of the structural limitations." *Cross Med. Prods.*, 424 F.3d at 1311–12 (citing *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990)).

Medtronic contends the accused systems do not satisfy each of Atlas's claim limitations to establish infringement. (*See* Mot. 14). The parties have stipulated the preamble of claims 11 and 21 is a limitation of the '734 Patent. (*See* Joint Claim Construction Stipulation ("Claim Constr. Stip.") 1 [ECF No. 129]). The preamble requires:

> A communicator for wirelessly transmitting frames to and receiving frames from at least one additional communicator in accordance with a predetermined medium

access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect pre-determined functions comprising:

('734 Patent, Col. 49, ll.31–40).

### 1) "Designating" Limitation

Following the preamble, the first "pre-determined function[]" concerns "designating one of the communicators of the Group as a hub and the remaining the [sic] communicators of the Group as remotes" (the "designating" limitation). (Mot. 15; Resp. 2 (alterations added) (quoting '734 Patent, col. 49, ll. 41–43)). The "hub" refers to a "communicator that has been designated by the medium access control protocol to control communication to and from the remotes." (July 30 Claim Constr. Order 10 n.3). The designating limitation applies to both claims 11 and 21.

Medtronic argues the MAC protocol must effect or "carry out" the predetermined functions in each limitation following the preamble, including the designating limitation. (Mot. 15). According to Medtronic, the MAC protocol designates a communicator as a hub after evaluating criteria, including location, transmission range, power source status (battery versus continuous power), interference level, and a communicator's prior status as a hub. (*See id.* 15–16). Medtronic challenges Laneman's testimony for failing to explain how the accused devices allegedly perform the designating step (*see id.* 16 (citing Laneman Report 29, 35)), and that he did not opine regarding a designation at "design time" until his deposition[11] (*see id.* (citing Laneman Dep. 98:18–99:12)). Medtronic further asserts the designation cannot be carried out by the MAC protocol because it is not active at design time. (*See id.* (citing Laneman Dep. 90:2–

---

[11] Medtronic takes issue with Laneman's testimony, arguing it was not previously disclosed and is conclusory. (*See* Reply 10).

17

Federal Circuit Appendix
A23

15)).

Atlas argues the designation criteria are pre-programmed into the read only memory ("ROM") of each communicator and "constitute part of the MAC protocol of the present invention." (Resp. 3 (quoting '734 Patent, col. 42, ll. 13–15)). Criteria at the time of design may include whether communicators are "powered by continuous AC power or whether each is battery powered." (*Id.* (quoting '734 Patent, col. 42, ll. 17–19)). Atlas argues these design criteria occur while the MAC protocol is inactive. According to Atlas, Medtronic's construction excludes these embodiments and must be rejected. (*See* Resp. 3–4).

The MAC protocol controls each communicator of the Group, doing so to effect certain pre-determined functions. Although the parties do not dispute the devices have predetermined functions at the time of manufacture and cannot later assume different roles, such as switching from a cardiac implant to a monitor, they disagree whether the MAC protocol must be turned on or be operational to make a designation, and whether the accused protocols actively designate a hub and remote. Even though certain criteria are preprogrammed at design time into the devices, the Telemetry protocols, like the MAC protocol, interpret real-time data and effect certain pre-determined functions to control the communications between the devices. When active, the protocols identify the hub and remote, even if their functions were pre-determined. Further, Atlas contends nothing in the claims expressly requires the MAC protocol be active at the time of designation. (*See* Resp. 3). Atlas has sufficiently demonstrated a basis for the trier of fact to find the accused products satisfy the designating limitation.

## 2) "Establishing" or "Transmitting" Limitation

The establishing limitation refers to "the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive

Federal Circuit Appendix
A24

frames." ('734 Patent, col. 49, ll. 44–46). The Patent's transmitting limitation is described as:

> the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub . . . .

(*Id.* ll. 47–54). The establishing and transmitting limitations apply to both claims 11 and 21, and so these two limitations are considered together.

The Court has construed "the hub establishing repeating communication cycles" to mean "the hub defining in advance the starting time and duration for each repeating communication cycle" (July 30 Claim Constr. Order 12), with each communication cycle being "a series of intervals for outbound and inbound communications" (*id.* 10 n.3). The Court further noted the '734 Patent "indicates the hub itself uses a MAC protocol as a component of its overarching function, not that the MAC protocol is, independently, defining anything about a communication cycle." (*Id.* (citing '734 Patent, col. 11, ll. 28–32)). Similarly, the Court construed "the hub transmitting information to the remotes to establish the communication cycle" to mean "the hub transmitting to the remotes information necessary to know in advance the starting time and duration of the communication cycle." (*Id.* 13). The Court previously construed the transmitting and establishing limitations in conjunction with the language, "the hub transmitting information to the remotes to establish . . . a plurality of predeterminable intervals," and interpreted it to mean "the hub transmitting to the remotes information necessary to know in advance the starting time and duration of each of . . . two or more predeterminable intervals during each communication cycle." (*Id.* 14 (alterations in original)).

The parties dispute the construction of certain terms addressed in the Claim Construction Order, and whether the accused devices are capable of knowing the duration of a communication

19

cycle in advance. (*See* Sept. 24, 2014 Hr'g Tr. 83:10–85:7 (asserting divergent definitions for "in advance," "to know," and "two or more")).[12] To clarify, it is necessary to know in advance the starting time and duration of the communication cycle and two or more intervals. Both of the following must be true to meet the claims' establishing and transmitting limitations: (1) "the hub defining in advance the starting time and duration for each repeating communication cycle" (July 30 Claim Constr. Order 12), and (2) "the hub transmitting to the remotes information necessary to know in advance the starting time and duration of each of . . . two or more predeterminable intervals during each communication cycle" (*id.* 14 (alterations in original)).

Medtronic contends the "hub does not define in advance the duration of a communication cycle (the establishing limitation) or transmit information to the alleged remote device so that the remote can know in advance the starting time and duration of the communication cycle and predeterminable intervals (the transmitting limitation)." (Mot. 17).[13] With respect to the cardiac devices, Medtronic further argues the Pump ID message and Periodic Data Update do not include information about the duration of a cycle, when the remote can transmit, or when the remote is expected to receive. (*See* Mot. 18 (citing Kivi Decl. ¶ 5)). Medtronic asserts a cycle's duration cannot be known in advance because clinicians initiate and terminate communication sessions, or alternatively a session is terminated when a device goes out of range. (*See id.*). Atlas acknowledges a communication cycle for the accused devices may in some circumstances be the length of one interrogation session by a clinician (*see* Sept. 24, 2014 Hr'g Tr. 86:20–87:14), but it argues the cycle is not required to repeat — only that it has the capability to repeat.

---

[12] Atlas argues "in advance" means before the remotes transmit to the hub (Sept. 24, 2014 Hr'g Tr. 84:8–9), while Medtronic contends the cycle's duration must be known in advance, that is, before the communication cycle commences (*see id.* 73:6–14; 89:22–24; 90:1–5).

[13] For support, Medtronic cites its Statement of Material Facts, paragraphs four through six. Those paragraphs are disputed. (*See* Defs.' SMF ¶¶ 4–6; Pl.'s SMF ¶¶ 4–6).

The parties primarily dispute the timeline of what it means to be known in advance. As previously explained, not only does the hub initiate intervals, but it also "conveys information about the starting time and duration of each repeating communication cycle — [it] must, that is, 'define[] intervals of the communication cycle.'" (July 30 Claim Constr. Order 11 (quoting '734 Patent, col. 5, ll. 54–55 (alterations added))). Specifically, the hub defines the intervals. (*See id.*). The parties do not dispute that the length or duration of the intervals is predetermined.

And "[i]n order for remotes to power down at appropriate times — a key innovation of the '734 Patent — they must have received defined intervals in advance from the hub . . . . [T]he '734 Patent specifies the hub designates the start and end times of the communication intervals."[14] (*Id.* (alterations added) (citing '734 Patent, col. 13, ll. 12–14)). Thus, to the extent a communication cycle is "known in advance," it is because the length or duration of the intervals is predetermined. Because a communication cycle continues until a clinician or other person using the device manually terminates it, a device's battery life expires, or a device becomes out of range, the cycle's duration obviously cannot be known until such time one of these events occurs; this is Medtronic's main argument. (*See* Mot. 17–18; Reply 7–9).

Yet, the hub also has the capability to terminate a communication cycle by sending an end-session message. (*See* Sept. 11 Hr'g Tr. 89:1–18 (discussing Deposition of Christopher House, May 13, 2014 [ECF No. 148-2])). The evidence, viewed in the light most favorable to the non-moving party, suggests the accused hubs (the cardiac base device and the insulin pump) have the capability to establish the communication cycle.[15]

---

[14] "Due to the defined intervals of the communication cycle and the information conveyed by the hub, the remotes are able to power off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub." ('734 Patent, col. 5, ll. 54–58).

[15] Additionally, it is unclear whether the accused hub transmits an end-session message to terminate the communication cycle in response to environmental or predetermined factors, such as a device's power

21

CASE NO. 13-23309-CIV-ALTONAGA

### 3) "Revoking" Limitation

The limitation in Claim 11 provides "the hub revoking a previous transmission opportunity allocation of a remote which has not transmitted more than a predetermined number of frames during a previous number of communication cycles" (the "revoking" limitation).[16] ('734 Patent, col. 48, ll. 33–36).

Medtronic's interpretation of the revoking limitation focuses on the phrase "during a previous number of communication cycles." (*Id.*). According to Medtronic, the '734 Patent considers prior communication cycles to adjust for changes in remote activity (amount of data transmitted) in order to maximize efficiency. (*See id.* (quoting '734 Patent, col. 6, ll.3–12)). Atlas argues the limitation includes consideration of "the previous portion of the current communication cycle" because "it would be illogical to read this claim to allow for the revocation of a previously allocated transmission opportunity based on underutilized transmission opportunities or lost communications in an entirely different communication cycle, while not covering such revocation as a result of underutilized transmission opportunities or lost communications in the current communication cycle." (Resp. 11 (emphasis omitted)). But Atlas fails to address how the accused devices consider recent communication cycles.

Medtronic emphasizes the '734 Patent specification's references to "Txop allocations may be varied or adjusted by the hub from one communication cycle to the next to account for changes in activity of the remotes. The adjustment occurs in relation to the number of frames or quantity of data transmitted by each remote during recent communication cycles." (Reply 11 (emphasis omitted) (quoting '734 Patent, col. 6, ll. 3–12)). Although the first sentence could be

---

source and range, to the effect the hub could be said to know in real-time the duration of the communication cycle; in other words, immediately in advance of sending an end-session message.

[16]Atlas asserts Medtronic's cardiac devices infringe claim 11. (*See* Mot. 22 n.5).

22

construed to mean making adjustments from the current communication cycle to the next or from a prior communication cycle to a present or future one — as Atlas proposes — the second sentence refers to "recent communication cycles," in other words, previous, near-in-time communication cycles, not the present cycle.

The revoking limitation requires the hub to consider a remote's transmissions during previous communication cycles. While the limitation does not preclude the hub from also considering information from the present communication cycle, it must account for recent, previous ones. Atlas provides no evidence the accused devices take into consideration transmissions from previous cycles. (*See* Mot. 21–22; Resp. 10–12; Reply 11–12). As Medtronic points out, Laneman's testimony related to the revoking limitation seems to refer to the current communication cycle. (*See* Mot. 22 (citing Laneman Report 32)).

Atlas argues the accused devices' revoking transmissions based on the current communication cycle are equivalent to revoking transmissions based on prior communication cycles as described in the claim limitation. (*See* Resp. 12 ("One of ordinary skill in the art would know that more efficient use of the communications medium (one purpose of the invention claimed in the '734 patent) would be accomplished by revoking transmission opportunities either as a result of underutilized transmission opportunities or lost communications during a previous part of the current communication cycle, or underutilized or lost during a different, earlier communication cycle."). This equivalency argument is rejected, as it is raised for the first time in Atlas's Response. Even if the doctrine of equivalents was properly raised in the case, Atlas fails to satisfy its evidentiary burden, as it provides no expert testimony regarding the "insubstantiality of the differences between the claimed invention and the accused device . . . ." *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1328 (Fed. Cir. 2007) (alteration

23

Federal Circuit Appendix
A29

added; internal quotation marks and citation omitted) (affirming a grant of summary judgment of non-infringement where the patentee "provided no particularized testimony from an expert or person skilled in the art that specifically addressed equivalents 'on a limitation-by-limitation basis'" (citation omitted)).[17]

Atlas fails to demonstrate the accused cardiac devices satisfy the revoking limitation, and thus it has not shown infringement as to claim 11. The Court need not consider the remaining limitations — the transmitting transmission opportunity allocation limitation and the monitoring limitation — specific to claim 11. Summary judgment of non-infringement is granted as to claim 11.

### 4) "Two Frames" Limitation

The claim 21 limitation requires that the MAC protocol effect the function of "the hub transmitting two frames containing information to establish the plurality of predeterminable intervals during each communication cycle, the second frame containing the information to established [sic] the plurality of predeterminable intervals occurring before the intervals in which the remotes are allowed to transmit frames to the hub" (the "two frames" limitation).[18] ('734 Patent, Col. 51, ll. 3–9).

Medtronic argues this limitation requires "the hub to transmit two frames containing the information for establishing the plurality of predeterminable intervals during each communication cycle" (Mot. 23), and that both "frames must be sent before the remotes transmit so that the remotes know when to transmit and when to receive frames" (*id.* 24 (emphasis

---

[17] According to Medtronic, Atlas no longer intends to pursue a doctrine of equivalency theory at trial. (*See* Medtronic Defendants' Notice of Changed Position 1–2 [ECF No. 234] (citing Atlas's Response to Medtronic's Motion in Limine 5 [ECF No. 218])).

[18] In its Motion Medtronic further defines "the information" in claim 21. (*See* Mot. 23). The Court's prior construction of the phrase "the information transmitted from the hub" concerned claim 6.

omitted)). Medtronic explains even under Laneman's analysis a remote transmits frames to the hub before the hub transmits the second frame. (*See id.* (citing Laneman Report 34 ("The cardiac base device sends the ID request in a frame to . . . [a] patient device . . . . Once the cardiac patient device responds with valid ID information, the cardiac base device sends an Open Session Request in a frame to the cardiac patient device. . . . Upon [] receipt by the cardiac base of the Open Session Ready Response from the cardiac patient device, a bi-directional communication link is established . . . ." (alterations added))). Laneman identifies the Open Session Request as the second frame sent by the cardiac base device. (*See* Laneman Report 34). From this, Medtronic argues the remote still transmits valid ID information in response to the first frame before the second frame is transmitted from the hub. (*See* Mot. 25).

Atlas emphasizes the accused hubs transmit at least two frames to the accused remotes. (*See* Resp. 13). The timeline, however, is disputed. Atlas contends whether both frames are transmitted "before the intervals in which the remotes are allowed to transmit frames to the hub" ('734 Patent, Col. 51, ll. 8–9) depends on how the intervals are defined (*see* Resp. 13). Atlas refers back to the establishing limitation in an effort to define intervals as "intervals of the 'repeating communication cycles.'" (*Id.*). Atlas's definition is not viable, however, because the establishing limitation indicates each communication cycle "has intervals during which the hub and the remotes transmit and receive frames." ('734 Patent, col. 51, ll. 27–28).

Atlas explains "a communication session between a cardiac base and patient device does not occur until the cardiac base device transmits the Open Session request," in an effort to demonstrate the remote's transmission would occur outside the communication cycle and not be limited by claim 21. (Resp. 13). At issue are how the accused devices' communication cycles are defined, and when the communication cycles commence. The parties do not dispute when a

25

communication cycle starts and finishes, yet the parameters of a communication cycle for the accused devices are unclear. Regarding the cardiac devices, Laneman states a cardiac base device initiates a communication cycle by transmitting a downlink frame to a patient device (*see* Laneman Report 13), but he also opines a communication cycle does not commence until the Open Session Request is issued (*see id.* 14).

The first instance of a downlink transmission is the cardiac base device sending a Device ID message, which, based on Laneman's former testimony, would initiate the communication cycle. Lanning attests the clinician can initiate a session by transmitting an Open Session Request. (*See* Lanning Report 30). Factual issues remain as to the parameters of the communication cycles for the accused devices (particularly in terms of when the communication cycle commences), as compared to the intervals during which the remotes are allowed to transmit frames. The parameters of the accused devices' communication cycles are a dispositive issue, and how the accused technology works is a question reserved for the trier of fact. *Schoell*, 247 F.3d at 1207.

Medtronic insists nothing in claim 21 requires the intervals to occur during the communication cycle and thus urges the two frames limitation would still not be satisfied. (*See* Reply 12). Medtronic's interpretation is not so convincing so as to compel a grant of summary judgment. The claim limitations' references to intervals refer to "communication cycles, each of which has intervals." ('734 Patent, col. 49, ll. 44–46). In the context of the '734 Patent, the intervals occur within a communication cycle.

With regard to the diabetes devices, Medtronic argues the communication timeline likewise fails because the remote transmits ACK/NAK messages in response to the first frame before the hub transmits the second frame. (*See* Mot. 25; Laneman Report 38 ("The pump sends

26

Federal Circuit Appendix
A32

the marriage message . . . to the monitor, and the Periodic Data Update message . . . to initiate the intervals of the communication session.  The Periodic Data Update message is transmitted before the ACK or NAK message is sent by the monitor to the pump.").  As is the case for the cardiac devices, the parameters of the communication cycle for the diabetes device remain a factual issue.

### C.  Laches

To proceed under an affirmative defense of laches, a defendant must establish "the patentee unreasonably and inexcusably delayed filing suit and that the delay resulted in material prejudice to the defendant."[19]  *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371 (Fed. Cir. 2011) (citing *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998)).  The delay is measured from the time the patentee possessed actual or constructive knowledge of a defendant's potentially infringing activities.  *Wanlass*, 148 F.3d at 1337 (citation omitted).  "[C]ourts impose a duty on patentees to police their patent rights, and will impose constructive knowledge based on the required reasonable, diligent inquiry."  *Magnetar Technologies Corp. v. Six Flags Theme Parks Inc.*, Civ. No. 07-127-LPS-MPT, 2014 WL 533425, at *6 (D. Del. Feb. 7, 2014) (alteration added) (citing *Wanlass*, 148 F.3d at 1338).

"A presumption of laches arises if the patentee delays bringing suit for more than six years after actual or constructive knowledge of the defendant's infringing activity."  *Ecolab, Inc.*, 264 F.3d at 1371  (citing *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028, 1035–36 (Fed. Cir. 1992)).  The "length of time that may be deemed unreasonable has no fixed boundaries," but instead depends on the circumstances of a case.  *Id.* (citing *A.C. Aukerman Co.*,

---

[19] "The effect of laches is merely to withhold damages for infringement which occurred prior to the filing of the suit."  *Peter Letterese And Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1321 (11th Cir. 2008) (internal quotation marks and citation omitted).

960 F.2d at 1030).   In response to a "defendant's evidence of at least a six-year delay, a patentee may offer proof that the delay has not in fact been six years — that is, that the time it first learned or should have known of the infringement after the patent issued was within six years.  If a patentee is successful on this factual issue, no presumption arises."  *A.C. Aukerman Co.*, 960 F.2d at 1038 (internal footnote call number and citation omitted).

But "a presumption is not evidence." *Id.* at 1037.  "[A]t all times, the defendant bears the ultimate burden of persuasion of the affirmative defense of laches. . . .  The burden of persuasion does not shift by reason of the patentee's six-year delay." *Id.* at 1038–39 (alterations added; internal citations omitted).  "If the patentee presents a sufficiency of evidence which, if believed, would preclude a directed finding in favor of the infringer, the presumption evaporates and the accused infringer is left to its proof.  That is, the accused infringer would then have to satisfy its burden of persuasion with actual evidence." *Id.* at 1037–38 (citation omitted).  "When raising the laches defense in the summary judgment context, the defendant . . . must establish that there was no genuine issue of material fact about the delay . . . ." *Wanlass*, 148 F.3d at 1337 (alterations added; citation omitted).  Raising "a genuine issue respecting either factual element of a laches defense" overcomes the presumption of laches. *A.C. Aukerman Co.*, 960 F.2d at 1038.

Medtronic argues Atlas and its predecessors-in-interest delayed bringing suit for over six years after they should have known of Medtronic's alleged infringement.  (*See* Mot. 26–27).  Medtronic not only insists the laches defense applies, but asserts the "burden shifts to Atlas 'to show that either the patentee's delay was reasonable or excusable under the circumstances or the defendant suffered neither economic nor evidentiary prejudice.'" (*Id.* 27 (quoting *Wanlass*, 148 F.3d at 1337)).  The Court focuses only on evidence of constructive knowledge, as Atlas's

28

Response does not address Medtronic's alleged economic and evidentiary prejudice.

The '734 Patent was issued in December 1994, and Medtronic began manufacturing the accused devices using Telemetry B in 2002 and those using Telemetry C in 2006, more than six years before Atlas filed suit in September 2013. (*See* Defs.' SMF ¶¶ 15–16; Pl.'s SMF ¶¶ 15–16). The presumption of laches applies.

To rebut the presumption, Atlas explains it was not on notice of Medtronic's alleged infringement until 2011, when a press release regarding the supply of Zarlink chips to Medtronic was issued. (*See* Resp. 19). Atlas claims this was the earliest it could have learned of Medtronic's alleged infringement. (*See id.*). Atlas underscores the highly confidential nature of the telemetry protocols and devices in this case as good cause for any delay in filing suit. (*See id.*). It states it could not have reasonably known about Medtronic's confidential telemetry protocols except by way of discovery in this case, and it notes Medtronic did not purchase chips from Zarlink. (*See id.*). The Court gives little weight to Atlas's discovery argument, as Atlas filed suit and "formulated infringement contentions against Medtronic's products in this case[]" before receiving discovery from Medtronic." (Reply 14).

According to Medtronic, Atlas possessed constructive knowledge of potential infringement because Medtronic's activities were "pervasive, open, and notorious." *Wanlass*, 148 F.3d at 1338. Constructive knowledge of suspected infringement "give[s] rise to a duty to investigate whether there is infringement[,]" and such knowledge may be imputed if the alleged infringer's "activities are sufficiently prevalent in the inventor's field of endeavor." *Id.* (alterations added). Medtronic states Atlas should have known of its telemetry products from information the company submitted to the FDA since 2002 and maintained on its website, including advertising its release of Telemetry C products and product manuals. (*See* Reply 14).

29

Federal Circuit Appendix
A35

Yet apart from submitting company information to the FDA and hosting a website, there is little evidence Medtronic's activities were in fact "'pervasive, open, and notorious'" in the industry to put Atlas on constructive notice.  *Wanlass*, 148 F.3d at 1338 (citing *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 (Fed. Cir. 1996) (vacating summary judgment of laches as to one of eight defendants because patentee raised a triable issue of fact as to whether it knew or should have known of infringing conduct, where defendant did not market its products until seven years before the suit but the patentee testified it did not know of the accused products until a tradeshow four year before filing suit)).

Without more information regarding the amount of publicly available information at the time and Medtronic's prevalence in the inventor's field, disputed issues of material fact remain as to when Atlas, or its predecessors-in-interest, [20] possessed constructive knowledge of Medtronic's alleged infringement.  *See A.C. Aukerman Co.*, 960 F.2d at 1039 ("If the decision on laches is made on summary judgment, there must . . . be no genuine issues of material fact, the burden of proof of an issue must be correctly allocated, and all pertinent factors must be considered." (alteration added)); *cf. Gasser Chair Co.*, 60 F.3d at 773 (reversing summary judgment of laches for multiple reasons, including trial court's improper inference against non-moving party regarding when patentee should have known of alleged infringement).

**D.  Notice and Marking**

Medtronic argues Atlas's claims are barred by the Patent-Marking Statute, 35 U.S.C. section 287(a), precluding a damages award.  (*See* Mot. 28).  Pursuant to section 287(a), a patentee may not recover damages without establishing "proof that the infringer was notified of

---

[20] "A patentee cannot avoid the consequences of his laches by transferring the patent." *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997), *abrogated in part on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998).

Federal Circuit Appendix
A36

the infringement and continued to infringe thereafter."[21]  *Id.*  Such notice is required to recover a

damages award.  *See id.*  Absent actual notice, a patentee may provide constructive notice to

other inventors by marking the number of the patent on "substantially all of its patented

products," *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993), in a

"substantially consistent and continuous" manner, *id.* at 1537.  Because "compliance with the

marking statute, 35 U.S.C. [section] 287(a), is a question of fact," resolution of the issue is

improper at summary judgment, unless "no reasonable jury could find that the patentee either has

or has not provided actual notice to the particular defendants by informing them of his patent and

of their infringement of it."  *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001)

(alteration added; citations and internal quotation marks omitted).

Atlas contends Medtronic possessed constructive knowledge of its infringement of

Atlas's Patent because Atlas and its predecessors sufficiently marked substantially all of their

products protected by the '734 Patent.  (*See* Resp. 20–22).  According to Atlas, assignee, Digital

Ocean, marked its Grouper product line, which apart from Medtronic's accused products, is "the

only product[]  known by anyone to have embodied or practiced the '734 [P]atent."  (*Id.* 20; *see*

Defs.' SMF ¶ 31; Pl.'s SMF ¶ 31 (alteration added)).

Fischer testified the Grouper product line was marked with the number of the '734

Patent.  (*See* Fischer Deposition 138:17–19).  Fischer became aware of the marking requirements

in December 1992 when the industrial design of the enclosures, the promotion materials, and the

labeling were being defined.  (*See id.* 138:22–129:2).  He met with Digital Ocean to provide the

marketing and industrial design teams information regarding the required labeling, and "verified

after we began showing the products that it either said patent pending or, once the patent was

---

[21] Atlas does not assert Medtronic had actual knowledge of infringement.  (*See* Defs.' SMF ¶ 30; Pl.'s SMF ¶ 30).

granted, had the patent number." (*Id.* 139:6–8).  Although Fischer admitted he lacked physical evidence of a marked Grouper line product, he has "every reason to believe" the Grouper product line was marked with the '734 Patent. (*Id.* 139:22–140:7).

Fischer also emphasized Digital Ocean was "very good at . . . execution on the fulfillment side.  So the probability that any one wouldn't be marked is very small.  The people who did that were some of the most competent and consistent people in the whole company." (*Id.* 140:13–18 (alteration added)).  As a basis for his belief Digital Ocean consistently marked substantially all of its products, Fischer explains the company went so far as to mark a prototype (a Manta product he has in his possession) when it was not legally required to do so. (*See id.* 142:5–15).

Medtronic asserts Fischer lacks personal knowledge all Digital Ocean products were marked. (*See* Reply 14).  The weight to be given to Fischer's testimony and whether Atlas has met its burden to show it complied with the statutory requirements of section 287(a) are issues for the trier of fact.  While Atlas has the burden of proof to demonstrate compliance at trial, to succeed on its summary judgment motion, Medtronic must establish no reasonable jury could find Atlas complied with the Patent-Marking Statute.  This is simply not the case given the evidence in the record.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Medtronic's Motion for Summary Judgment **[ECF No. 148]** is **GRANTED in part** and **DENIED in part**.  Summary judgment of non-infringement is granted in Medtronic's favor as to claims 6 and 11 and denied as to claim 21.

Federal Circuit Appendix
A38

CASE NO.  13-23309-CIV-ALTONAGA

**DONE AND ORDERED** in Chambers at Miami, Florida, this 8th day of October, 2014.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

Federal Circuit Appendix
A39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 14-21006-CIV-ALTONAGA/O'Sullivan

ATLAS IP, LLC,

      Plaintiff,

vs.

ST. JUDE MEDICAL, INC., and
ST. JUDE MEDICAL S.C., INC.,

      Defendants.

_____/

## ORDER ON CLAIM CONSTRUCTION

**THIS CAUSE** came before the Court for claim construction.  The Court has carefully considered the extensive briefing by the parties, pertinent portions of the record and authorities, and heard argument and received evidence at a *Markman*[1] hearing held on July 2, 2014 [ECF No. 67].

## I.  BACKGROUND

### A.  Procedural Background

Plaintiff, Atlas IP, LLC ("Atlas"), is the owner by assignment of United States Patent Number 5,371,734, titled "Medium access control protocol for wireless network" (the "'734 Patent") [ECF No. 32-1].  (*See* Amended Complaint . . . ("Amended Complaint") ¶ 2 [ECF No. 32]).  Atlas alleges one count of infringement of the '734 Patent.  (*See generally id.*).  On June 3, 2014, St. Jude filed an Answer and Affirmative Defenses . . . ("Answer") [ECF No. 43], denying infringement and raising several affirmative defenses, including the doctrines of estoppel and

_____

[1] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc).

laches, as well as the invalidity of the '734 Patent for failure to satisfy one or more of the requirements of 35 U.S.C. sections 102, 103, and 112. (*See* Answer 7–9).

The parties have identified multiple terms and phrases from the '734 Patent that are disputed and require claim construction. On June 9, 2014, Atlas filed a Claim Construction Brief ("Opening Brief") [ECF No. 53]. On June 23, 2014, St. Jude filed a Responsive Claim Construction Brief ("Response") [ECF No. 55]. On June 27, 2014, Atlas filed a Claim Construction Reply Brief ("Reply") [ECF No. 64]. The parties conferred and on July 1, 2014, filed a Joint Claim Construction Chart ("Joint Chart") [ECF No. 66] identifying the terms, phrases, and clauses requiring construction, and the parties' proposed constructions.

**B. Factual Background**

The '734 Patent was issued on December 6, 1994, and relates to an application filed on January 29, 1993. (*See* '734 Patent 1; Opening Br. 3). Michael A. Fischer ("Fischer") is the sole named inventor of the '734 Patent. (*See* '734 Patent). The '734 Patent expired prior to the filing of this action. (*See* Resp. 1).

The claimed invention of the '734 Patent relates to a "medium access control (MAC) protocol for wireless, preferably radio frequency (RF), LAN-type network communications among a plurality of resources, such a[s] battery powered portable computers." ('734 Patent, col. 5, ll. 10–14 (alteration added)). Within such a network, "[o]ne of the communicators functions as a hub and the remaining communicators function as remotes." (*Id.* at Abstract (alteration added)). "The hub establishes repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames," or information. (*Id.* at col. 5, ll. 44–47). "The hub transmits control information to the remotes to establish the communication cycle and to establish a plurality of predeterminable intervals during each

2

communication cycle." (*Id.* at col. 5, ll. 47–50). "The intervals allow the hub and the remotes to anticipate transmitting and receiving frames, thereby allowing the remotes to power off their receivers and transmitters to achieve a considerable savings in power consumption without degrading communications." (*Id.* at Abstract). As the Summary of the Invention of the '734 Patent explains, the invention "obtains significant reductions in battery power drain by permitting the receivers as well as the transmitters of the communicator stations to be powered off during a majority of the time, but selectively and predictably powered on to send or receive relevant communications." (*Id.* at col. 5, ll. 28–33).

In this suit, Atlas asserts claims 6, 11, 14, 21, and 44 (the "Asserted Claims") of the '734 Patent. (*See* Opening Br. 3). These claims are independent but share the following limitations:

A communicator for wirelessly transmitting frames to and receiving frames from at least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect pre-determined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the [*sic*] communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those

3

> intervals when the remote is expected to receive a frame from the hub, by
> using the information transmitted from the hub . . . .

(*Id.* 3–4 (quoting '734 Patent, claim 6)).   The Asserted Claims "are largely identical to each

other, as they share in common the same preamble and first six claim paragraphs . . . ." (Resp.

5).

## II.  LEGAL FRAMEWORK

### A.  General Principles of Claim Construction

The construction of a patent is a matter of law to be determined by the Court.  *See*

*Markman*, 52 F.3d at 970–71.  "It is a bedrock principle of patent law that the claims of a patent

define the invention to which the patentee is entitled the right to exclude."  *Aventis Pharm. Inc.*

*v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citation and internal quotation

marks omitted).  "[I]n interpreting an asserted claim, the [C]ourt should look first to the intrinsic

evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in

evidence, the prosecution history."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582

(Fed. Cir. 1996) (alterations added; citation omitted).  "Such intrinsic evidence is the most

significant source of the legally operative meaning of disputed claim language."  *Id.*

In construing patent claims, the Court first looks to the claim language because "the

claims themselves provide substantial guidance as to the meaning of particular claim terms."

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  "[W]ords of a claim are

generally given their ordinary and customary meaning," that is, "the meaning that the term would

have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the

effective filing date of the patent application."  *Id.* at 1312–13 (alteration added; citations and

internal quotation marks omitted).   The presumption that words have their ordinary and

customary meaning when used in a patent claim is rebutted when the patentee, acting as his or

her own "lexicographer," has "clearly stated in the patent specification or file history" a definition different than the term's ordinary and customary meaning. *Vitronics Corp.*, 90 F.3d at 1582 (citations omitted); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("[A]n inventor may choose to be his own lexicographer if he defines the specific terms used to describe the invention with reasonable clarity, deliberateness, and precision." (alteration added; citation and internal quotation marks omitted)).  A patentee may otherwise demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term, in the specification or prosecution history, by using expressions of "manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc.*, 299 F.3d at 1325 (citation omitted).

In addition to the claims themselves, the Court should consider "the appropriate context in which the claim term is used." *Aventis Pharm. Inc.*, 715 F.3d at 1373 (citation omitted).  So, for example, the "written description and other parts of the specification . . . may shed contextual light on the plain and ordinary meaning," but context cannot be used to "deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope." *Id.* (alteration added; citation omitted).  The specification is considered "the single best guide to the meaning of a disputed term," and "[u]sually, it is dispositive." *Vitronics Corp.*, 90 F.3d at 1582 (alteration added).  Nevertheless, the Federal Circuit has repeatedly warned against importing limitations from the specifications into the claims. *See, e.g., Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. . . . [W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as

5

Federal Circuit Appendix
A44

being limited to that embodiment." (alterations added; internal citations omitted)). "That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims." *Teleflex, Inc.*, 299 F.3d at 1326 (citation and internal quotation marks omitted).

If presented, another piece of intrinsic evidence a court may consider in claim construction is the patent's prosecution history, a record of the proceedings before the Patent and Trademark Office ("PTO"), including the prior art cited during examination of the patent. *See Phillips*, 415 F.3d at 1317. The "prosecution history provides evidence of how the PTO and the inventor understood the patent"; but because it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* (citations omitted).

A court engaging in claim construction is also authorized to rely on evidence external to the patent, including dictionaries, learned treatises, and expert and inventor testimony. *See id.* Such extrinsic evidence "can shed useful light on the relevant art" but is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (citations and internal quotation marks omitted). "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics Corp.*, 90 F.3d at 1583 (citations omitted).

**B. Indefiniteness**

The specification of a patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor

6

Federal Circuit Appendix
A45

regards as the invention." 35 U.S.C. § 112(b).[2] A "patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). The "definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters *post hoc*." *Id.* at 2130. Whether a claim is definite or indefinite is a matter of law. *See Young v. Lumenis, Inc.*, 492 F.3d 1336, 1344 (Fed. Cir. 2007). A party challenging the definiteness of a claim bears the burden to show it is invalid by clear and convincing evidence. *See id.* at 1345.

### III. CLAIM CONSTRUCTION

The parties dispute the following terms and phrases in the '734 Patent: (1) "communicator"; (2) "the hub establishing repeating communication cycles"; (3) "the hub transmitting information to the remotes to establish the communication cycle"; (4) "the hub transmitting information to the remotes to establish . . . a plurality of predeterminable intervals during each communication cycle"; (4) "the information transmitted from the hub"; (5) "the hub allocating a number of transmission opportunities during at least one communication cycle which is at least one less in number than the number of remotes in the Group"; (6) "length"; and (7) "the remotes transmitting a transfer unit having a header having at least one field containing information describing at least one frame of a previous transmission unit which was not successfully received by the hub; and the hub responding to the field information describing the frame which was successfully received by transmitting in another subsequent transfer unit those

---

[2] Cases filed before September 16, 2012, refer to 35 U.S.C. section 112(b) as 35 U.S.C. section 112, paragraph 2. Paragraph two of 35 U.S.C. section 112 was replaced with newly designated section 112(b) when section 4(c) of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, took effect. *See In re Packard*, 751 F.3d 1307, 1309 n.1 (Fed. Cir. 2014) (per curiam).

remaining frames of the previous transfer unit which were not successfully received." (Joint Chart 6–9). The Court addresses each of these terms and phrases below.

**A. "Communicator"**

The parties dispute the construction of the term "communicator" in all of the Asserted Claims. (*See* Joint Chart 6). Atlas proposes to construe communicator as "a device capable of communication." (Opening Br. 4 (internal quotation marks omitted)). Atlas asserts this construction is the "plain and ordinary meaning" of the word and is "consistent with the specification's teachings." (*Id.*). "St. Jude agrees with Atlas that a 'communicator' must be a 'device capable of communication.'" (Resp. 18). St. Jude does not contest Atlas's formulation of the "plain and ordinary meaning" of "communicator." (*See generally id.*). However, St. Jude argues Atlas's construction is "overly broad and unhelpful to the jury" because "a jury might be led to believe that a device incapable of assuming the function of *either* hub or remote (under the control of the MAC protocol) can be a 'communicator.'" (*Id.* 19–20 (emphasis in original)). St. Jude proposes to construe communicator as a "wireless network node that the medium access control protocol can assign as either hub or remote." (Joint Chart 6).

The words of a patent claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history. *See Phillips*, 415 F.3d at 1314. A "patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012). To redefine a term, a patentee must "clearly set forth a definition of the disputed claim term" other than its plain and ordinary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citations omitted). "It is

8

not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments[;] the patentee must clearly express an intent to redefine the term." *Thorner*, 669 F.3d at 1365 (alteration added; citations and internal quotation marks omitted). A patentee may also limit the scope of a term's meaning by disavowal. *See id.* "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent . . . ." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). However, "claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Innova/Pure Water, Inc., v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) (citations and internal quotation marks omitted).

Atlas argues because the "specification of the '734 [P]atent contains no specialized definition of this term," communicator's ordinary and plain meaning should prevail. (Opening Br. 4 (alteration added)). The '734 Patent does specify that the remotes and the hub belong to the same Group and share certain characteristics. For example, the '734 Patent states "[e]ach communicator includes a transmitter and a receiver." ('734 Patent, col. 5, ll. 38–39 (alteration added)). The '734 Patent specifies the "communication occurs among members of a Group of communicators. One of the communicators of the Group is designated as a 'hub' and the remaining communicators are designated as 'remotes.'" (*Id.* at col. 5, ll. 39–44). These specifications do not, however, amount to a redefinition of communicator or a disavowal of the full scope of communicator's meaning, as St. Jude contends (*see* Resp. 18–20), because the patent does not use "words or expressions of manifest exclusion or restriction," *Innova/Pure Water, Inc.*, 381 F.3d at 1117, to limit "communicator" to a wireless network node capable of

9

assuming the role of either a hub or remote.  (*See generally* '734 Patent).

St. Jude contends Atlas's construction is "unhelpful to the jury."  (Resp. 18).  St. Jude, however, cites no authority to support the assertion that a particular construction should defeat the ordinary and customary meaning of a term simply because of its helpfulness to the jury.  (*See generally id.*).  The '734 Patent's specification does not "clearly express intent to redefine" communicator or make clear the term does not include devices that are incapable of assuming the function of either hub or remote.  *Thorner*, 669 F.3d at 1365; *see also SciMed Life Sys., Inc.*, 242 F.3d at 1341.  Thus, communicator's customary and ordinary meaning controls, and the Court construes "communicator" to mean "a device capable of communication."

### B.  "The Hub Establishing Repeating Communication Cycles"

Atlas proposes the construction of this limitation as "the hub [as defined] initiating more than one communication cycle [as defined]."  (Opening Br. 8 (alterations in original)).[3]  Atlas contends the specification imparts no special meaning on "establishing," and thus the word should follow its plain meaning, which Atlas asserts is initiating.  (*Id.*).  Atlas further maintains, "Nothing in these limitations requires that the hub *define* anything about a communication cycle."  (Reply 2 (emphasis in original)).

St. Jude proposes to construe this limitation as "the hub defining in advance the starting time and duration for each repeating communication cycle."  (Joint Chart 6).  According to St. Jude, "the hub must not merely *initiate* the communication cycle, as Atlas contends, but rather must *define the start time and duration* of the cycle . . . ."  (Resp. 8 (emphasis in original)).  St. Jude argues this construction is more faithful to the '734 Patent's description of the "present

---

[3] Although the definition of "hub" was initially disputed (*see* Resp. 20), the parties now agree the proper construction is "communicator that has been designated by the medium access control protocol to control communication to and from the remotes" (Joint Chart 6).  Likewise, the parties agree "communication cycle" should be construed as "a series of intervals for outbound and inbound communications."  (*Id.*).

invention" and accords with other "critical parts of the specification." (*Id.* 9).

Claims must "be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (citation and internal quotation marks omitted). The "descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based on the description. The specification is, thus, the primary basis for construing the claims." *Id.* (citation and internal quotation marks omitted). The "patent specification" is the portion of the patent in which the "applicant describes the invention." *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004). In this patent, the specification is contained in part in the "Summary of the Invention," which states, "The hub establishes repeating communication cycles, each of which has intervals during which the hub and the remotes transmit frames." ('734 Patent, col. 5, ll. 44–47). The Summary of the Invention continues, "Due to the *defined intervals* of the communication cycle and the information conveyed by the hub, the remotes are able to power off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub." (*Id.* at col. 5, ll. 54–58 (emphasis added)).

The specification explains a hub does more than just initiate the intervals. The hub must also convey information about the starting time and duration of each repeating communication cycle — must, that is, "define[] intervals of the communication cycle." (*Id.* at col. 5, ll. 54–55 (alteration added)). In order for remotes to power down at appropriate times — a key innovation of the '734 Patent — they must have received defined intervals in advance from the hub. Furthermore, the '734 Patent specifies the hub designates the start and end times of the communication intervals: "All intervals of the communication cycle **70** take place within the limits of predesignated assigned times established by the hub." (*Id.* at col. 13, ll. 12–14). Atlas's

11

proposed construction of "establishing" as "initiating" is therefore under-inclusive, because "predesignated assigned times" cannot be "initiated by the hub." Atlas's construction would not account for this later use of the phrase "established by the hub."

Atlas argues the limitations do not require the hub to define anything about a communication cycle, but the MAC protocol controls "each communicator of the Group to effect predetermined functions" (Reply 2 (citation omitted)), meaning "the MAC protocol (rather than the hub) constrains the communications between a hub and remotes, and the hub merely transmits the communication information to the remotes" (*id.* 3). However, the excerpts Atlas cites in its Reply do not indicate a "MAC protocol" is defining the communication cycle. For instance, the '734 Patent indicates "the hub **64** controls the communications to and from the remotes, using a MAC protocol . . . . The foundation for this MAC protocol is allocation of media access for transmission . . . ." ('734 Patent, col. 11, ll. 28–32 (alterations added)). This merely indicates the hub itself uses a MAC protocol as a component of its overarching function, not that the MAC protocol is, independently, defining anything about a communication cycle.

St. Jude's proposed construction more consistently interprets the meaning of "establishing" in "the appropriate context in which the claim term is used." *Aventis Pharm. Inc.*, 715 F.3d at 1373 (citation omitted). The Court construes "the hub establishing repeating communication cycles" to mean "the hub defining in advance the starting time and duration for each repeating communication cycle."

### C. "The Hub Transmitting Information to the Remotes to Establish the Communication Cycle"

Atlas proposes to construe this term as "[t]he hub [as defined] transmitting information to the remotes to initiate the communication cycle." (Joint Chart 6 (first alteration added)). St. Jude's proposed construction is "the hub transmitting to the remotes information necessary to

know in advance the starting time and duration of the communication cycle." (*Id.*).  St. Jude argues transmitting only information necessary to initiate the communication cycle "would not provide the remotes with enough knowledge to be able to power off their transmitters and receivers when the appropriate communication periods end . . . ." (Resp. 12).

Consistent with the Court's construction in Part 3.B, *supra*, the hub, by "establishing repeating communication cycles," defines in advance the starting time and duration for each repeating communication cycle.  As a result, the hub must transmit to the remotes the information necessary to know these starting times and durations.  Furthermore, the '734 Patent explicitly states, "Due to the defined intervals of the communication cycle and the information conveyed by the hub, the remotes are able to power off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub." ('734 Patent, col. 5, ll. 54–58).  The "information" the hub conveys must provide remotes the ability to know in advance when the communication cycle starts and its duration.  Accordingly, the Court construes "the hub transmitting information to the remotes to establish the communication cycle" to mean "the hub transmitting to the remotes information necessary to know in advance the starting time and duration of the communication cycle."

**D. "The Hub Transmitting Information to the Remotes to Establish . . . a Plurality of Predeterminable Intervals During Each Communication Cycle"**

Atlas argues this limitation is incomplete and should be construed together with the term in Part 3.C, *supra*. (*See* Joint Chart 7).  Atlas claims the limitation to be construed is "the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals" and proposes the Court construe this limitation to mean "the hub transmitting information to the remotes to initiate the communication cycle, such cycle including a plurality of predeterminable [as defined] intervals." (*Id.* (alteration in original)).  St. Jude

13

proposes to construe this limitation as "the hub transmitting to the remotes information necessary to know in advance the starting time and duration of . . . two or more predeterminable intervals during each communication cycle." (*Id.* (alteration in original)).

Pursuant to the Court's constructions in Parts 3.B and 3.C, *supra*, the hub defines in advance the starting time and duration for each repeating communication and transmits to the remotes the information necessary to know these starting times and durations. Each communication cycle has "intervals during which the hub and the remotes transmit and receive frames." ('734 Patent, col. 46 ll. 30–31; *see also id.* at Figure 3). Both parties agree such a communication cycle contains multiple intervals. (*See* Opening Br. 9 ("'such cycle including a plurality of predeterminable intervals'"); Resp. 11 ("two or more predeterminable intervals during each communication cycle")). Accordingly, the Court construes "the hub transmitting information to the remotes to establish . . . a plurality of predeterminable intervals during each communication cycle" to mean "the hub transmitting to the remotes information necessary to know in advance the starting time and duration of each of . . . two or more predeterminable intervals during each communication cycle."

E.   **"The Information Transmitted from the Hub"**

This phrase appears in later paragraphs of claim 6 of the patent. (*See* '734 Patent, col. 46, ll. 41–49). Atlas asserts this limitation needs no construction. (Joint Chart 7). It contends the words "information" and "transmitted" "are plain English terms that require no separate construction." (Opening Br. 10). St. Jude argues this "term is a reference back to the 'information' recited in an earlier limitation," specifically the constructions of "the hub transmitting information to the remotes to establish the communication cycle" and "the hub transmitting information to the remotes to establish . . . a plurality of predeterminable intervals

14

during each communication cycle." (Joint Chart 7). St. Jude asserts "the remotes must use the information transmitted by the hub to the remotes . . . to power down the remotes' wireless transmitters and receivers . . . ." (Resp. 16). St. Jude contends its proposed construction is correct because the word "the" before "information" indicates "information" refers back to a previous use of the same word and because the named inventor agrees "information" refers back to the use of the word in the previous use. (*See id.* 16–17).

St. Jude maintains using "the" before "information" triggers a requirement that "information" refer back to an antecedent use of the same word. (Resp. 16). An antecedent basis must be reasonably ascertainable by those skilled in the art. *See Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (holding "anode gel" provided by implication the antecedent basis for "zinc anode"). While an "antecedent basis" argument is typically made when a party argues a claim is indefinite, *see, e.g., Konami Corp. v. Roxor Games, Inc.*, 445 F. Supp. 2d 725, 737 (E.D. Tex. 2006), it is uncontroversial that a term may reference a previously used instance of the same term. St. Jude also asserts its construction "is consistent with the claimed invention as described in the specification . . . ." (Resp. 16).

In the Asserted Claims, the only earlier instance of the word "information" occurs in the phrase "the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals." (Joint Chart 2–5). In Claim 6, this phrase is the first reference to "information," which appears without the word "the" before it. (*See* '734 Patent, col. 46, ll. 16–58). Logically, "the information" refers to this first use of "information," which the Court has construed to be "information necessary to know in advance the starting time and duration of the communication cycle" in Part 3.C, *supra*. St. Jude's construction harmonizes the patent applicant's decision to initially write "information" and only later write "the

15

information" in claim 6.

This conclusion is buttressed by extrinsic evidence.  A court engaging in claim construction may rely on evidence external to the patent, such as inventor testimony.  *See Phillips*, 415 F.3d at 1317.  Admittedly, in situations where analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term, "it is improper to rely on extrinsic evidence." *Vitronics Corp.*, 90 F.3d at 1583 (citations omitted).  Inventor testimony cannot "contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324 (citations omitted).  But this is a case where the Court may consider extrinsic evidence because it is not beyond dispute "the information" necessarily refers back to "information" in a previous portion of the claim and the testimony does not contradict the specification.

Testimony of the sole inventor, Fischer, corroborates St. Jude's proposed construction. The relevant claim paragraphs read, "the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub" and "the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub." ('734 Patent, col. 46, ll. 41–49).  The following exchange took place during Fischer's deposition:

> Q. And because of the information that is sent by the hub to the remotes in advance, the remotes also know when their receivers need to be powered on so that they can be ready to have a communications exchange with the hub?
>
> A: Well, certainly so that they can receive something.  I don't know about — exchange implies a turn around to transmit.  I don't know that it implies exchange, but certainly it implies the ability to receive.  That portion I would agree with.
>
> Q. Yes.  And that's actually the subject of the next sentence in your Summary of

the Invention, right, at column 5, lines 58, and I'll read that into the record.

A. Yes.

Q. "In addition, and very significantly, the remotes are able to power off their receivers during times other than those intervals when the remote is expected to receive frames from a hub."

A. Yes.

(Videotaped Deposition of Michael Fischer, June 4, 2014 60:3–23 [ECF No. 55-1]).

Fischer's testimony adds further support to St. Jude's proposed construction, as Fischer confirms that the information transmitted "by the hub" in advance is the information the "receivers need to be powered on." (*Id.*) This is the same information the Court has construed in prior limitations, *supra*. Accordingly, the Court construes "the information transmitted from the hub" as a reference back to the "information" recited in the earlier constructions of "the hub transmitting information to the remotes to establish the communication cycle," and "the hub transmitting information to the remotes to establish . . . a plurality of predeterminable intervals during each communication cycle."

### F.  "The Hub Allocating a Number of Transmission Opportunities During at Least One Communication Cycle Which Is at Least One Less in Number than the Number of Remotes in the Group"

Atlas's proposed construction is "[t]he hub allocating a number M of transmission opportunities during one or more communication cycles with $M \geq (N-1)$, where N is the number of remotes in the group." (Joint Chart 8 (alteration added)). Atlas asserts this construction is the only proposed construction that accounts for a situation in which there is only one remote. (*See* Opening Br. 11 ("[I]f the subject language means 'one remote less or greater,' then, in the case of a single remote in the Group, the transmission opportunities would be zero or more, *e.g.*, one . . . ." (alteration added))). Atlas argues St. Jude's proposed construction is "nonsensical" and

17

cannot be correct because in the case of one remote, the number of transmission opportunities would be at least one less than one, that is, zero or fewer. (*Id.* 10).

According to St. Jude, this term is indefinite. (*See* Joint Chart 8). St. Jude contends it is unclear whether "at least" modifies the word "less" or "at least" modifies the entire phrase "one less in number." (*See* Resp. 22). St. Jude also proposes an alternative construction, should the Court find the term is not indefinite: that this term be construed as "the hub allocating a number of transmission opportunities during at least one communication cycle that is fewer than the number of remotes in the Group." (Joint Chart 8). St. Jude asserts this alternate construction better accords with the '734 Patent's goal to avoid collisions by allowing the hub to "allocate transmission opportunities in response to requests from the remotes themselves" because "during a communication cycle, one or more remotes may not be allocated a transmission opportunity." (Resp. 23 (citations omitted)).

A patent's claims, "viewed in light of the specification and prosecution history," must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc.*, 134 S. Ct. at 2129. "The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Id.* Clear and convincing evidence, therefore, is required to establish indefiniteness. *See Florida Atl. Univ. Research Corp. v. Acer, Inc.*, Nos. 12–80694–CIV, 12–80697–CIV, 12–80701–CIV, 2014 WL 2960968, at *5 (S.D. Fla. June 30, 2014).

If "at least" modifies the word "less," "the phrase contemplates values that are 'at least one less than,' or fewer than, some number.'" (Resp. 22). For example (assuming ten remotes), where "at least" modifies "less," "at least one less than ten remotes" means "ten minus a number that is one or greater," and yields nine or fewer transmission opportunities. In contrast, if "at

18

Federal Circuit Appendix
A57

least" modifies the entire phrase "one less in number," "the phrase contemplates values that are 'at least,' or greater than or equal to, some number.'" (*Id.*). For example, where "at least" modifies "one less than ten," "at least one less than ten remotes" means "a number greater than or equal to ten minus one," and yields nine or greater transmission opportunities. The uncertainty in whether "at least" modifies the word "one" or the entire phrase "one less in number" is unreasonable because it leads to two conflicting interpretations. This constitutes clear and convincing evidence the term is not "precise enough to afford clear notice of what is claimed" and is, thus, invalid for indefiniteness. *Nautilus, Inc.* 134 S. Ct. at 2129 (citations omitted).

Neither Atlas's nor St. Jude's proposed constructions can control the term's construction because neither is more or less faithful to the language of the '734 Patent than the other. *See Phillips*, 415 F.3d at 1314 (holding the language of the patent is the primary guide for the construction of its terms). Atlas asserts its proposed construction is superior because it provides for the situation in which there is only one remote. (*See* Opening Br. 11). Assuming this assertion is true, the '734 Patent never explicitly discusses such a situation. (*See generally* '734 Patent). St. Jude claims its proposed alternative construction allows for a situation in which one or more remotes do not receive a transmission opportunity. (*See* Resp. 23). The '734 Patent does not require each remote to receive a transmission opportunity nor does it require "at least one" remote not to receive a transmission opportunity. (*See generally* '734 Patent). Because the language of the '734 Patent does not mandate either interpretation, the term is indefinite.

Accordingly, the Court does not construe the term "the hub allocating a number of transmission opportunities during at least one communication cycle which is at least one less in number than the number of remotes in the Group" because it is indefinite.

19

### G.   "Length"

Atlas proposes to construe "length" as "[t]he distance or duration from one point to another."   (Joint Chart 8 (alteration added)).   Atlas contends its definition better fits the "common definition" of length and better accords with the specification of the '734 Patent, which "provides a variety of examples of 'length,'" not limited to time.   (Opening Br. 11; *see also* Reply 6–7).

St. Jude proposes to construe "length" as "time duration."   (Joint Chart 8).   St. Jude agrees the plain meaning of length includes a measure of distance but argues this meaning is too broad in light of the "technical context of the word as it is used in the '734 [P]atent's claims and specification."   (Resp. 21 (alteration added)).   St. Jude asserts claim 14, "the only asserted claim in which the term 'length' appears," only refers to length in the context of the communication cycle and "the patent expressly and exclusively measures the communication cycle in *time* . . . ." (*Id.* 21–22 (emphasis in original)).   St. Jude says it is conceivable a message measured in data bytes can have a "length" but argues "it would be nonsense to think of such a message as being measured 'the distance . . . from one point to another' as Atlas proposes."   (*Id.* 22 n.6 (alteration in original)).

A patentee using a broad term "obtain[s] the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope." *Thorner*, 669 F.3d at 1367 (alteration added).   A patentee may disavow the full scope of a term's plain and ordinary meaning "[w]here the specification makes clear that the invention does not include a particular feature . . . even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc.*, 242 F.3d at 1341 (alterations added).   Furthermore, claims must "be read in view of the

20

specification, of which they are a part" because the "specification is always highly relevant to the claim construction analysis." *Phillips*, 415 F.3d at 1315 (citations and internal quotation marks omitted).

Neither party disputes claim 14 of the '734 Patent uses length in reference to time duration. (*See* Opening Br. 11; Reply 6–7; Resp. 21). The '734 Patent itself also refers to the communication cycles and intervals as durations of time: "The [transmission opportunity] is an amount of time . . . ." ('734 Patent, col. 12, ll. 21–22 (alteration added)). "All intervals of the communication cycle **70** take place within the limits of predesignated assigned times . . . . Each interval is measured in terms of a number of basic time increments . . . ." (*Id.* at col. 13, ll. 12–15 (alteration added)).

St. Jude asserts because claim 14 only refers to length in the context of a communication cycle and the patent only measures the communication cycle in time, length can only refer to time. (*See* Resp. 21–22). It is true the length of the communication cycles' intervals are measured in units of time. (*See* '734 Patent, col. 13, ll. 12–15). The specification, however, refers several times to other interpretations of length. For instance, the specification notes a preamble can have a "length" (*id.* at col. 19 ll. 54–55), and the preamble is "a predetermined sequence of binary values which are used by receiving communicators **60** to acquire and synchronize to the incoming transmission" (*id.* at col. 19, ll. 43–46). The specification notes the existence of the "length of the body field," and "the maximum body length is defined by the maximum number of bytes . . . ." (*Id.* at col. 24, ll. 33–48 (alterations added)). These examples indicate "length" includes values more properly measured as distances from one point to another, as Atlas contends. St. Jude incorrectly narrows its analysis to claim 14 language alone. Claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315

21

(citation and internal quotation marks omitted).  Because the specification refers to time in terms of duration and distance, Atlas's construction is more faithful to the language of the '734 Patent. Accordingly, the Court construes "length" to mean "the distance or duration from one point to another."

### H.   "The Remotes Transmitting a Transfer Unit Having a Header Having at Least One Field Containing Information Describing at Least One Frame of a Previous Transmission Unit Which Was Not Successfully Received by the Hub; and the Hub Responding to the Field Information Describing the Frame Which Was Successfully Received by Transmitting in Another Subsequent Transfer Unit Those Remaining Frames of the Previous Transfer Unit Which Were Not Successfully Received"

Atlas proposes to construe this term as "[t]he remotes transmitting a message to the hub [as defined] with a part of the message having information describing one or more frames transmitted by the hub that the remotes had not successfully received, and the hub [as defined] responding to such information by retransmitting the described frames that the remotes had not successfully received."  (Joint Chart 9 (first alteration added)).  Atlas asserts the language in the claim "received by the hub" is "an obvious typographical error" and the "claim should read 'received by the remotes.'"  (*Id.*).  As written, the claim requires the remotes to transmit a transfer unit describing a previous unit the *hub* did not successfully receive, which Atlas points out would have "the remotes being aware of which frames had been received by the hub." (Opening Br. 12).

St. Jude argues this term is indefinite (*see* Joint Chart 9) and is "wholly nonsensical" (Resp. 24).  St. Jude further argues the correction Atlas seeks of what it terms a typographical error is, in fact, a "radical redrafting" in an attempt to avoid invalidity for indefiniteness.  (*Id.* 25). St. Jude claims Atlas is attempting "to re-draft the limitation to the exact *opposite* of what is written" and Atlas's proposed construction is inconsistent with the rest of the specification.  (*Id.*

22

24 (emphasis in original)).

The Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011) (citations and internal quotation marks omitted). Yet "[w]hen a harmless error in a patent is not subject to reasonable debate, it can be corrected by the court, as for other legal documents." *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005) (alteration added; citation omitted). Correcting clerical error due to oversight is not "a re-making of the claim[] but is merely giving to it the meaning which was intended by the applicant and understood by the examiner." *I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 442 (1926).

Both parties agree this term as written contains errors which render the term incongruent with the rest of the '734 Patent. (*See* Opening Br. 12; Resp. 24). The parties disagree whether these errors are harmless and not subject to reasonable debate, or are instead significant and eliminating them would amount to a redrafting of the '734 Patent. (*See* Opening Br. 12; Resp. 24). Here, changing "received by the hub" to "received by the remotes" changes the direction of the flow of information from inbound to outbound communication, fundamentally altering the meaning of the phrase. Atlas's proposed change is not the correction of an "obvious typographical error" because the "correction" substantially impacts the understanding of the claim. Even assuming this change would save the term from indefiniteness, the Court cannot grant a change merely to sustain its validity. *See Rembrandt Data Techs., LP*, 641 F.3d at 1339. Accordingly, because the term is invalid for indefiniteness, the Court does not construe it.

Federal Circuit Appendix
A62

## IV. CONCLUSION

It is **ORDERED AND ADJUDGED** that the claims, terms, and phrases of the patent at issue are construed as set forth above.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 30th day of July, 2014.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

24

APPEAL,CLOSED,JJO,PATENT,REF_DISCOV

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:13-cv-23309-CMA

Atlas IP, LLC v. Medtronic, Inc., et al             Date Filed: 09/12/2013
Assigned to: Judge Cecilia M. Altonaga          Date Terminated: 10/17/2014
Referred to: Magistrate Judge John J. O'Sullivan   Jury Demand: Defendant
Cause: 35:0271 Patent Infringement              Nature of Suit: 830 Patent
                                                Jurisdiction: Federal Question

**Plaintiff**

**Atlas IP, LLC**                    represented by   **George C. Summerfield**
*a Florida Limited*                                  Stadheim & Grear
                                                     400 North Michigan Avenue
                                                     Suite 2200
                                                     Chicago, IL 60611
                                                     Email:
                                                     summerfield@stadheimgrear.com
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Kyle L. Harvey**
                                                     Stadheim & Grear
                                                     400 North Michigan Avenue
                                                     Suite 2200
                                                     Chicago, IL 60611
                                                     Email: harvey@stadheimgrear.com
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Robert Spalding**
                                                     Stadheim & Grear, Ltd
                                                     400 N. Michigan Avenue
                                                     Floor 22
                                                     Chicago, IL 60611
                                                     312-755-4400
                                                     Email: spalding@stadheimgrear.com
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Rolf O. Stadheim**
                                                     Stadheim & Grear

Federal Circuit Appendix
A64

400 North Michigan Avenue
Suite 2200
Chicago, IL 60611
Email: stadheim@stadheimgrear.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Curtis David Carlson**
Carlson & Lewittes PA
1 SE Third Avenue
Suite 1200
Miami, FL 33131
305-372-9700
Fax: 372-8265
Email: carlson@carlson-law.net
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Medtronic, Inc.**                    represented by    **Akshay S. Deoras**
Kirkland & Ellis, LLP
601 Lexington Avenu
New York, NY 10022-4611
212-446-4800
Email: akshay.deoras@kirkland.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Beatrice Hahn**
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY 10022-4611
212-446-4900
Email: beatrice.hahn@kirkland.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeanne M. Heffernan**
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY 10022-4611
212-446-4800
Email: jheffernan@kirkland.com
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Lauren B. Sabol**
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY 10022-4611
212-446-4800
Email: lauren.sabol@kirkland.com
*TERMINATED: 03/27/2014*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Luke L. Dauchot**
Kirkland & Ellis, LLP
333 South Hope Street
Los Angeles, CA 90071
213-680-8400
Fax: 213-680-8500
Email: luke.dauchot@kirkland.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Kane**
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY 10022
212-446-4800
Email: ryan.kane@kirkland.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharre Lotfollahi**
Kirkland & Ellis, LLP
333 South Hope Street
Los Angeles, CA 90071
213-680-8400
Email: sharre.lotfollahi@kirkland.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janet T. Munn**
Rasco Klock Perez Nieto, P.L.
2555 Ponce de Leon Blvd, Suite 600
Coral Gables, FL 33134
305-476-7101

Fax: 305-476-7102
Email: jmunn@rascoklock.com
*ATTORNEY TO BE NOTICED*

**Philip A. Allen , III**
Garbett Stiphany Allen & Roza
80 SW 8th Street
Suite 3100
Miami, FL 33130
305-810-2790
Fax: 579-4722
Email: pallen@gsarlaw.com
*TERMINATED: 11/15/2013*

**Defendant**

**Medtronic USA, Inc.**                 represented by  **Akshay S. Deoras**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Beatrice Hahn**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeanne M. Heffernan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren B. Sabol**
(See above for address)
*TERMINATED: 03/27/2014*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Luke L. Dauchot**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Kane**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharre Lotfollahi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janet T. Munn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip A. Allen , III**
(See above for address)
*TERMINATED: 11/15/2013*

**Defendant**

**Medtronic Minimed, Inc.**                    represented by    **Akshay S. Deoras**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Beatrice Hahn**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeanne M. Heffernan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren B. Sabol**
(See above for address)
*TERMINATED: 03/27/2014*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Luke L. Dauchot**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Kane**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharre Lotfollahi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janet T. Munn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip A. Allen , III**
(See above for address)
*TERMINATED: 11/15/2013*

**Defendant**

**St. Jude Medical, Inc.**                    represented by    **Ellen Lin**
*TERMINATED: 03/18/2014*                                       Gibson Dunn & Crutcher LLP
                                                               333 S Grand Avenue
                                                               Los Angeles, CA 90071-3197
                                                               213-229-7000
                                                               Email: elin@gibsondunn.com
                                                               *LEAD ATTORNEY*
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **H. Mark Lyon**
                                                               Gibson Dunn & Crutcher LLP
                                                               1881 Page Mill Road
                                                               Palo Alto, CA 94304-1211
                                                               650-849-5300
                                                               Email: mlyon@gibsondunn.com
                                                               *LEAD ATTORNEY*
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Neema Jalali**
                                                               Gibson Dunn & Crutcher LLP
                                                               555 Mission Street
                                                               Suite 3000
                                                               San Francisco, CA 94105-0921
                                                               415-393-8200
                                                               Email: njalali@gibsondunn.com
                                                               *LEAD ATTORNEY*

Federal Circuit Appendix
A69

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Guerra**
Feldman Gale
One Biscayne Tower, 30th Floor
2 S. Biscayne Blvd.
Miami, FL 33131
305-358-5001
Fax: 305-358-3309
Email: rguerra@feldmangale.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wayne M. Barsky**
Gibson Dunn & Crutcher LLP
2029 Century Park East
Los Angeles, CA 90067-3026
310-552-8500
Email: wbarsky@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Anthony Gale**
Feldman Gale PA
One Biscayne Tower 30th Floor
2 S Biscayne Boulevard
Miami, FL 33131
305-358-5001
Fax: 358-3309
Email: jgale@feldmangale.com
*ATTORNEY TO BE NOTICED*

**Rafael A. Perez-Pineiro**
Feldman Gale P.A.
One Biscayne Tower, 30th Floor
2 South Biscayne Boulevard
Miami, FL 33131-4332
305-358-5001
Fax: 305-358-3309
Email: rperez@feldmangale.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**St. Jude Medical S.C., Inc.**         represented by **Ellen Lin**
*TERMINATED: 03/18/2014*                (See above for address)
                                        *LEAD ATTORNEY*
                                        *PRO HAC VICE*

Federal Circuit Appendix
A70

*ATTORNEY TO BE NOTICED*

**H. Mark Lyon**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neema Jalali**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Guerra**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wayne M. Barsky**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Anthony Gale**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rafael A. Perez-Pineiro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Atlas IP, LLC**    represented by **George C. Summerfield**
One S.E. Third Avenue          (See above for address)
Suite 1200              *LEAD ATTORNEY*
Miami, FL 33131          *PRO HAC VICE*
                   *ATTORNEY TO BE NOTICED*

                   **Kyle L. Harvey**
                   (See above for address)
                   *LEAD ATTORNEY*
                   *PRO HAC VICE*
                   *ATTORNEY TO BE NOTICED*

                   **Robert Spalding**
                   (See above for address)
                   *LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rolf O. Stadheim**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Curtis David Carlson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Medtronic Minimed, Inc.**            represented by   **Akshay S. Deoras**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Beatrice Hahn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeanne M. Heffernan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren B. Sabol**
(See above for address)
*TERMINATED: 03/27/2014*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Luke L. Dauchot**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Kane**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharre Lotfollahi**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janet T. Munn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip A. Allen , III**
(See above for address)
*TERMINATED: 11/15/2013*

**Counter Claimant**

**Medtronic USA, Inc.**                    represented by    **Akshay S. Deoras**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Beatrice Hahn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeanne M. Heffernan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren B. Sabol**
(See above for address)
*TERMINATED: 03/27/2014*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Luke L. Dauchot**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Kane**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharre Lotfollahi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janet T. Munn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip A. Allen , III**
(See above for address)
*TERMINATED: 11/15/2013*

**Counter Claimant**

**Medtronic, Inc.**                    represented by    **Akshay S. Deoras**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Beatrice Hahn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeanne M. Heffernan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren B. Sabol**
(See above for address)
*TERMINATED: 03/27/2014*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Luke L. Dauchot**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Kane**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharre Lotfollahi**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janet T. Munn**

Federal Circuit Appendix
A74

(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip A. Allen , III**
(See above for address)
*TERMINATED: 11/15/2013*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/12/2013 | 1 | COMPLAINT against Atlas IP, LLC. Filing fees $ 400.00 receipt number 113C-6054357, filed by Atlas IP, LLC. (Attachments: # 1 Exhibit A)(Carlson, Curtis) (Entered: 09/12/2013) |
| 09/12/2013 | 2 | Judge Assignment to Judge Cecilia M. Altonaga (jc) (Entered: 09/12/2013) |
| 09/12/2013 | 3 | Clerks Notice to Filer re: Electronic Case. No Civil Cover Sheet. Filer is instructed to file a Notice (Other) with the Civil Cover Sheet attached within 24 hours of the notice. (jc) (Entered: 09/12/2013) |
| 09/13/2013 | 4 | NOTICE by Atlas IP, LLC re 1 Complaint, 3 Clerks Notice to Filer re: Electronic Case *13-23309* (Carlson, Curtis) (Entered: 09/13/2013) |
| 09/13/2013 | 5 | NOTICE of Filing Proposed Summons(es) by Atlas IP, LLC re 1 Complaint filed by Atlas IP, LLC (Attachments: # 1 Summon(s) Medtronic, Inc., # 2 Summon(s) Medtronic Minimed, Inc., # 3 Summon(s) Medtronic USA, Inc., # 4 Summon(s) St.Jude Medical, Inc., # 5 Summon(s) St.Jude Medical S.C. Inc.) (Carlson, Curtis) (Entered: 09/13/2013) |
| 09/13/2013 | 6 | Summons Issued as to Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc., St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. (lbc) (Entered: 09/13/2013) |
| 10/02/2013 | 7 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Neema Jalali. Filing Fee $ 75. Receipt # 66569. (cw) (Entered: 10/04/2013) |
| 10/02/2013 | 8 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Ellen Lin. Filing Fee $ 75. Receipt # 66571. (cw) (Entered: 10/04/2013) |
| 10/02/2013 | 9 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for H. Mark Lyon. Filing Fee $ 75. Receipt # 66570. (cw) (Entered: 10/04/2013) |
| 10/02/2013 | 10 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Wayne M. Barsky. Filing Fee $ 75. Receipt # 66572. (cw) (Entered: 10/04/2013) |
| 10/04/2013 | 11 | ORDER denying without prejudice 10 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Wayne M. Barsky may re-file this motion clarifying his status in the Bars of the District of Columbia, U.S. District Court for the District of Columbia, U.S. District Court for the Northern District of |

Federal Circuit Appendix
A75

| | | |
|---|---|---|
| | | California, and U.S. District Court for the Eastern District of Missouri. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 10/04/2013) |
| 10/04/2013 | 12 | ORDER denying without prejudice 9 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing of Attorney H. Mark Lyon Notice of Termination delivered by US Mail to H. Lyon. Mr. Lyon may re-file this motion upon clarifying his status before the Bar of the U.S. Court of Appeals for the District of Columbia Circuit. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 10/04/2013) |
| 10/04/2013 | 13 | ORDER granting 7 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 10/04/2013) |
| 10/04/2013 | 14 | ORDER granting 8 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 10/04/2013) |
| 10/04/2013 | | Attorney Wayne M. Barsky terminated. Notice of Termination delivered by US Mail to Wayne Barsky. (cw) (Entered: 10/07/2013) |
| 10/07/2013 | 15 | NOTICE of Attorney Appearance by James Anthony Gale on behalf of St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. Attorney James Anthony Gale added to party St. Jude Medical S.C., Inc.(pty:dft), Attorney James Anthony Gale added to party St. Jude Medical, Inc.(pty:dft). (Gale, James) (Entered: 10/07/2013) |
| 10/07/2013 | 16 | NOTICE of Attorney Appearance by Rafael A. Perez-Pineiro on behalf of St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. Attorney Rafael A. Perez-Pineiro added to party St. Jude Medical S.C., Inc.(pty:dft), Attorney Rafael A. Perez-Pineiro added to party St. Jude Medical, Inc.(pty:dft). (Perez-Pineiro, Rafael) (Entered: 10/07/2013) |
| 10/08/2013 | 17 | Order Requiring Joint Scheduling Report and Certificates of Interested Parties by 10/29/2013. Signed by Judge Cecilia M. Altonaga on 10/7/2013. (ps1) (Entered: 10/08/2013) |
| 10/08/2013 | | Attorney Wayne M. Barsky representing St. Jude Medical, Inc. (Defendant) Activated. (ksa) (Entered: 10/09/2013) |
| 10/08/2013 | 18 | Renewed MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Wayne M. Barsky. (ksa) (Entered: 10/09/2013) |
| 10/09/2013 | 19 | ORDER granting 18 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 10/09/2013) |
| 10/10/2013 | 20 | ORDER requiring service to be perfected by 1/10/2014. Signed by Judge Cecilia M. Altonaga on 10/9/2013. (ps1) (Entered: 10/10/2013) |
| 10/10/2013 | 21 | Unopposed MOTION for Extension of Time to File Response/Reply as to 1 Complaint by St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. (Attachments: # 1 Text of Proposed Order)(Guerra, Richard) (Entered: 10/10/2013) |

Federal Circuit Appendix
A76

| 10/10/2013 | | Attorney H. Mark Lyon representing St. Jude Medical, Inc. (Defendant) Activated. (ksa) (Entered: 10/11/2013) |
|---|---|---|
| 10/10/2013 | 23 | Renewed MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for H. Mark Lyon. Filing Fee $ 75.00. Receipt # 66570. (ksa) (Entered: 10/11/2013) |
| 10/11/2013 | 22 | ORDER granting 21 Motion for Extension of Time to File a Response to the Complaint; Defendants St. Jude Medical, Inc. and St. Jude Medical S.C., Inc. have until 11/14/13. Signed by Judge Cecilia M. Altonaga on 10/11/2013. (ps1) (Entered: 10/11/2013) |
| 10/11/2013 | | Set/Reset Answer Due Deadline: St. Jude Medical S.C., Inc. and St. Jude Medical, Inc.'s response due 11/14/2013. (ps1) (Entered: 10/11/2013) |
| 10/11/2013 | 24 | ORDER granting 23 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 10/11/2013) |
| 10/14/2013 | 25 | MOTION for Extension of Time to File Answer RE: Complaints re 1 Complaint by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. Attorney Philip A. Allen, III added to party Medtronic Minimed, Inc.(pty:dft), Attorney Philip A. Allen, III added to party Medtronic USA, Inc.(pty:dft), Attorney Philip A. Allen, III added to party Medtronic, Inc.(pty:dft). (Attachments: # 1 Text of Proposed Order)(Allen, Philip) (Entered: 10/14/2013) |
| 10/15/2013 | 26 | ORDER denying 25 Motion for Extension of Time to Answer RE: Complaints due to the failure of Defendants to supply a proposed order in the manner required by the Local Rules. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 10/15/2013) |
| 10/15/2013 | 27 | MOTION for Extension of Time to File Answer RE: Complaints re 1 Complaint by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Text of Proposed Order)(Allen, Philip) (Entered: 10/15/2013) |
| 10/15/2013 | 28 | ORDER granting 27 Motion for Extension of Time to Answer, RE: Complaints: Medtronic Minimed, Inc.; Medtronic USA, Inc.; and Medtronic, Inc.'s answer due 11/14/2013. Signed by Judge Cecilia M. Altonaga on 10/15/2013. (ps1) (Entered: 10/15/2013) |
| 10/15/2013 | 29 | NOTICE of Attorney Appearance by Philip A. Allen, III on behalf of Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc. (Allen, Philip) (Entered: 10/15/2013) |
| 10/28/2013 | 30 | Joint MOTION to Sever *Plaintiff's Claims* by St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. Responses due by 11/15/2013 (Attachments: # 1 Text of Proposed Order)(Guerra, Richard) (Entered: 10/28/2013) |
| 10/29/2013 | 31 | ORDER denying 30 Motion to Sever. Signed by Judge Cecilia M. Altonaga on 10/29/2013. (ps1) (Entered: 10/29/2013) |
| 10/29/2013 | 32 | |

| | | Corporate Disclosure Statement by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc. (Allen, Philip) (Entered: 10/29/2013) |
|---|---|---|
| 10/29/2013 | 33 | SCHEDULING REPORT - **Rule 16.1** by St. Jude Medical S.C., Inc., St. Jude Medical, Inc. (Attachments: # 1 Text of Proposed Order)(Guerra, Richard) (Entered: 10/29/2013) |
| 10/29/2013 | 34 | Corporate Disclosure Statement by St. Jude Medical S.C., Inc., St. Jude Medical, Inc. (Guerra, Richard) (Entered: 10/29/2013) |
| 10/30/2013 | 35 | ORDER Setting Trial and Pre-Trial Schedule, Requiring Mediation, and Referring Certain Matters to Magistrate Judge Andrea M. Simonton: Jury Trial set for 2 week trial period beginning 10/20/2014 in Miami Division before Judge Cecilia M. Altonaga. Calendar Call set for 10/14/2014 09:00 AM in Miami Division before Judge Cecilia M. Altonaga. Motions to amend pleadings or join parties due by 12/27/2013. All discovery due by 7/7/2014. Mediation order due by 11/20/2013. Mediation Deadline 7/14/2014. In Limine Motions due by 9/8/2014. All pre-trial motions due by 7/21/2014. Pretrial Stipulation due by 9/8/2014. Signed by Judge Cecilia M. Altonaga on 10/30/2013. (ps1) (Entered: 10/30/2013) |
| 11/13/2013 | 36 | NOTICE of Attorney Appearance by Janet T. Munn on behalf of Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. Attorney Janet T. Munn added to party Medtronic Minimed, Inc.(pty:dft), Attorney Janet T. Munn added to party Medtronic USA, Inc.(pty:dft), Attorney Janet T. Munn added to party Medtronic, Inc.(pty:dft). (Munn, Janet) (Entered: 11/13/2013) |
| 11/14/2013 | 37 | *Defendant's St. Jude Medical, Inc. and St. Jude Medical S.C., Inc.'s ANSWER* and Affirmative Defenses to Complaint with Jury Demand by St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. (Guerra, Richard) (Entered: 11/14/2013) |
| 11/14/2013 | 38 | MOTION to Dismiss 1 Complaint *Motion and Memorandum of Law in Support of the Medtronic Defendants' Motion to Dismiss Plaintiff Atlas's Complaint Or, in the Alternative, For a More Definite Statement*, MOTION for More Definite Statement by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. Responses due by 12/2/2013 (Munn, Janet) (Entered: 11/14/2013) |
| 11/14/2013 | 42 | Unopposed MOTION for Jeanne M. Heffernan to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Filing Fee $ 75.00. Receipt # 69023. (ksa) (Entered: 11/18/2013) |
| 11/15/2013 | 39 | NOTICE by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc. re 38 MOTION to Dismiss 1 Complaint *Motion and Memorandum of Law in Support of the Medtronic Defendants' Motion to Dismiss Plaintiff Atlas's Complaint Or, in the Alternative, For a More Definite Statement* MOTION for More Definite Statement *Notice of Filing by the Medtronic Defendants of Corrected Certificates of Service for Defendants' Motion to Dismiss Plaintiff Atlas's Complaint Or, in the Alternative, For a More Definite Statement and Unopposed Motion for Pro Hac Vice Admission of Jeanne M. Heffernan* (Munn, Janet) (Entered: 11/15/2013) |
| | | |

Federal Circuit Appendix
A78

| 11/15/2013 | 40 | UNSTIPULATED Unopposed MOTION for Substitution of Counsel *of Medtronic Defendants* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. Responses due by 12/2/2013 (Attachments: # 1 Exhibit A - (Proposed) Order)(Munn, Janet) (Entered: 11/15/2013) |
| 11/15/2013 | 41 | ORDER granting 40 Unstipulated Motion for Substitution of Counsel. Attorney Philip A. Allen, III terminated. Signed by Judge Cecilia M. Altonaga (lk) (Entered: 11/15/2013) |
| 11/18/2013 | 43 | ORDER granting 42 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 11/18/2013) |
| 11/20/2013 | 44 | NOTICE by St. Jude Medical S.C., Inc., St. Jude Medical, Inc. *of Filing Proposed Order Scheduling Mediation* (Attachments: # 1 Text of Proposed Order)(Guerra, Richard) (Entered: 11/20/2013) |
| 11/21/2013 | 45 | ORDER STRIKING 44 Notice of Filing Proposed Order Scheduling Mediation filed by St. Jude Medical S.C., Inc., St. Jude Medical, Inc.; the parties are to submit a proposed order which includes a date, time, and location of the mediation conference as required by the Court's 35 Order by 11/27/13. Signed by Judge Cecilia M. Altonaga on 11/21/2013. (ps1) (Entered: 11/21/2013) |
| 11/21/2013 | 46 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Kyle L. Harvey. Filing Fee $ 75.00. Receipt # 69443. (ksa) (Entered: 11/21/2013) |
| 11/21/2013 | 47 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Rolf O. Stadheim. Filing Fee $ 75.00. Receipt # 69444. (ksa) (Entered: 11/21/2013) |
| 11/21/2013 | 48 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for George C. Summerfield. Filing Fee $ 75.00. Receipt # 69445. (ksa) (Entered: 11/21/2013) |
| 11/21/2013 | 49 | ORDER granting 46 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 11/21/2013) |
| 11/21/2013 | 50 | ORDER granting 47 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 11/21/2013) |
| 11/21/2013 | 51 | ORDER granting 48 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 11/21/2013) |
| 11/22/2013 | 52 | Unopposed MOTION for Akshay S. Deoras to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Filing Fee $ 75.00. Receipt # 69645. (ksa) (Entered: 11/25/2013) |
| 11/22/2013 | 53 | Unopposed MOTION for Beatrice Hahn to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Filing Fee $ 75.00. Receipt # 69644. (ksa) (Entered: 11/25/2013) |

Federal Circuit Appendix

A79

| 11/22/2013 | 54 | Unopposed MOTION for Lauren Sabol to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Filing Fee $ 75.00. Receipt # 69642. (ksa) (Entered: 11/25/2013) |
| 11/22/2013 | 55 | Unopposed MOTION for Luke L. Dauchot to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Filing Fee $ 75.00. Receipt # 69643. (ksa) (Entered: 11/25/2013) |
| 11/25/2013 | 56 | ORDER granting 52 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 11/25/2013) |
| 11/25/2013 | 57 | ORDER granting 53 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 11/25/2013) |
| 11/25/2013 | 58 | ORDER granting 54 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 11/25/2013) |
| 11/25/2013 | 59 | ORDER granting 55 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 11/25/2013) |
| 11/26/2013 | 60 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. re 45 Order Striking, *Joint Notice of Filing [Proposed] Order Scheduling Mediation, Filed in Compliance with the Court's Order of November 21, 2013 [D.E. 45]* (Attachments: # 1 Exhibit (Proposed) Order)(Munn, Janet) (Entered: 11/26/2013) |
| 11/26/2013 | 61 | ORDER Scheduling Mediation before Eric D. Green. Mediation Hearing set for 4/1/2014 09:30 AM Signed by Judge Cecilia M. Altonaga on 11/26/2013. (lbc) (Entered: 11/26/2013) |
| 12/02/2013 | 62 | ORDER Scheduling Mediation before Eric D. Green; Mediation Hearing set for 3/19/2014 10:00 AM. Signed by Judge Cecilia M. Altonaga on 12/2/2013. (ps1) (Entered: 12/02/2013) |
| 12/02/2013 | 63 | AMENDED COMPLAINT against All Defendants, filed by Atlas IP, LLC. (Attachments: # 1 Exhibit "A", # 2 Exhibit "B", # 3 Exhibit "C")(Carlson, Curtis) (Entered: 12/02/2013) |
| 12/02/2013 | 64 | RESPONSE to Motion re 38 MOTION to Dismiss 1 Complaint *Motion and Memorandum of Law in Support of the Medtronic Defendants' Motion to Dismiss Plaintiff Atlas's Complaint Or, in the Alternative, For a More Definite Statement* MOTION for More Definite Statement filed by Atlas IP, LLC. Replies due by 12/12/2013. (Carlson, Curtis) (Entered: 12/02/2013) |
| 12/04/2013 | 65 | ORDER denying as moot 38 Motion to Dismiss or alternatively, Motion for More Definite Statement. Signed by Judge Cecilia M. Altonaga on 12/4/2013. (ps1) (Entered: 12/04/2013) |
| 12/05/2013 | 66 | AMENDED ORDER re 62 ORDER Scheduling Mediation, (Mediation Hearing set for 3/19/2014 10:00 AM as to Medtronic, Inc. Defendants). Signed |

Federal Circuit Appendix
A80

|  |  |  |
|---|---|---|
|  |  | by Judge Cecilia M. Altonaga on 12/5/2013. (ps1) Modified on 12/5/2013 (ps1). Modified text re hearing date on 12/6/2013 (dgj). (Entered: 12/05/2013) |
| 12/05/2013 | 67 | Clerks Notice of Docket Correction re 66 Amended Order, scheduling mediation; **Docket Text Modified** by Clerk to reflect correct parties. (ps1) (Entered: 12/05/2013) |
| 12/05/2013 | 68 | AMENDED ORDER re 61 ORDER Scheduling Mediation; mediation as to St. Jude Defendants scheduled for 4/1/14 at 9:30 a.m. Signed by Judge Cecilia M. Altonaga on 12/5/2013. (ps1) (Entered: 12/05/2013) |
| 12/06/2013 | 69 | Clerks Notice of Docket Correction re 66 Amended Order. **Docket Text Modified** by Clerk to reflect correct date of hearing 3/19/2014. (dgj) (Entered: 12/06/2013) |
| 12/19/2013 | 70 | *Defendants'* ANSWER and Affirmative Defenses to Amended Complaint with Jury Demand by St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. (Guerra, Richard) (Entered: 12/19/2013) |
| 12/19/2013 | 71 | *Defendants Medtronic, Inc., Medtronic USA, Inc. and Medtronic Minimed, Inc.* ANSWER and Affirmative Defenses to Amended Complaint with Jury Demand , COUNTERCLAIM against Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc. by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Munn, Janet) (Entered: 12/19/2013) |
| 01/14/2014 | 72 | ORDER that Plaintiff shall file a response to the 71 Counterclaims by January 21, 2014. Signed by Judge Cecilia M. Altonaga on 1/14/2014. (wc) (Entered: 01/14/2014) |
| 01/14/2014 | 73 | MOTION TO DISMISS 71 Answer to Amended Complaint, Counterclaim,, FOR FAILURE TO STATE A CLAIM by Atlas IP, LLC. Responses due by 1/31/2014 (Carlson, Curtis) (Entered: 01/14/2014) |
| 01/15/2014 | 74 | PAPERLESS NOTICE of Hearing on Motion 73 MOTION TO DISMISS 71 Counterclaims. Motion Hearing set for 1/27/2014 08:30 AM in Miami Division before Judge Cecilia M. Altonaga. (wc) (Entered: 01/15/2014) |
| 01/23/2014 | 75 | RESPONSE in Opposition re 73 MOTION TO DISMISS 71 Answer to Amended Complaint, Counterclaim,, FOR FAILURE TO STATE A CLAIM *Medtronic Defendants' Memorandum in Opposition to Plaintiff's Motion to Dismiss Medtronic Defendants' Counterclaims* filed by Medtronic, Inc.. (Munn, Janet) (Entered: 01/23/2014) |
| 01/24/2014 | 76 | REPLY to Response to Motion re 73 MOTION TO DISMISS 71 Answer to Amended Complaint, Counterclaim,, FOR FAILURE TO STATE A CLAIM filed by Atlas IP, LLC. (Carlson, Curtis) (Entered: 01/24/2014) |
| 01/27/2014 | 77 | Minute Entry for proceedings held before Judge Cecilia M. Altonaga: Motion Hearing held on 1/27/2014 at 8:35 a.m. re 73 MOTION TO DISMISS 71 Answer to Amended Complaint, Counterclaim, FOR FAILURE TO STATE A CLAIM filed by Atlas IP, LLC. Written order to follow. Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov (cpz) (Entered: 01/27/2014) |
|  |  |  |

| | | |
|---|---|---|
| 01/27/2014 | 78 | ORDER granting in part and denying in part 73 Motion to Dismiss for Failure to State a Claim. Amended pleading due by 2/10/2014. Signed by Judge Cecilia M. Altonaga on 1/27/2014. (wc) (Entered: 01/27/2014) |
| 01/28/2014 | 79 | TRANSCRIPT of Motion to Dismiss held on 01/27/14, before Judge Cecilia M. Altonaga, 1-32 pages, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/21/2014. Redacted Transcript Deadline set for 3/3/2014. Release of Transcript Restriction set for 5/1/2014. (smn) (Entered: 01/28/2014) |
| 01/31/2014 | 80 | Corporate Disclosure Statement by Atlas IP, LLC (Carlson, Curtis) (Entered: 01/31/2014) |
| 02/07/2014 | 81 | Unopposed MOTION to Amend/Correct 71 Answer to Amended Complaint, Counterclaim,, *Unopposed Motion of the Medtronic Defendants for Leave to Amend their Counterclaim I for Non-Infringement* by Medtronic, Inc.. Responses due by 2/24/2014 (Attachments: # 1 Exhibit A - Redlined Version of Existing Answer, # 2 Exhibit B - Clean Version of Proposed Amended Answer, # 3 Exhibit C - (Proposed) Order Granting Unopposed Motion for Leave to Amend)(Munn, Janet) (Entered: 02/07/2014) |
| 02/10/2014 | 82 | ORDER granting 81 Unopposed Motion to Amend/Correct. The Medtronics Defendants shall file their Amended Second Affirmative Defense and Amended Counterclaim I - for non-infringement and their Third Affirmative Defense for Invalidity as a separate docket entry by February 12, 2014, and shall also file, at the same time, their Amended Counterclaim II - a counterclaim for invalidity. Signed by Judge Cecilia M. Altonaga on 2/10/2014. (wc) (Entered: 02/10/2014) |
| 02/10/2014 | 83 | RESPONSE/REPLY to 63 Amended Complaint *Defendants Medtronic, Inc., Medtronic USA, Inc. and Medtronic Minimed, Inc.'s Amended Answer and Counterclaims* by Medtronic, Inc.. (Munn, Janet) (Entered: 02/10/2014) |
| 02/11/2014 | 84 | RESPONSE/REPLY to 83 Response/Reply (Other) *to Defendants' Counterclaims* by Atlas IP, LLC, Atlas IP, LLC. (Carlson, Curtis) (Entered: 02/11/2014) |
| 02/11/2014 | 85 | Joint MOTION Entry of Protective Order by Atlas IP, LLC, Atlas IP, LLC. (Carlson, Curtis) (Entered: 02/11/2014) |
| 02/12/2014 | 86 | ORDER granting 85 Motion for Protective Order. Signed by Judge Cecilia M. Altonaga on 2/11/2014. (ps1) (Entered: 02/12/2014) |
| 02/12/2014 | 87 | Defendant's MOTION to Dismiss 63 Amended Complaint *Pursuant to 35 U.S.C. Section 299 and Incorporated Memorandum of Law* by St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. Responses due by 3/3/2014 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Guerra, Richard) (Entered: 02/12/2014) |
| | | |

Federal Circuit Appendix

A82

| | | |
|---|---|---|
| 02/13/2014 | 88 | Unopposed MOTION for Leave to File *Amend their Affirmative Defenses and Incorporated Memorandum of Law* by St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Text of Proposed Order)(Guerra, Richard) (Entered: 02/13/2014) |
| 02/14/2014 | 89 | ORDER granting 88 Motion for Leave to File Amended Answer. *Clerks Notice: Filer must separately re-file the amended pleading pursuant to Local Rule 15.1, and as ordered by the Judge on or before 2/18/14* Signed by Judge Cecilia M. Altonaga on 2/14/2014. (wc) (Entered: 02/14/2014) |
| 02/14/2014 | 90 | *First Amended* ANSWER and Affirmative Defenses to Amended Complaint with Jury Demand by St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. (Attachments: # 1 Exhibit A)(Guerra, Richard) (Entered: 02/14/2014) |
| 02/14/2014 | 91 | Joint MOTION for Extension of Time to Mediate *to Reschedule Mediation Date* by St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. (Attachments: # 1 Text of Proposed Order)(Guerra, Richard) (Entered: 02/14/2014) |
| 02/18/2014 | 92 | ORDER granting 91 Motion for Extension of Time to Mediate. Mediation Hearing reset for 4/22/2014 09:30 AM Signed by Judge Cecilia M. Altonaga on 2/18/2014. (ps1) (Entered: 02/18/2014) |
| 02/19/2014 | 93 | NOTICE by Medtronic, Inc. re 87 Defendant's MOTION to Dismiss 63 Amended Complaint *Pursuant to 35 U.S.C. Section 299 and Incorporated Memorandum of Law The Medtronic Defendants' Notice of Non-Objection and Statement of Position Regarding the Motion of the St. Jude Defendants to Dismiss Pursuant to 35 U.S.C. Section 299* (Munn, Janet) (Entered: 02/19/2014) |
| 03/03/2014 | 94 | RESPONSE in Opposition re 87 Defendant's MOTION to Dismiss 63 Amended Complaint *Pursuant to 35 U.S.C. Section 299 and Incorporated Memorandum of Law* filed by Atlas IP, LLC, Atlas IP, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Carlson, Curtis) (Entered: 03/03/2014) |
| 03/13/2014 | 95 | REPLY to Response to Motion re 87 Defendant's MOTION to Dismiss 63 Amended Complaint *Pursuant to 35 U.S.C. Section 299 and Incorporated Memorandum of Law* filed by St. Jude Medical S.C., Inc., St. Jude Medical, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Guerra, Richard) (Entered: 03/13/2014) |
| 03/17/2014 | 96 | ORDER granting 87 Motion to Dismiss. Atlas's claims against St. Jude Defendants are severed and may be pursued in a seperate action without prejudice due to misjoinder. Signed by Judge Cecilia M. Altonaga on 3/17/2014. (ps1) (Entered: 03/17/2014) |
| 03/26/2014 | 97 | MEDIATION REPORT by Eric Green. Disposition: Case did not settle.(lbc) (Entered: 03/26/2014) |
| 03/27/2014 | 98 | Unopposed MOTION to Withdraw as Attorney *Unopposed Motion of Defendants for Withdrawal of Counsel* by Lauren Sabol. by Medtronic, Inc.. Responses due by 4/14/2014 (Attachments: # 1 Exhibit A - (Proposed) Order) (Munn, Janet) (Entered: 03/27/2014) |
| | | |

| 03/27/2014 | 99 | ORDER granting 98 Motion to Withdraw as Attorney. Attorney Lauren B. Sabol terminated Notice of Termination delivered by US Mail to Lauren Sabol. Signed by Judge Cecilia M. Altonaga on 3/27/2014. (wc) (Entered: 03/27/2014) |
| --- | --- | --- |
| 04/04/2014 | 100 | Case Reassignment of Paired Magistrate Judge pursuant to Administrative Order(s) 2013-63 to Magistrate Judge John J. O'Sullivan. Magistrate Judge John J. O'Sullivan and Magistrate Judge Andrea M. Simonton no longer assigned to case. (vp) (Entered: 04/04/2014) |
| 05/07/2014 | | Set Hearing - Discovery Hearing set for 5/8/2014 03:30 PM in Miami Division before Magistrate Judge John J. O'Sullivan. (cg1) (Entered: 05/07/2014) |
| 05/07/2014 | 101 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. *Of Telephonic Discovery Hearing* (Attachments: # 1 Exhibit A - Atlas' 3rd set of RFP to Medtronic Defendants, # 2 Exhibit B - Medtronic Objections and Responses to Atlas' 3rd set of RFP)(Munn, Janet) (Entered: 05/07/2014) |
| 05/08/2014 | 102 | ORDER on Informal Discovery Conference. Signed by Magistrate Judge John J. O'Sullivan on 5/8/2014. (tro) (Entered: 05/08/2014) |
| 05/08/2014 | 103 | Minute Entry for proceedings held before Magistrate Judge John J. O'Sullivan: Discovery Hearing held on 5/8/2014. (Digital 15:30:56.) (cg1) (Entered: 05/09/2014) |
| 06/03/2014 | 104 | MOTION for Extension of Time to Serve Expert Reports by Atlas IP, LLC. Responses due by 6/20/2014 (Carlson, Curtis) (Entered: 06/03/2014) |
| 06/04/2014 | 105 | NOTICE of Hearing on 104 MOTION for Extension of Time to Serve Expert Reports: Telephone Conference set for 6/5/2014 08:30 AM in Miami Division before Judge Cecilia M. Altonaga. Please see notice for conference call instructions. (ps1) (Entered: 06/04/2014) |
| 06/05/2014 | 106 | Minute Entry for proceedings held before Judge Cecilia M. Altonaga: Motion Hearing held on 6/5/2014 at 8:30 a.m. re 104 MOTION for Extension of Time to Serve Expert Reports filed by Atlas IP, LLC. Written order to follow. Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov (cpz) (Entered: 06/05/2014) |
| 06/05/2014 | 107 | ORDER denying 104 Motion for Extension of Time. Signed by Judge Cecilia M. Altonaga on 6/5/2014. (ps1) (Entered: 06/05/2014) |
| 06/10/2014 | 108 | NOTICE by St. Jude Medical S.C., Inc., St. Jude Medical, Inc. *of Filing Inter Partes Review of the Asserted Patent* (Attachments: # 1 Exhibit A)(Guerra, Richard) (Entered: 06/10/2014) |
| 06/11/2014 | 109 | Clerks Notice to Filer re 108 Notice (Other), **Document and Case Style Do Not Match;** CORRECTIVE ACTION REQUIRED - The Filer must File a Notice of Striking, then refile the document with the correct case style and case number in the appropriate case. (ps1) (Entered: 06/11/2014) |
| 06/12/2014 | 110 | NOTICE of Striking 108 Notice (Other) filed by St. Jude Medical S.C., Inc., St. Jude Medical, Inc. by St. Jude Medical S.C., Inc., St. Jude Medical, Inc. (Guerra, Richard) (Entered: 06/12/2014) |

Federal Circuit Appendix

A84

| 06/13/2014 | 111 | Unopposed MOTION for Sharre Lotfollahi to Appear Pro Hac Vice, for Defendants, Consent to Designation and Request to Electronically Receive Notices of Electronic Filing. Filing Fee $ 75.00. Receipt # 81149. (ksa) (Entered: 06/17/2014) |
| 06/17/2014 | 112 | ORDER granting 111 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 06/17/2014) |
| 06/17/2014 | 113 | Plaintiff's MOTION in Limine *to Limit Expert Report of Mark Lanning* by Atlas IP, LLC. (Attachments: # 1 Exhibit Lanning Report)(Carlson, Curtis) (Entered: 06/17/2014) |
| 06/18/2014 | 114 | ORDER denying 113 Motion in Limine. Signed by Judge Cecilia M. Altonaga on 6/18/2014. (ps1) (Entered: 06/18/2014) |
| 06/25/2014 | 115 | Amended MOTION in Limine by Atlas IP, LLC. (Attachments: # 1 Exhibit A) (Carlson, Curtis) (Entered: 06/25/2014) |
| 06/26/2014 | 116 | PAPERLESS NOTICE of Hearing on Motion 115 Amended MOTION in Limine: Motion Hearing set for 7/10/2014 09:30 AM in Miami Division before Judge Cecilia M. Altonaga. (ps1) (Entered: 06/26/2014) |
| 07/01/2014 | 117 | Joint MOTION for Extension of Time of Expert Discovery Deadline And Related Motions Deadline by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. Responses due by 7/18/2014 (Attachments: # 1 Exhibit A-Proposed Order granting joint motion for extension)(Munn, Janet) (Entered: 07/01/2014) |
| 07/02/2014 | 118 | ORDER granting 117 Motion for Extension of Time. All pre-trial Motions due by 8/4/2014. Signed by Judge Cecilia M. Altonaga on 7/2/2014. (ps1) (Entered: 07/02/2014) |
| 07/07/2014 | 119 | MOTION for Extension of Time to Complete Certain Fact Discovery *and Memorandum of Law* re 35 Scheduling Order, Order Referring Case to Judge, Order Referring Case to Mediation,,,,,, by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. Responses due by 7/24/2014 (Attachments: # 1 Exhibit A - Email, # 2 Exhibit B - Subpoena to Produce Documents, # 3 Exhibit C - Subpoena to Testify, # 4 Exhibit D - Proposed Order)(Munn, Janet) (Entered: 07/07/2014) |
| 07/08/2014 | 120 | ORDER granting 119 Motion for Extension of Time regarding fact discovery. Signed by Judge Cecilia M. Altonaga on 7/8/2014. (ps1) (Entered: 07/08/2014) |
| 07/08/2014 | 121 | RESPONSE in Opposition re 115 Amended MOTION in Limine *and Memorandum of Law* filed by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit 1 - Transcript, # 2 Exhibit 2 - Interrogatories, # 3 Exhibit 3 - Amended Answer, # 4 Exhibit 4 - Response to RFA, # 5 Exhibit 5 - Interrogatories, # 6 Exhibit 6- Interrogatories, # 7 Exhibit 7 - Proposed Order)(Munn, Janet) (Entered: 07/08/2014) |
| 07/09/2014 | 122 | REPLY to Response to Motion re 115 Amended MOTION in Limine filed by Atlas IP, LLC, Atlas IP, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Carlson, Curtis) (Entered: 07/09/2014) |

| 07/09/2014 | 123 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. *of Telephonic Discovery Hearing Before Judge John J. O'Sullivan* (Attachments: # 1 Exhibit A - Subpoena, # 2 Exhibit B- Subpoena)(Munn, Janet) (Entered: 07/09/2014) |
| 07/09/2014 | 125 | NOTICE of Telephonic Discovery Hearing by ATTORNEY: Telephone Discovery Hearing set for 7/22/14 at 3:00 pm before Magistrate Judge John J. O'Sullivan (tp) (Entered: 07/10/2014) |
| 07/09/2014 |  | DE 123 set Telephonic Discovery Hearings Telephone Conference set for 7/22/2014 03:00 PM in Miami Division before Magistrate Judge John J. O'Sullivan. (tp) (Entered: 07/10/2014) |
| 07/10/2014 | 124 | Minute Entry for proceedings held before Judge Cecilia M. Altonaga: Motion Hearing held on 7/10/2014 at 9:15 a.m. re 115 Amended MOTION in Limine filed by Atlas IP, LLC. Written order to follow. Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov (cpz) (Entered: 07/10/2014) |
| 07/10/2014 | 126 | Clerks Notice to Filer re 123 Notice (Other). **Wrong Event Selected**; ERROR - The Filer selected the wrong event. The document was re-docketed by the Clerk, see [de#125]. It is not necessary to refile this document. (tp) (Entered: 07/10/2014) |
| 07/10/2014 | 127 | ORDER denying 115 Motion in Limine. Signed by Judge Cecilia M. Altonaga on 7/10/2014. (ps1) (Entered: 07/10/2014) |
| 07/22/2014 | 128 | ORDER TO SHOW CAUSE and Order on Informal Discovery Conference. Show Cause Hearing set for 8/14/2014 04:00 PM in Miami Division before Magistrate Judge John J. O'Sullivan. Show Cause Response due by 8/1/2014. Signed by Magistrate Judge John J. O'Sullivan on 7/22/2014. (tro) (Entered: 07/22/2014) |
| 07/22/2014 | 129 | STIPULATION *Joint Claim Construction Stipulation* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc. (Munn, Janet) (Entered: 07/22/2014) |
| 07/22/2014 | 130 | Minute Entry for proceedings held before Magistrate Judge John J. O'Sullivan: Telephone Discovery held on 7/22/2014. (Digital 15:07:12-15:24:20.) (mno) (Entered: 07/23/2014) |
| 07/24/2014 | 131 | MOTION to Supplement or Amend the Court's Order of July 22, 2014 re 128 Order to Show Cause, by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A- Proposed Order)(Munn, Janet) (Entered: 07/24/2014) |
| 07/24/2014 | 132 | ORDER granting 131 Motion to Supplement or Amend. See Order for Details. Signed by Magistrate Judge John J. O'Sullivan on 7/24/2014. (tro) (Entered: 07/24/2014) |
| 07/24/2014 | 133 | NOTICE of Compliance *with the Court's Order of July 24, 2014* by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. re 132 Order on Motion |

Federal Circuit Appendix

A86

| | | |
|---|---|---|
| | | for Miscellaneous Relief (Attachments: # 1 Exhibit A- Affidavit of Christopher Compton, process server) (Munn, Janet) (Entered: 07/24/2014) |
| 07/30/2014 | 134 | Unopposed MOTION and Memorandum of Law For Leave To Exceed The Page Limit by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A- Proposed Order)(Munn, Janet) (Entered: 07/30/2014) |
| 07/30/2014 | 135 | ORDER granting 134 Motion. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 07/30/2014) |
| 08/01/2014 | 136 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. re 132 Order on Motion for Miscellaneous Relief *of Medtronic Defendants Regarding the July 22, 2014 Order Following Discovery Conference [D.E. 128] and the Amended Order on July 22, 2014 Discovery Conference [D.E. 132]* (Attachments: # 1 Exhibit A - Ontario Order, # 2 Exhibit B - Proposed Order) (Munn, Janet) (Entered: 08/01/2014) |
| 08/01/2014 | 137 | Order Cancelling Show Cause Hearing. Signed by Magistrate Judge John J. O'Sullivan on 8/1/2014. (mkr) (Entered: 08/01/2014) |
| 08/01/2014 | 138 | Unopposed MOTION for Extension of Time to Complete Discovery *and Memorandum of Law* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Order, # 2 Exhibit B - Proposed Order)(Munn, Janet) (Entered: 08/01/2014) |
| 08/04/2014 | 139 | MOTION for Summary Judgment by Atlas IP, LLC. Responses due by 8/21/2014 (Attachments: # 1 Memorandum)(Carlson, Curtis) (Entered: 08/04/2014) |
| 08/04/2014 | 140 | Statement of: OF UNDISPUTED FACTS SUPPORTING ITS MOTION FOR SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS OF THE 734 PATENT ARE NOT INVALID by Atlas IP, LLC re 139 MOTION for Summary Judgment (Carlson, Curtis) (Entered: 08/04/2014) |
| 08/04/2014 | 141 | AFFIDAVIT in Support re 139 MOTION for Summary Judgment filed by Atlas IP, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B (part 1 of 8), # 3 Exhibit B (part 2 of 8), # 4 Exhibit B (part 3 of 8), # 5 Exhibit B (part 4 of 8), # 6 Exhibit B (part 5 of 8), # 7 Exhibit B (part 6 of 8), # 8 Exhibit B (part 7 of 8), # 9 Exhibit B (part 8 of 8), # 10 Exhibit C, # 11 Exhibit D, # 12 Exhibit E, # 13 Exhibit F, # 14 Exhibit G, # 15 Exhibit H, # 16 Exhibit I, # 17 Exhibit J, # 18 Exhibit K, # 19 Exhibit L, # 20 Exhibit M)(Carlson, Curtis) (Entered: 08/04/2014) |
| 08/04/2014 | 142 | Unopposed MOTION for Hearing *on Defendants' Motion for Summary Judgment and Motion to Exclude Damages Opinions of Donald Merino* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Proposed Order)(Munn, Janet) (Entered: 08/04/2014) |
| 08/04/2014 | 143 | NOTICE by Medtronic, Inc., Medtronic Minimed, Inc., Medtronic USA, Inc. *of Conventional Filings* (Munn, Janet) (Entered: 08/04/2014) |
| 08/04/2014 | 144 | |

| | | |
|---|---|---|
| | | UNOPPOSED MOTION and Memorandum of Law for Leave to File Under Seal Defendants' Motion and Memorandum of Law for Summary Judgment and Motion and Memorandum of Law to Exclude The Opinions of Donald Merino on Damages by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc. (Attachments: # 1 Exhibit A/Text of Proposed Order)(nc) (Entered: 08/05/2014) |
| 08/05/2014 | | SYSTEM ENTRY - Docket Entry 145 [motion] restricted/sealed until further notice. (nc) (Entered: 08/05/2014) |
| 08/05/2014 | 146 | ORDER granting 142 Motion for Hearing, Re: 139 MOTION for Summary Judgment filed by Atlas IP, LLC. Motion Hearing set for 9/11/2014 09:00 AM in Miami Division before Judge Cecilia M. Altonaga. Signed by Judge Cecilia M. Altonaga on 8/5/2014. (ps1) (Entered: 08/05/2014) |
| 08/05/2014 | 147 | ORDER granting 144 Motion to Seal. Unsealing due by 8/5/2015. Signed by Judge Cecilia M. Altonaga on 8/5/2014. (ps1) (Entered: 08/05/2014) |
| 08/05/2014 | | SYSTEM ENTRY - Docket Entry 148 [motion] restricted/sealed until further notice. (nc) (Entered: 08/05/2014) |
| 08/05/2014 | 149 | TRANSCRIPT of the Hearing on the Motion in Limine held on 07/10/14, before Judge Cecilia M. Altonaga, 1-16 pages, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/29/2014. Redacted Transcript Deadline set for 9/8/2014. Release of Transcript Restriction set for 11/6/2014. (smn) (Entered: 08/05/2014) |
| 08/05/2014 | 150 | MOTION to Exclude the Opinions of Plaintiff's Expert Donald Merino on Damages *and Memorandum of Law* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Hahn Declaration, # 2 Exhibit 1 to Exhibit A - Hahn Declaration, # 3 Exhibit 2 to Exhibit A - Hahn Declaration, # 4 Exhibit 3 to Exhibit A - Hahn Declaration, # 5 Exhibit 4 to Exhibit A - Hahn Declaration, # 6 Exhibit 5 to Exhibit A - Hahn Declaration, # 7 Exhibit 6 to Exhibit A - Hahn Declaration, # 8 Exhibit 7 to Exhibit A - Hahn Declaration, # 9 Exhibit 8 to Exhibit A - Hahn Declaration, # 10 Exhibit 9 to Exhibit A - Hahn Declaration, # 11 Exhibit 10 to Exhibit A - Hahn Declaration, # 12 Exhibit 11 to Exhibit A - Hahn Declaration, # 13 Exhibit 12 to Exhibit A - Hahn Declaration, # 14 Exhibit 13 to Exhibit A - Hahn Declaration, # 15 Text of Proposed Order Proposed Order)(Munn, Janet) (Entered: 08/05/2014) |
| 08/05/2014 | 151 | MOTION for Summary Judgment *and Memorandum of Law on Liability and Damages " REDACTED - PUBLIC FILING"* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. Responses due by 8/22/2014 (Attachments: # 1 Exhibit A - Deoras Declaration, # 2 Exhibit 1 to Exhibit A - Deoras Declaration, # 3 Exhibit 2 to Exhibit A - Deoras Declaration, # 4 Exhibit 3 to Exhibit A - Deoras Declaration, # 5 Exhibit 4 to Exhibit A - Deoras Declaration, # 6 Exhibit 5 to Exhibit A - Deoras Declaration, # 7 Exhibit 6 to Exhibit A - Deoras Declaration, # 8 Exhibit 7 to Exhibit A - Deoras Declaration, # 9 Exhibit 8 to Exhibit A - Deoras Declaration, # 10 |

Federal Circuit Appendix
A88

|  |  | Exhibit 9 to Exhibit A - Deoras Declaration, # 11 Exhibit 10 to Exhibit A - Deoras Declaration, # 12 Exhibit 11 to Exhibit A - Deoras Declaration, # 13 Exhibit 12 to Exhibit A - Deoras Declaration, # 14 Exhibit 13 to Exhibit A - Deoras Declaration, # 15 Exhibit 14 to Exhibit A - Deoras Declaration, # 16 Exhibit 15 to Exhibit A -Deoras Declaration, # 17 Exhibit 16 to Exhibit A - Deoras Declaration, # 18 Exhibit 17 to Exhibit A - Deoras Declaration, # 19 Exhibit 18 to Exhibit A - Deoras Declaration, # 20 Exhibit 19 to Exhibit A - Deoras Declaration, # 21 Exhibit 20 to Exhibit A - Deoras Declaration, # 22 Exhibit 21 to Exhibit A - Deoras Declaration, # 23 Exhibit 22 to Exhibit A - Deoras Declaration, # 24 Exhibit 23 to Exhibit A - Deoras Declaration, # 25 Exhibit 24 to Exhibit A - Deoras Declaration, # 26 Exhibit 25 to Exhibit A - Deoras Declaration, # 27 Exhibit 26 to Exhibit A - Deoras Declaration, # 28 Exhibit 27 to Exhibit A - Deoras Declaration, # 29 Exhibit 28 to Exhibit A - Deoras Declaration, # 30 Exhibit 29 to Exhibit A - Deoras Declaration, # 31 Exhibit 30 to Exhibit A - Deoras Declaration, # 32 Exhibit 31 to Exhibit A - Deoras Declaration, # 33 Exhibit 32 to Exhibit A - Deoras Declaration, # 34 Exhibit 33 to Exhibit A - Deoras Declaration, # 35 Exhibit 34 to Exhibit A - Deoras Declaration, # 36 Exhibit 35 to Exhibit A - Deoras Declaration, # 37 Exhibit 36 to Exhibit A - Deoras Declaration, # 38 Exhibit 37 to Exhibit A - Deoras Declaration, # 39 Exhibit 38 to Exhibit A - Deoras Declaration, # 40 Exhibit 39 to Exhibit A - Deoras Declaration, # 41 Exhibit B - Kivi Declaration, # 42 Exhibit C - Ivey Declaration, # 43 Exhibit D - Lanning Declaration, # 44 Exhibit A to Exhibit D - Lanning Declaration, # 45 Exhibit E - Proposed Order)(Munn, Janet) (Entered: 08/05/2014) |
|---|---|---|
| 08/05/2014 | 152 | ORDER terminating 151 Motion for Summary Judgment in light of ECF No. 148. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 08/05/2014) |
| 08/05/2014 | 153 | ORDER terminating 150 Motion in light of ECF No. 145. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 08/05/2014) |
| 08/06/2014 | 154 | ORDER granting 138 Motion for Extension of Time to Complete Discovery. The fact discovery deadline is extended solely for the purpose of receiving documents produced by, and deposition testimony of, Wi-LAN Inc. for use in this matter. All discovery on Wi-LAN Inc. shall be completed by August 12, 2014. Signed by Judge Cecilia M. Altonaga on 8/5/14. (wc) (Entered: 08/06/2014) |
| 08/06/2014 | 155 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. *of Filing Corrected and Complete Version of the Declaration of Akshay S. Deoras, Esq. Filed in Support of Defendants' Motion for Summary Judgment* (Attachments: # 1 Exhibit 1 - Deoras Declaration) (Munn, Janet) (Entered: 08/06/2014) |
| 08/15/2014 | 156 | Joint MOTION for Leave to Submit the Parties' Respective Technology Tutorials by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Text of Proposed Order Exhibit A)(Munn, Janet) (Entered: 08/15/2014) |
| 08/15/2014 | 157 | ORDER granting 156 Motion Joint Motion for Leave to Submit the Parties' Respective Technology Tutorials. Signed by Judge Cecilia M. Altonaga on 8/15/2014. (ps1) (Entered: 08/15/2014) |

| 08/20/2014 | 158 | Unopposed MOTION for Leave to File Excess Pages *in its response to motion for summary judgment* by Atlas IP, LLC. (Carlson, Curtis) (Entered: 08/20/2014) |
| 08/21/2014 | 159 | ORDER granting 158 Motion for Leave to File Excess Pages. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 08/21/2014) |
| 08/21/2014 | 160 | RESPONSE in Opposition re 139 MOTION for Summary Judgment *and Cross-Motion for Summary Judgment of Invalidity* filed by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Declaration of D. Akshay, # 2 Exhibit 1 to Declaration of D. Akshay, # 3 Exhibit 3 to Declaration of D. Akshay, # 4 Exhibit 4 to Declaration of D. Akshay, # 5 Exhibit 5 to Declaration of D. Akshay, # 6 Exhibit 6 to Declaration of D. Akshay, # 7 Exhibit 7 to Declaration of D. Akshay, # 8 Exhibit 8 to Declaration of D. Akshay, # 9 Exhibit 9 to Declaration of D. Akshay, # 10 Exhibit 10 to Declaration of D. Akshay, # 11 Text of Proposed Order Exhibit B)(Munn, Janet) (Entered: 08/21/2014) |
| 08/21/2014 | 161 | RESPONSE/REPLY to 140 Statement *of Undisputed Facts* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Munn, Janet) (Entered: 08/21/2014) |
| 08/21/2014 | 162 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. re 160 Response in Opposition to Motion,, *of Filing Exhibit 2 to the Declaration of Akshay S. Deoras, Esq., Filed in Support of Medtronic's Opposition to Atlas's Motion for Summary Judgment* (Attachments: # 1 Exhibit 2 to Declaration of D. Akshay) (Munn, Janet) (Entered: 08/21/2014) |
| 08/21/2014 | 175 | CROSS MOTION for Summary Judgment of Invalidity by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. Responses due by 9/8/2014 See DE 160 for image(tp) (Entered: 08/22/2014) |
| 08/22/2014 | 163 | UNOPPOSED MOTION and Memorandum of Law for Leave to File Under Seal Plaintiff's Responses to Defendants' Motion to Exclude The Opinions of Donald Merino, Ph.D by Atlas IP, LLC (Attachments: # 1 Text of Proposed Order)(nc) (Entered: 08/22/2014) |
| 08/22/2014 | | SYSTEM ENTRY - Docket Entry 164 [misc] restricted/sealed until further notice. (nc) (Entered: 08/22/2014) |
| 08/22/2014 | | SYSTEM ENTRY - Docket Entry 165 [misc] restricted/sealed until further notice. (nc) (Entered: 08/22/2014) |
| 08/22/2014 | | SYSTEM ENTRY - Docket Entry 166 [misc] restricted/sealed until further notice. (nc) (Entered: 08/22/2014) |
| 08/22/2014 | 167 | Clerk's Notice of Filing Deficiency Re: 164 Sealed Document, 166 Sealed Document, 165 Sealed Document. Document(s) missing required signature(s) (Fed.R.Civ.P. 11(a)). (nc) (Entered: 08/22/2014) |
| 08/22/2014 | 168 | UNOPPOSED MOTION and Memorandum of Law for Leave to File Under Seal Plaintiff's Responsive Papers to Defendants' Motions for Summary |

Federal Circuit Appendix
A90

|  |  | Judgment by Atlas IP, LLC (Attachments: # 1 Text of Proposed Order)(nc) (Entered: 08/22/2014) |
|---|---|---|
| 08/22/2014 |  | SYSTEM ENTRY - Docket Entry 169 [misc] restricted/sealed until further notice. (nc) (Entered: 08/22/2014) |
| 08/22/2014 |  | SYSTEM ENTRY - Docket Entry 170 [misc] restricted/sealed until further notice. (nc) (Entered: 08/22/2014) |
| 08/22/2014 |  | SYSTEM ENTRY - Docket Entry 171 [misc] restricted/sealed until further notice. (nc) (Entered: 08/22/2014) |
| 08/22/2014 |  | SYSTEM ENTRY - Docket Entry 172 [misc] restricted/sealed until further notice. (nc) (Entered: 08/22/2014) |
| 08/22/2014 | 173 | Clerk's Notice of Filing Deficiency Re: 171 Sealed Document, 172 Sealed Document. Document(s) missing required signature(s) (Fed.R.Civ.P. 11(a)). (nc) (Entered: 08/22/2014) |
| 08/22/2014 |  | SYSTEM ENTRY - Docket Entry 174 [misc] restricted/sealed until further notice. (nc) (Entered: 08/22/2014) |
| 08/22/2014 | 176 | Clerks Notice to Filer re 160 Response in Opposition to Motion,,. **Two or More Document Events Filed as One**: ERROR - Only one event was selected by the Filer but more than one event was applicable to the document filed. The docket entry was corrected by the Clerk see DE 175 . It is not necessary to refile this document but in the future, the Filer must select all applicable events. (tp) (Entered: 08/22/2014) |
| 08/25/2014 | 177 | ORDER granting 168 Motion to Seal. Unsealing due by 8/22/2015. Signed by Judge Cecilia M. Altonaga on 8/22/2014. (ps1) (Entered: 08/25/2014) |
| 08/25/2014 | 178 | ORDER granting 163 Motion to Seal. Unsealing due by 8/22/2015. Signed by Judge Cecilia M. Altonaga on 8/22/2014. (ps1) (Entered: 08/25/2014) |
| 08/25/2014 | 179 | ORDER denying 175 Motion for Summary Judgment, as it was filed beyond the deadline for submitting pre-trial motions contained in the Order appearing at docket entry number 118. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 08/25/2014) |
| 08/28/2014 | 180 | Order Providing Instructions for Jury Trial. Signed by Judge Cecilia M. Altonaga on 8/28/2014. (ps1) (Entered: 08/28/2014) |
| 08/29/2014 | 181 | Unopposed MOTION for Leave to File Excess Pages *Regarding the Medtronic Defendants' Combined Reply to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Text of Proposed Order Exhibit A)(Munn, Janet) (Entered: 08/29/2014) |
| 08/29/2014 | 182 | PAPERLESS NOTICE of Hearing: Scheduling Conference set for 9/4/2014 04:00 PM in Miami Division before Judge Cecilia M. Altonaga. (ps1) (Entered: 08/29/2014) |
| 08/29/2014 | 183 | ORDER granting 181 Motion for Leave to File Excess Pages. Signed by Judge Cecilia M. Altonaga on 8/29/2014. (ps1) (Entered: 08/29/2014) |

| 09/02/2014 | 184 | RESPONSE in Support re 139 MOTION for Summary Judgment filed by Atlas IP, LLC. (Carlson, Curtis) (Entered: 09/02/2014) |
|---|---|---|
| 09/02/2014 | 185 | NOTICE by Atlas IP, LLC *REGARDING TECHNOLOGY TUTORIAL* (Carlson, Curtis) (Entered: 09/02/2014) |
| 09/02/2014 | 186 | UNOPPOSED MOTION and Memorandum of Law for Leave to File Under Seal Defendants' Reply In Support of Defendants' Motion Exclude The Opinions of Donald Merion on Damages by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc. (Attachments: # 1 Exhibit A/Text of Proposed Order)(nc) (Entered: 09/02/2014) |
| 09/02/2014 | | SYSTEM ENTRY - Docket Entry 187 [misc] restricted/sealed until further notice. (nc) (Entered: 09/02/2014) |
| 09/02/2014 | 188 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. *of Conventional Filings* (Munn, Janet) (Entered: 09/02/2014) |
| 09/02/2014 | 189 | UNOPPOSED MOTION and Memorandum of Law for Leave to File Under Seal Defedants' Reply In Support of Defendants' Motion for Summary Judgment by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc. (Attachments: # 1 Exhibit A/Text of Proposed Order)(nc) (Entered: 09/03/2014) |
| 09/03/2014 | | SYSTEM ENTRY - Docket Entry 190 [misc] restricted/sealed until further notice. (nc) (Entered: 09/03/2014) |
| 09/03/2014 | 191 | ORDER granting 186 Motion to Seal. Unsealing due by 9/3/2015. Signed by Judge Cecilia M. Altonaga on 9/3/2014. (ps1) (Entered: 09/03/2014) |
| 09/03/2014 | 192 | ORDER granting 189 Motion to Seal. Unsealing due by 9/3/2015. Signed by Judge Cecilia M. Altonaga on 9/3/2014. (ps1) Modified on 9/3/2014 to correct Unsealing date.(jmd) (Entered: 09/03/2014) |
| 09/03/2014 | 193 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. *of Filing Redacted Version of Their Reply in Support of Their Motion to Exclude the Opinion of Donald Merino Regarding Damages* (Attachments: # 1 Exhibit A to the Notice of Filing - Reply, # 2 Exhibit A - Hahn's Declaration, # 3 Exhibit 14 to Hahn's Declaration, # 4 Exhibit 15 to Hahn's Declaration, # 5 Exhibit 16 to Hahn's Declaration, # 6 Exhibit 17 to Hahn's Declaration, # 7 Exhibit 18 to Hahn's Declaration, # 8 Exhibit 19 to Hahn's Declaration, # 9 Exhibit 20 to Hahn's Declaration, # 10 Exhibit 21 to Hahn's Declaration, # 11 Exhibit 22 to Hahn's Declaration) (Munn, Janet) (Entered: 09/03/2014) |
| 09/03/2014 | 194 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. *of Filing Redacted Version of Reply in Support of Defendants' Motion for Summary Judgment* (Attachments: # 1 Exhibit A to the Notice of Filing - Reply, # 2 Exhibit A to the Reply - Deoras Declaration, # 3 Exhibit 40 to Deoras Declaration, # 4 Exhibit 41 to Deoras Declaration, # 5 Exhibit 42 to Deoras Declaration, # 6 Exhibit 43 to Deoras Declaration) (Munn, Janet) (Entered: 09/03/2014) |
| 09/04/2014 | 195 | Minute Entry for proceedings held before Judge Cecilia M. Altonaga: Scheduling Conference held on 9/4/2014. Court Reporter: Stephanie McCarn, |

| | | |
|---|---|---|
| | | 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov (cpz) (Entered: 09/04/2014) |
| 09/05/2014 | 196 | Joint MOTION to Bring Electronic Equipment into the courtroom by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. Responses due by 9/22/2014 (Attachments: # 1 Exhibit A - Proposed Order)(Munn, Janet) (Entered: 09/05/2014) |
| 09/05/2014 | 197 | ORDER granting 196 Motion to Bring Electronic Equipment into the courtroom. Signed by Judge Cecilia M. Altonaga on 9/5/2014. (ps1) (Entered: 09/05/2014) |
| 09/08/2014 | 198 | PRETRIAL STIPULATION *(Joint Stipulation)* by Atlas IP, LLC (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Carlson, Curtis) (Entered: 09/08/2014) |
| 09/08/2014 | 199 | MOTION for Leave to File *Second Motion in Limine* by Atlas IP, LLC. (Attachments: # 1 Exhibit 1 (motion in limine), # 2 Exhibit 2 (proposed order), # 3 Affidavit of Robert M. Spalding, # 4 Exhibit A to Spalding Declaration, # 5 Exhibit B to Spalding Declaration, # 6 Exhibit C to Spalding Declaration) (Carlson, Curtis) Modified restricted image for 199-4 per DE 210 on 9/10/2014 (tp). (Entered: 09/08/2014) |
| 09/08/2014 | 200 | Proposed Jury Instructions by Atlas IP, LLC. (Carlson, Curtis) (Entered: 09/08/2014) |
| 09/08/2014 | 201 | Proposed Findings of Fact and Proposed Conclusions of Law by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Proposed Findings of Fact)(Munn, Janet) (Entered: 09/08/2014) |
| 09/08/2014 | 202 | NOTICE by Atlas IP, LLC *Joint Proposed Verdict Form* (Carlson, Curtis) (Entered: 09/08/2014) |
| 09/08/2014 | 203 | MOTION in Limine *and Memorandum of Law in support Thereof* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Declaration, # 2 Exhibit 1 to Exhibit A - Declaration, # 3 Exhibit 2 to Exhibit A - Declaration, # 4 Exhibit 3 to Exhibit A - Declaration, # 5 Exhibit 4 to Exhibit A - Declaration, # 6 Exhibit 5 to Exhibit A - Declaration, # 7 Exhibit 6 to Exhibit A - Declaration, # 8 Exhibit 7 to Exhibit A - Declaration, # 9 Exhibit 8 to Exhibit A - Declaration, # 10 Exhibit 9 to Exhibit A - Declaration, # 11 Exhibit 10 to Exhibit A - Declaration, # 12 Exhibit 11 to Exhibit A - Declaration, # 13 Exhibit 12 to Exhibit A - Declaration, # 14 Exhibit 13 to Exhibit A - Declaration)(Munn, Janet) (Entered: 09/08/2014) |
| 09/09/2014 | 204 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. re 203 MOTION in Limine *and Memorandum of Law in support Thereof of Filing Proposed Order* (Attachments: # 1 Exhibit A - Proposed Order) (Munn, Janet) (Entered: 09/09/2014) |
| 09/09/2014 | 205 | UNOPPOSED MOTION Re-File Docket Entry 199-4 Under Seal With Accompanying Relief by Atlas IP, LLC (nc) (Entered: 09/09/2014) |
| 09/09/2014 | | |

Federal Circuit Appendix

A93

| | | |
|---|---|---|
| | | SYSTEM ENTRY - Docket Entry 206 [misc] restricted/sealed until further notice. (nc) (Entered: 09/09/2014) |
| 09/09/2014 | 207 | Joint MOTION for Leave to File *(Serve) Corrected and Supplemental Expert Reports Regarding Damages* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Proposed Order)(Munn, Janet) (Entered: 09/09/2014) |
| 09/09/2014 | 208 | RESPONSE in Opposition re 199 MOTION for Leave to File *Second Motion in Limine* filed by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Proposed Order)(Munn, Janet) (Entered: 09/09/2014) |
| 09/10/2014 | 209 | ORDER granting 207 Motion for Leave to File. *Clerks Notice: Filer must separately re-file the amended pleading pursuant to Local Rule 15.1, unless otherwise ordered by the Judge.* Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 09/10/2014) |
| 09/10/2014 | 210 | ORDER granting 205 Motion for Leave to Re-File Docket Entry 199 -4 Under Seal With Accompanying Information. The Clerk is to remove Docket Entry 199 -4 from the public docket. Unsealing due by 9/10/2015. Signed by Judge Cecilia M. Altonaga on 9/10/2014. (ps1) Modified on 9/10/2014 reflect correct Unseal due date. (jmd) (Entered: 09/10/2014) |
| 09/10/2014 | 211 | NOTICE of Hearing on 145 SEALED MOTION Motion and Memorandum of Law to Exclude The Opinions of Donald Merino on Damages by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc., 148 SEALED MOTION and Memorandum of Law for Summary Judgment on Liability and Damages Filed Under Seal by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc., and 139 MOTION for Summary Judgment: Motion Hearing set for 9/11/2014 before Judge Cecilia M. Altonaga. (ps1) (Entered: 09/10/2014) |
| 09/10/2014 | 212 | NOTICE of Compliance by Sealing [199-4] pursuant to 210 Order. (nc) (Entered: 09/10/2014) |
| 09/10/2014 | | Set/Reset Deadlines as to 145 Motion and Memorandum of Law to Exclude The Opinions of Donald Merino on Damages by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc., 148 SEALED MOTION and Memorandum of Law for Summary Judgment on Liability and Damages Filed Under Seal by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc., 139 MOTION for Summary Judgment: Motion Hearing set for 9/11/2014 09:00 AM in Miami Division before Judge Cecilia M. Altonaga. (ps1) (Entered: 09/10/2014) |
| 09/11/2014 | 213 | Minute Entry for proceedings held before Judge Cecilia M. Altonaga: Motion Hearing held on 9/11/2014 re 145 SEALED MOTION Motion and Memorandum of Law to Exclude The Opinions of Donald Merino on Damages by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc., 139 MOTION for Summary Judgment filed by Atlas IP, LLC, 148 SEALED MOTION and Memorandum of Law for Summary Judgment on Liability and Damages Filed Under Seal by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc. Appearances by George Summerfield and Curtis |

Federal Circuit Appendix
A94

| | | |
|---|---|---|
| | | Carlson for the plaintiff and Akshay Deoras, Jeanne Heffernan and Janet Munn for the defendant. Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov (ch1) (Entered: 09/11/2014) |
| 09/12/2014 | 214 | TRANSCRIPT of the Scheduling Conference held on 09/04/14, before Judge Cecilia M. Altonaga, 1-13 pages, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/6/2014. Redacted Transcript Deadline set for 10/17/2014. Release of Transcript Restriction set for 12/15/2014. (smn) (Entered: 09/12/2014) |
| 09/15/2014 | 217 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Robert M. Spalding. Filing Fee $ 75.00. Receipt # 86784. (ksa) (Entered: 09/18/2014) |
| 09/16/2014 | 215 | TRANSCRIPT of Telephonic Discovery Hearing held on 5/8/2014 before Magistrate Judge John J. O'Sullivan, 1-16 pages, Court Reporter: Jerald M. Meyers, 954-431-4757 / crjm@aol.com. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/10/2014. Redacted Transcript Deadline set for 10/20/2014. Release of Transcript Restriction set for 12/18/2014. (Attachments: # 1 Designation Access Form)(amb) (Entered: 09/16/2014) |
| 09/17/2014 | 216 | Notice of Supplemental Authority by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. (Attachments: # 1 Exhibit A - Opinion in Virnetx dated September 16, 2014) (Munn, Janet) (Entered: 09/17/2014) |
| 09/18/2014 | 218 | RESPONSE in Opposition re 203 MOTION in Limine *and Memorandum of Law in support Thereof* filed by Atlas IP, LLC. (Carlson, Curtis) (Entered: 09/18/2014) |
| 09/18/2014 | 219 | AFFIDAVIT in Opposition re 203 MOTION in Limine *and Memorandum of Law in support Thereof (DECLARATION OF ROBERT M. SPALDING)* filed by Atlas IP, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Carlson, Curtis) (Entered: 09/18/2014) |
| 09/18/2014 | 220 | ORDER granting 217 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 09/18/2014) |
| 09/19/2014 | 221 | REPLY to Response to Motion re 199 MOTION for Leave to File *Second Motion in Limine* filed by Atlas IP, LLC. (Carlson, Curtis) (Entered: 09/19/2014) |
| 09/22/2014 | 222 | ORDER granting 199 Motion for Leave to File Motion in Limine. *Clerks Notice: Filer must separately re-file the amended pleading pursuant to Local Rule 15.1, unless otherwise ordered by the Judge.* Signed by Judge Cecilia M. Altonaga on 9/22/2014. (ps1) (Entered: 09/22/2014) |
| | | |

| 09/22/2014 | 223 | PAPERLESS NOTICE of Hearing on 145 SEALED MOTION: Motion Hearing set for 9/26/2014 01:00 PM in Miami Division before Judge Cecilia M. Altonaga. (ps1) (Entered: 09/22/2014) |
| 09/22/2014 | 224 | MOTION in Limine by Atlas IP, LLC. (Attachments: # 1 Affidavit Robert Spalding, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Carlson, Curtis) (Entered: 09/22/2014) |
| 09/23/2014 | 225 | Joint MOTION of the Parties for Entry of an Order Permitting use of Electronic Devices and Equipment at Court by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Proposed Order)(Munn, Janet) (Entered: 09/23/2014) |
| 09/23/2014 | 226 | REPLY to Response to Motion re 203 MOTION in Limine *and Memorandum of Law in support Thereof* filed by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Declaration of A. Deoras, # 2 Exhibit 14 to Exhibit A - Declaration of A. Deoras)(Munn, Janet) (Entered: 09/23/2014) |
| 09/24/2014 | 227 | ORDER granting 225 Motion of the Parties for Entry of an Order Permitting the Use of Electronic Devices and Equipment at Court. Signed by Judge Cecilia M. Altonaga on 9/24/2014. (ps1) (Entered: 09/24/2014) |
| 09/24/2014 | 228 | TRANSCRIPT of the Motion for Summary Judgment and the Motion to Exclude held on 09/11/14, before Judge Cecilia M. Altonaga, 1-210 pages, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/20/2014. Redacted Transcript Deadline set for 10/30/2014. Release of Transcript Restriction set for 12/26/2014. (smn) (Entered: 09/24/2014) |
| 09/24/2014 | 229 | TRANSCRIPT of the Motion in Limine held on 07/10/14, before Judge Cecilia M. Altonaga, 1-16 pages, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/20/2014. Redacted Transcript Deadline set for 10/30/2014. Release of Transcript Restriction set for 12/26/2014. (smn) (Entered: 09/24/2014) |
| 09/26/2014 | 230 | Minute Entry for proceedings held before Judge Cecilia M. Altonaga: Motion Hearing held on 9/26/2014 re 145 SEALED MOTION Motion and Memorandum of Law to Exclude The Opinions of Donald Merino on Damages by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc. Written order to follow. Court Reporter: Lisa Edwards, 305-523-5499 / Lisa_Edwards@flsd.uscourts.gov (sh01) (Entered: 09/26/2014) |
| 09/29/2014 | 232 | Unopposed MOTION for Ryan Kane, Esq., to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Filing Fee $ 75.00. Receipt # 87378. (ksa) (Entered: 09/30/2014) |

| | | |
|---|---|---|
| 09/30/2014 | 231 | TRANSCRIPT of Motion Hearing held on September 26, 2014, before Judge Cecilia M. Altonaga, 1-93 pages, Court Reporter: Lisa Edwards, 305-523-5499 / Lisa_Edwards@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/24/2014. Redacted Transcript Deadline set for 11/3/2014. Release of Transcript Restriction set for 1/2/2015. (le) (Entered: 09/30/2014) |
| 10/01/2014 | 233 | ORDER granting 232 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 10/01/2014) |
| 10/02/2014 | 234 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. *of changed position* (Attachments: # 1 Exhibit 1- October 1, 2014 Email) (Munn, Janet) (Entered: 10/02/2014) |
| 10/03/2014 | 235 | UNOPPOSED MOTION and Memorandum of Law for Leave to File Under Seal Defendants' Opposition to Atlas's Motions In Limine by Medtronic, Inc., Medtronic USA, Inc., Medtronic MiniMed, Inc. (Attachments: # 1 Text of Proposed Order)(nc) (Entered: 10/06/2014) |
| 10/06/2014 | | SYSTEM ENTRY - Docket Entry 236 [misc] restricted/sealed until further notice. (nc) (Entered: 10/06/2014) |
| 10/06/2014 | 237 | ORDER granting 145 Sealed Motion to Exclude Opinions. Signed by Judge Cecilia M. Altonaga on 10/6/2014. (ps1) (Entered: 10/06/2014) |
| 10/06/2014 | 238 | ORDER granting 235 Motion to File Under Seal. Unsealing due by 10/6/2015. Signed by Judge Cecilia M. Altonaga on 10/6/2014. (ps1) (Entered: 10/06/2014) |
| 10/06/2014 | 239 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. *of Filing Redacted Version of Defendants' Opposition to Atlas' Motions in Limine* (Attachments: # 1 Exhibit A - Opposition, # 2 Exhibit A - Declaration, # 3 Exhibit 1 to Declaration, # 4 Exhibit 2 to Declaration, # 5 Exhibit 3 to Declaration, # 6 Exhibit 4 to Declaration, # 7 Exhibit 5 to Declaration, # 8 Exhibit 6 to Declaration, # 9 Exhibit 7 to Declaration) (Munn, Janet) (Entered: 10/06/2014) |
| 10/07/2014 | 240 | MOTION to Strike *Atlas's Newly Disclosed Damages Theory and Memorandum of Law in Support Thereof* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. Responses due by 10/24/2014 (Attachments: # 1 Exhibit A - Declaration, # 2 Exhibit 1 to Declaration, # 3 Exhibit 2 to Declaration, # 4 Exhibit 3 to Declaration, # 5 Exhibit 4 to Declaration, # 6 Exhibit 5 to Declaration, # 7 Exhibit 6 to Declaration, # 8 Exhibit 7 to Declaration, # 9 Exhibit 8 to Declaration, # 10 Exhibit 9 to Declaration, # 11 Exhibit 10 to Declaration, # 12 Exhibit 11 to Declaration, # 13 Exhibit 12 to Declaration, # 14 Exhibit B - Proposed Order)(Munn, Janet) (Entered: 10/07/2014) |
| 10/07/2014 | 241 | Joint MOTION for Pretrial Conference *and Memorandum of Law* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. |

Federal Circuit Appendix
A97

| | | (Attachments: # 1 Text of Proposed Order Exhibit A)(Munn, Janet) (Entered: 10/07/2014) |
|---|---|---|
| 10/07/2014 | 242 | ORDER granting 241 Motion. The parties are directed to contact the Courtroom Deputy to address scheduling of the conference requested. Signed by Judge Cecilia M. Altonaga (CMA) (Entered: 10/07/2014) |
| 10/08/2014 | 243 | ORDER granting in part and denying in part 148 Motion for Summary Judgment. Signed by Judge Cecilia M. Altonaga on 10/8/2014. (ps1) (Entered: 10/08/2014) |
| 10/08/2014 | 244 | ORDER setting deadline as to 240 MOTION to Strike *Atlas's Newly Disclosed Damages Theory and Memorandum of Law in Support Thereof*; Responses due by 10/10/2014, Replies due by 10/13/2014. Signed by Judge Cecilia M. Altonaga on 10/8/2013. (ps1) (Entered: 10/08/2014) |
| 10/08/2014 | 245 | NOTICE of Hearing: Pretrial Conference set for 10/20/2014 08:30 AM in Miami Division before Judge Cecilia M. Altonaga. (ps1) (Entered: 10/08/2014) |
| 10/08/2014 | 246 | REPLY to Response to Motion re 224 MOTION in Limine filed by Atlas IP, LLC. (Carlson, Curtis) (Entered: 10/08/2014) |
| 10/10/2014 | 247 | RESPONSE in Opposition re 240 MOTION to Strike *Atlas's Newly Disclosed Damages Theory and Memorandum of Law in Support Thereof* filed by Atlas IP, LLC. (Attachments: # 1 Affidavit Robert M. Spalding, # 2 Exhibit A) (Carlson, Curtis) (Entered: 10/10/2014) |
| 10/10/2014 | 248 | MOTION for Reconsideration re 243 Order on Sealed Motion *and Memorandum of Law in Support* by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Attachments: # 1 Exhibit A - Declaration, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit B - Proposed Order) (Munn, Janet) (Entered: 10/10/2014) |
| 10/13/2014 | 249 | RESPONSE in Opposition re 248 MOTION for Reconsideration re 243 Order on Sealed Motion *and Memorandum of Law in Support* filed by Atlas IP, LLC. (Carlson, Curtis) (Entered: 10/13/2014) |
| 10/13/2014 | 250 | REPLY to Response to Motion re 240 MOTION to Strike *Atlas's Newly Disclosed Damages Theory and Memorandum of Law in Support Thereof* filed by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Munn, Janet) (Entered: 10/13/2014) |
| 10/14/2014 | 251 | Exhibit and Witness List by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc... (Munn, Janet) (Entered: 10/14/2014) |
| 10/14/2014 | 252 | Proposed Voir Dire Questions by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Munn, Janet) (Entered: 10/14/2014) |
| 10/14/2014 | 253 | NOTICE by Medtronic USA, Inc., Medtronic, Inc., Medtronic Minimed, Inc. *of Joint Submission of Voir Dire Statement of the Case* (Munn, Janet) (Entered: 10/14/2014) |
| 10/14/2014 | 254 | Minute Entry for proceedings held before Judge Cecilia M. Altonaga: Calendar Call held on 10/14/2014. Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov (sh01) (Entered: 10/14/2014) |

| 10/14/2014 | 255 | ORDER denying as moot 240 Motion to Strike. Signed by Judge Cecilia M. Altonaga on 10/14/2014. (ps1) (Entered: 10/14/2014) |
| 10/14/2014 | 256 | Proposed Jury Instructions by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Munn, Janet) (Entered: 10/14/2014) |
| 10/14/2014 | 257 | REPLY to Response to Motion re 248 MOTION for Reconsideration re 243 Order on Sealed Motion *and Memorandum of Law in Support* filed by Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc.. (Munn, Janet) (Entered: 10/14/2014) |
| 10/15/2014 | 258 | ORDER granting in part and denying in part 139 Motion for Summary Judgment. Signed by Judge Cecilia M. Altonaga on 10/15/2014. (ps1) (Entered: 10/15/2014) |
| 10/17/2014 | 259 | CLERK'S NOTICE re 245 NOTICE of Hearing: Pretrial Conference set for 10/20/2014 08:30 AM in Miami Division before Judge Cecilia M. Altonaga; the hearing is CANCELLED. The parties will be advised if the hearing will be rescheduled. (ps1) (Entered: 10/17/2014) |
| 10/17/2014 | 260 | ORDER denying as moot 203 Motion in Limine; denying as moot 224 Motion in Limine; granting 248 Motion for Reconsideration. Summary Judgment is granted in Medtronic's favor as to Claim 21. The Clerk is directed to close the case and any pending motions are denied as moot. Signed by Judge Cecilia M. Altonaga on 10/17/2014. (ps1) (Entered: 10/17/2014) |
| 10/17/2014 | | Civil Case Terminated. Closing Case. (ps1)<br><br>**NOTICE: If there are sealed documents in this case, they may be unsealed after 1 year or as directed by Court Order, unless they have been designated to be permanently sealed. See Local Rule 5.4 and Administrative Order 2014-69.** (Entered: 10/17/2014) |
| 10/17/2014 | 261 | JUDGMENT in favor of Medtronic Minimed, Inc., Medtronic USA, Inc., Medtronic, Inc. against Atlas IP, LLC. Signed by Judge Cecilia M. Altonaga on 10/17/2014. (ps1) (Entered: 10/17/2014) |
| 10/20/2014 | 262 | Notice of Appeal as to 261 Judgment by Atlas IP, LLC. Filing fee $ 505.00 receipt number 113C-7167972. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under Transcript Information. (Carlson, Curtis) (Entered: 10/20/2014) |
| 10/21/2014 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 262 Notice of Appeal, Notice has been electronically mailed. (hh) (Entered: 10/21/2014) |

| **PACER Service Center** |
| **Transaction Receipt** |
| |

| 10/22/2014 12:12:36 | | | |
|---|---|---|---|
| **PACER Login:** | sg0248:2633776:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:13-cv-23309-CMA |
| **Billable Pages:** | 29 | **Cost:** | 2.90 |

US005371734A

# United States Patent [19]

### Fischer

[11] Patent Number: **5,371,734**

[45] Date of Patent: **Dec. 6, 1994**

[54] **MEDIUM ACCESS CONTROL PROTOCOL FOR WIRELESS NETWORK**

[75] Inventor: **Michael A. Fischer,** San Antonio, Tex.

[73] Assignee: **Digital Ocean, Inc.,** Overland Park, Kans.

[21] Appl. No.: **11,415**

[22] Filed: **Jan. 29, 1993**

[51] Int. Cl.5 ......................... H04B 7/216; H04B 7/26
[52] U.S. Cl. .................................... 370/18; 370/95.1; 370/95.3; 340/825.47; 455/38.2; 455/54.2
[58] Field of Search ...................... 370/18, 95.1, 95.3; 340/825.44, 825.47; 455/38.2, 38.3, 53.1, 54.1, 54.2, 68, 69, 70

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,449,248 | 5/1984 | Leslie et al. | 455/38.3 |
| 5,241,542 | 8/1993 | Natarajan et al. | 455/38.3 |
| 5,276,680 | 1/1994 | Messenger | 370/95.1 |

#### OTHER PUBLICATIONS

AS-100 Spread Spectrum ASIC, Signal Technologies, Inc., Nov. 14, 1991.
CSL-100 MOD/DEMOD ASIC, Signal Tech. Inc., Nov. 14, 1991.

Model 200 RF Modem, Signal Tech., Inc., Nov. 14, 1991.

*Primary Examiner*—Wellington Chin
*Attorney, Agent, or Firm*—John R. Ley

[57] **ABSTRACT**

A communicator station wirelessly transmits frames to and receives frames from a least one additional communicator in a Group in accordance with a MAC protocol. One of the communicators functions as a hub and the remaining communicators function as remotes. The hub sends control information to the hubs to establish repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames. The intervals allow the hub and the remotes to anticipate transmitting and receiving frames, thereby allowing the remotes to power off their receivers and transmitters to achieve a considerable savings in power consumption without degrading communications. Other improved features include adjusting the intervals and the durations of transmission opportunities in the communication cycle to obtain the beneficial aspects of TDMA and PRMA for LAN-like communication without also incurring most of the undesirable aspects of such MAC techniques. Other control functions such as arbitration determine which communicator is better suited to act as the hub.

**47 Claims, 12 Drawing Sheets**



U.S. Patent

Dec. 6, 1994

Sheet 1 of 12

5,371,734

Federal Circuit Appendix
A102



Fig_1



*Fig_2*



*Fig_3*



*Fig - 4*

U.S. Patent

Dec. 6, 1994

Sheet 5 of 12

5,371,734

Federal Circuit Appendix
A106



Fig_5

U.S. Patent

Federal Circuit Appendix
A107

Dec. 6, 1994    Sheet 6 of 12    5,371,734



U.S. Patent          Dec. 6, 1994          Sheet 7 of 12          5,371,734

Federal Circuit Appendix
A108



**Fig_10**

70 → | TIME | 76 | 78 | 80 | 82 | 84 | 86 | 88

| INFO INTERVAL | BROADCAST INTERVAL | DIRECTED INTERVAL | ALT INFO INTERVAL | REMOTE TRANSMISSION TXOP INTERVALS | TXOP REQUEST INTERVAL | HUB BEACON INTERVAL |

OUTBOUND PORTION 72 — INBOUND PORTION 74 — INBOUND OUTBOUND

**Fig_11**

72 | 146 | 200 | 154 | 202 | 154 | 202 | 154 | 204 | 154 | 204 | 150 | 146 | 206 | 150

| PRE-AMBLE | INFO FRAME | IFG | BROADCAST FRAM 1 | IFG | BROADCAST FRAME n | IFG | DIRECTED FRAME 1 | IFG | DIRECTED FRAME n | POST-AMBLE | PRE-AMBLE | ALT INFO FRAME | POST AMBLE |

144                                                                                      144

**Fig_12**

74 | 146 | 208 | 154 | 208 | 154 | 150 | 146 | 208 | 154 | 208 | 154 | 150 | 146 | 208 | 154 | 208 | 154

| PRE-AMBLE | FRAME 1 | IFG | FRAME n | IFG | POST-AMBLE | PRE-AMBLE | FRAME 1 | IFG | FRAME 2 | IFG | POST AMBLE | ••• | PRE-AMBLE | FRAME 1 | IFG | FRAME n | IFG | POST AMBLE |

REMOTE TXOP1          REMOTE TXOP 2          REMOTE TXOP n    150

**Fig_13**

86 | 146 | 151 | 150

| PRE-AMBLE | TXOP REQUEST | POST-AMBLE |

TXOP REQUEST INTERVAL

**Fig_14**

88 | 146 | 149 | 150 | 147 | 146 | 145 | 150

| PRE-AMBLE | HUB BEACON FRAME | POST-AMBLE | GAP | PRE-AMBLE | HUB BEACON REPLY | POST-AMBLE |

HUB BEACON INTERVAL

U.S. Patent

Dec. 6, 1994

Sheet 8 of 12

5,371,734

Federal Circuit Appendix
A109



Fig _ 15



*Fig_16*



*Fig_17*



*Fig_18*



*Fig_19*

5,371,734

1

# MEDIUM ACCESS CONTROL PROTOCOL FOR WIRELESS NETWORK

## CROSS-REFERENCE TO RELATED APPLICATION

This invention relates to an invention for a Technique for Bridging Local Area Networks Having Non-Unique Node Addresses, Ser. No. 08/011,361, filed concurrently herewith, by the inventor hereof, and assigned to the assignee of this Application. The disclosure of this related invention is incorporated herein by this reference.

## FIELD OF THE INVENTION

This invention relates to a technique and protocol for connecting multiple distinct computer resources by radio frequency (RF) or other wireless communications to establish a single logical network of the resources to permit communication between the distinct resources similar to that of a local area network (LAN). Even more specifically, the present invention relates to a medium access control (MAC) technique or protocol for selectively activating and deactivating the transmitters and receivers of the means for communicating between the resources to save electrical power consumed while still permitting LAN-like functionality, thereby extending considerably the ability of the resources to remain operable when battery powered.

## BACKGROUND OF THE INVENTION

A LAN is a well-known means of achieving communication between different resources, typically computer resources such as computers, work stations, printers and the like. The LAN itself includes a network interface connected to each resource and a physical communication medium connecting all of the interfaces. The interface and connected resource constitute a node. Each node has an unambiguous address or identification (ID). Communication between nodes is typically accomplished by sending and receiving an ordered Group of bits known as a frame or packet. Each frame is sent from a source node, and is received by a destination node. The ID of the source node (SID) and the ID of the destination node (DID) are frequently included within the frame in Groups of sequential bits known as fields. The technique of communicating between the nodes, and of controlling the composition of frames, is defined by a network protocol.

The network protocol includes a MAC aspect which establishes an orderly and predictable ability of each node to access the medium, for the purposes of communicating with another node by transmitting and receiving frames, of requesting access to the medium and of acknowledging previous frame communication. Without an orderly and predictable MAC technique, chaotic and inefficient communication, if any, would prevail, because it is highly unlikely that the frames sent from the source node would reach the destination node without interference and disruption caused by conflicting frames sent by another node at the same or overlapping time periods or at a time that the destination node was not ready to receive a frame. Therefore, the MAC facilities are one of the very important aspects of any LAN-like communication protocol among a plurality of equal peer-type transmitting and receiving stations such as nodes.

2

Because of the increasing recognition of the benefits of communicating information quickly between resources and of sharing resources in computational situations, LANs and networking in general are becoming widely used. Networking of personal computers and work stations allows for easy and effective communication and exchange of information between computers, as well as cost effective sharing of computer resources such as hard disks and printers.

Implementing a LAN can present a significant impediment when it is recognized that all of the resources must be wired together, particularly if the resources are physically separated and numerous. It is not unusual that many thousands or tens of thousands of feet or meters of cable may be required to connect a few tens or hundreds of resources, even when none of the resources is separated by more than a few hundreds of feet or meters. In existing facilities, sufficient physical access may not be available to route the necessary cabling. Installation, even if possible, may be very expensive. Even in designing and constructing new facilities, the cable expense itself for networking among a large number of personal computers or work stations may be cost-prohibitive.

Networks of LAN-like functionality have been established in the past by implementing the communication medium with wireless RF links between the resources. One difficulty presented by such systems is that MAC becomes considerably more difficult, because the RF links do not permit the transmitting and receiving stations (akin to nodes on a LAN) to sense the use of the medium (the RF signals) as reliably as in a wired network. Timing and synchronization requirements for the transmission of messages, static and interference from sources of RF noise, transmission and reception range limitations, multipath interference and fading and other known difficulties, all become significant concerns and limitations in implementing MAC protocols for wireless networks. These same concerns are generally not regarded as highly significant in wired or optical fiber networks because the integrity of the cabled medium usually avoids most if not all of these concerns. The integrity of the wired communication medium usually eliminates or significantly reduces the concerns about interference because the cabling offers inherent shielding from interference. Because the integrity of the communication is essentially assured in transmissions over the wires, range and signalling issues generally do not become significant. Light links have also been employed in networks, but the difficulties with light linked networks are usually even more exaggerated because of the directionality required for directing light beams in unobstructed, line-of-sight, signal paths.

To make the communications more reliable by avoiding many of the problems caused by the difficulties associated with the wireless medium, a variety of different MAC techniques have been employed in wireless network systems. In general the objective of these MAC techniques has been to add reliability to the communication process by compensating, to a certain degree, for the greater uncertainties associated with the wireless medium.

One of the most widely used MAC techniques, originally developed for wireless network systems, but now employed for several of the most common wired network standards, is referred to as carrier-sense multiple access (CSMA). In CSMA, each station uses its receiver to monitor the network medium for other transmission

5,371,734

3

activity prior to activating its transmitter. If any such activity is detected, the station waits until a predetermined time after the end of the detected network activity. If two or more stations begin transmitting at close enough to the same point in time so that none of these stations detect each other's transmission, the resulting transmissions are said to collide, with the result that none of the frames being transmitted by these stations are able to be successfully received at their intended destinations.

While CSMA protocols offer very low latency to begin communication during periods when little or no other network message traffic is active, they perform poorly when many stations are contending for access to the medium to send frames or when the aggregate amount to be transmitted exceeds about half of the data bandwidth of the network medium. In addition to this problem with saturation at well below the rated capacity of the network, wireless CSMA networks have increased chances for collisions when compared with wired CSMA networks, because obstructions to RF signal propagation could permit a station to erroneously detect an available network medium, allowing that station to activate its transmitter while another station was in the process of sending a frame.

Another MAC technique which is typically used in wireless networks is referred to as time division multiple access (TDMA). In TDMA, the available time for the multiplicity of the stations to access and use the radio links is divided among each of the stations. Each station has its own predesignated and assigned time Txop for communicating RF messages with other stations. Each station recognizes and operates under recognition of the order and sequence of the time Txops assigned to the other stations, to avoid overlap and conflict in the communications.

While TDMA protocols are generally very effective in providing reliably recognized opportunities for communicating messages, they can result in a reduced capacity or data bandwidth for transmitting information between stations when the communications are intermittent quantities of variable length messages ("bursts"). In burst message situations, which are highly typical of LAN-type communications, TDMA results in reduced useable data bandwidth because a large portion of the available time is unused for data communications because that time is assigned to stations that have nothing to send when their time slots occur. In situations where one station may have a considerable amount to send, the information must be broken up into parts and sent in sequence, one part each time the station's time occurs. Thus, TDMA, while providing reliable medium access in the difficult medium access environment of wireless networks, does not provide the higher message throughput or bandwidth as do some of the more traditional LANs.

Another MAC technique which is typically used in wireless networks is referred to as packet reservation multiple access (PRMA). In PRMA, each of the multiplicity of the stations must request and reserve a time to access and use the radio link to send its packets or frames. The requests are made on the basis of the amount of time that each station expects to use in communicating the amount of information it has queued for delivery to another station. The available time for all the stations to communicate is divided among each of the stations according to the requests of the stations. The time allocation reserved for each station is commu-

4

nicated to all of the stations, so all of the stations recognize which stations have a time allocation, how long the time allocation is and in what order the stations will receive and use their allocations. After this information is conveyed, each station requesting time uses its reserved time in its assigned order to communicate packets or frames with other stations.

PRMA techniques are more effective than TDMA techniques in utilizing the available time, because only those stations with messages to send need to be provided with an opportunity to send messages. However, fast response to requests is impossible because of the delays inherent in obtaining a reservation. A considerable amount of the available time is consumed in the rather complex communication of control information, referred to as "overhead." The overhead is used for requesting time, allocating a reservation of time, communicating the amount of time reserved, communicating the order in which the stations receive the time reservations, and the like. As a consequence, the quantity of useful data bandwidth of PRMA networks is also limited.

Another recent development in the field of computing is the increasing proliferation of battery-powered, portable computers. These portable computers allow computational tasks to be performed wherever the user happens to be located. Portable computers are usually used during travel, because portability is their primary advantage. Even during travel, however, there may be a need to access other computer resources through the portable computer, just as is more typically done with stationary resources. It may desirable to create temporary, ad hoc networks of portable computers so that, for example, users can network their portable computers to exchange data in meetings and classrooms. Of course in these situations, physically connecting the portable computers to a wired network medium may be inconvenient or impossible. In addition, the users and their locations may not be specifically predefined, and may change intermittently. In addition, to connect portable computers with RF or other wireless networking capability, it is necessary that the transmitters and receivers also operate from battery power, otherwise one of the primary benefits of wireless networking is negated by requiring the use of a power wire instead of a network medium wire. The additional power drain resulting from operating the transmitters and receivers diminishes the available power for the portable computer. If separate batteries are employed for the transmitter and receiver on one hand and for the portable computer on the other hand, the batteries for the transmitter and receiver should be able to provide as much longevity of use for the transmitter and receiver as the batteries for the portable computer provide, without being so large or heavy as to interfere with portability.

A major obstacle to adequate battery life for battery-operated wireless network interfaces is that conventional MAC protocols, whether using CSMA techniques, TDMA techniques, PRMA techniques, or other techniques (such as token passing), all assume that the network receivers are capable of receiving frames at all times that they are not actively transmitting. Consequently these MAC prior techniques are concerned only with controlling access to the network medium by transmitters. Because low-power, short-distance radio transceivers consume about as much electrical power in their receiving function as in their transmitting function, a useful protocol for battery operated networking must

5,371,734

**5**

avoid this assumption, and must concern itself with the access to the network medium by the receivers as well as the transmitters.

It is against this background that the significant improvements and advancements of the present invention have evolved.

## SUMMARY OF THE INVENTION

It is the overall objective of the present invention to provide a reliable medium access control (MAC) protocol for wireless, preferably radio frequency (RF), LAN-type network communications among a plurality of resources, such a battery powered portable computers. The MAC protocol of the present invention provides the reliable, predictable aspects of medium access similar to those obtained in TDMA, and also provides the more effective allocation of available bandwidth among those resources which have messages to send, similar to those available from PRMA. In addition, the MAC protocol of the present invention avoids many of the disadvantages associated with the inefficiencies of LAN-type burst communications in TDMA, the high overhead requirements for communications in PRMA, and the problems of avoiding collisions and saturation that affect CSMA. Further still, the present invention provides a MAC protocol which may be very effectively implemented with communicator stations used with portable computers, because it obtains significant reductions in battery power drain by permitting the receivers as well as the transmitters of the communicator stations to be powered off during a majority of the time, but selectively and predictably powered on to send or receive relevant communications.

In accordance with these and other aspects, a communicator station or communicator wirelessly transmits frames to and receives frames from a least one additional communicator in accordance with a predetermined MAC protocol. Each communicator includes a transmitter and a receiver. The communication occurs among members of a Group of communicators. The MAC protocol controls each communicator of the Group. One of the communicators of the Group is designated as a "hub" and the remaining communicators are designated as "remotes". The hub establishes repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames. The hub transmits control information to the remotes to establish the communication cycle and to establish a plurality of predeterminable intervals during each communication cycle. These intervals allow the hub to transmit frames to the remotes, allow the remotes to transmit frames to the hub, and allow each remote to anticipate receiving frames from the hub. Due to the defined intervals of the communication cycle and the information conveyed by the hub, the remotes are able to power off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub. In addition, and very significantly, the remotes are able to power off their receivers during times other than those intervals when the remote is expected to receive frames from the hub. Thus, the control information and the communication cycle conserve considerable power because the receivers and transmitters of the remotes may remain powered off for a considerable portion of time without degrading communications.

Another desirable aspect of the MAC protocol of the present invention is that the hub allocates transmission

**6**

opportunities (Txops) to the remotes, preferably based on bandwidth requests from the hubs. Txop allocation information is communicated to the remotes. Previous Txop allocations may be revoked or relinquished for non-use or very low use as determined by the hub monitoring the frames transmitted by each remote, for example. In addition the Txop allocations may be varied or adjusted by the hub from one communication cycle to the next to account for changes in activity of the remotes. The adjustment occurs in relation to the number of frames or quantity of data transmitted by each remote during recent communication cycles. Thus, the desirable aspects of TDMA are achieved by providing specific predeterminable intervals for Txops, and the desirable aspects of PRMA are achieved by adjusting the durations of the Txops to accommodate the communication of the more active remotes. Battery power concerns are addressed by allowing the predeterminable intervals for receiving frames, thus allowing the receivers to be powered off until the frames are anticipated.

Another aspect of the MAC protocol of the present invention involves conveying a variety of beneficial information concerning the communication cycle to the remotes, preferably at the beginning of each communication cycle, to achieve numerous other improvements. The hub transmits information to the remotes in a manner which does not incur a high overhead penalty. The hub preferably adjusts the length of a communication cycle relative to the length of a previous communication cycle to avoid some of the problems of interference from sources of periodic noise. The hub preferably transmits the information to the remotes twice during each communication cycle to reduce the possibility of a remote failing to receive the information during any communication cycle. Each remote preferably has the ability to select one among the plurality of antennas with which to receive RF signals during each communication cycle based on the strength of the received signal, preferably during a preamble portion of a transfer unit from the hub which includes the information. Preferably, the RF signals employ direct sequence spread spectrum modulation and demodulation established by a predetermined spreading code set by the hub to more effectively achieve good communication. The hub and a newly active remote also exchange operating characteristic information to allow negotiation of which communicator would better serve as a hub for the Group. The operational responsibility as the hub is preferably transferable from one communicator to another. Adjacent hubs of different Groups also communicate to adjust their operating characteristics and those of the remotes in their Groups to avoid conflicts in transmissions. The remotes also transmit transfer units that contain information describing the frames that were successfully received during a previous communication cycle to allow retransmission of the frames unsuccessfully received without having to retransmit all of the frames. These are examples of a few of the many improvements available from the present invention.

A more complete appreciation of the present invention and its scope can be obtained from understanding the accompanying drawings, which are briefly summarized below, the following detailed description of a presently preferred embodiment of the invention, and the appended claims.

5,371,734

7 8

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a Group of wired LAN segments bridged together by RF communications between communicators connected to each LAN segment in accordance with the present invention.

FIG. 2 is a block diagram similar to FIG. 1 showing the relative RF transmission ranges of a hub communicator of the Group shown in FIG. 1, and some of the other remote communicators of the Group, shown in FIG. 1.

FIG. 3 is an illustration of a communication cycle established by the hub communicator shown in FIGS. 1 and 2 to control outbound signal transmissions from the hub communicator to the remote communicators of the Group and to control inbound signal transmissions from the remote communicators to the hub communicator of the Group.

FIG. 4 is a block diagram of a communicator shown in FIGS. 1 and 2.

FIG. 5 is a block diagram of a RF modem of the communicator shown in FIG. 4.

FIG. 6 is a diagram showing components of a transfer unit which is communicated between communicators as shown in FIG. 1.

FIG. 7 is an expanded diagram of a payload of the transfer unit shown in FIG. 6.

FIG. 8 is an expanded diagram of a frame which forms a portion of the payload shown in FIG. 7.

FIG. 9 is an expanded diagram of fields of a header of the frame shown in FIG. 8.

FIG. 10 is a diagram showing the intervals occurring during an outbound portion and an inbound portion of the communication cycle shown in FIG. 3.

FIG. 11 is an expanded diagram of a portion of FIG. 10, showing transfer units and frames transmitted during the outbound portion of the communication cycle.

FIG. 12 is an expanded diagram of a portion of FIG. 10, showing the transfer units and frames transmitted by the remote communicators during their allocated transmission opportunities (Txops) in the inbound interval of the communication cycle.

FIG. 13 is an expanded diagram of a transfer unit and a frame sent by a remote communicator to the hub communicator to obtain a Txop allocation in the communication cycle.

FIG. 14 is an expanded diagram of exemplary transfer units and frames sent by hub communicators of adjacent Groups during a hub beacon interval of the communication cycle.

FIG. 15 is an operational state diagram showing the operation of the communicators shown in FIG. 1.

FIG. 16 is a flow chart of the operations occurring during listen RF active state of operation shown in FIG. 15.

FIG. 17 is a flow chart of the operations occurring during a request Txop state of operation shown in FIG. 15.

FIG. 18 is a flow chart of the operations occurring during hub communicator active state of operation shown in FIG. 15.

FIG. 19 is a flow chart of the operations occurring during remote communicator active state of operation shown in FIG. 15.

## DETAILED DESCRIPTION

A plurality of LAN segments which may be bridged in accordance with the present invention are shown in FIG. 1 and referenced at 30a, 30b, 30c, 30d, 30e and 30f. LAN segments generally will hereinafter be referred to by the reference number 30, while specific LAN segments shown in FIG. 1 will be referenced by an alphabetical identification in conjunction with the reference numeral 30 as shown. Each LAN segment 30 is in actuality a LAN or at least one node of LAN. Each LAN segment 30 includes a physical communication medium 32 which connects nodes 34 of each LAN segment 30 in a network topology (bus, ring, star, etc.) which is illustrated as a bus in FIG. 1 for simplicity. The communication medium 32 will typically take the form of electrical connectors interconnecting the nodes 34, but may also include radiant energy links, such as modulated light links, as are known to be employed in LANs.

Each node 34 comprises a network interface 36 connected to the communication medium 32, and one or more resources 38 connected to the interface at each node 34. The resource 38 can assume a variety of different configurations, as is known, but will typically include a computer such as a work station, portable computer, personal computer, printer, server, or the like.

Communication between separate nodes 34 and the resources 38 on those LAN segments 30 which have multiple nodes 34 and resources 38, such as LAN segments 30a, 30b and 30e, is accomplished in accordance with a network protocol which governs the transmission and receipt of communications, known as LAN packets, over the medium 32 linking the interfaces of the nodes 34. The communication actually is undertaken by the interfaces 36 transmitting and receiving the LAN packets over the communication medium 32 to establish communication between the nodes 34. The form of the LAN packets is also controlled by the network protocol which governs the communications over the LAN segments 30.

To allow orderly and reliable communication between the nodes 34, each node 34 has its own node address or NID. The NID of each node 34 is maintained by the interface 36 associated with the node. As shown in FIG. 1, exemplary NIDs for each node are illustrated enclosed within circles within the rectangles designating each node 34. The LAN packets transmitted from a source node typically contain the address of the source node (SID) sending the packet, and the address of the destination node (DID) to which the packet is addressed, in accordance with the typical network protocol.

Some of the LAN segments, i.e. 30c, 30d and 30f, are single resource, single node LAN segments. Thus, it is impossible to communicate between nodes on those LAN segments because two active nodes, a source node and a destination node, are required for LAN packet communication, and two nodes do not exist on those LAN segments. The other LAN segments, i.e. 30a, 30b and 30e, permit LAN functionality between the nodes 34, because each LAN segment contains at least two nodes 34. The preferred embodiment uses the RF MAC protocol for bridging between LAN segments, however the MAC protocol of the present invention is for communication between RF nodes. In alternate embodiments, the communicator function 60 can also be used directly as a LAN adapter, replacing the interfaces 36 of the PC or other resources 38.

One capability of the present invention is to bridge together the LAN segments 30, whether single node LAN segments (30b, 30c and 30f) or multiple node LAN segments (30a, 30b and 30e) so that all of the

5,371,734

9

nodes 34, regardless of the type of LAN segment 30 upon which they appear, can achieve effective LAN like communication among a "Group" of separate LAN segments. The number of LAN segments which can be bridged is preferably limited to a predetermined number, for example sixteen. The communications between the LAN segments will be transparent to the network interfaces 36 and without altering the protocol used on any of the LAN segments 30. In essence, the bridged LAN segments 30 establish a single logical LAN.

To bridge the LAN segments 30 together for effective communication between the nodes 34, communicator stations or communicators 60a, 60b, 60c, 60d, 60e and 60f are connected to each LAN segment 30a, 30b, 30c, 30d, 30e and 30f, respectively, as is shown in FIG. 1. Each communicator will hereinafter be generally referred to by the reference number 60, while specific communicators shown in FIG. 1 will be referenced by an alphabetical identification in conjunction with the referenced numeral 60 as shown.

Another more general capability of the present invention is to serve as a self-contained, wireless network or LAN, with the communicators attached directly to the resources 38, in place of the wired LAN segments 32 and the associated interfaces 36. In this more general usage, the communicators directly connect to a resource and convey LAN packets or other information using the MAC protocol of the present invention, and no bridging between separate LAN segments occurs. It should be understood that the MAC protocol of the present invention is equally applicable to either situation.

Each communicator 60 communicates with the node or nodes 34 on the LAN segment 30 (or resource 38) to which it is locally attached. A "local" node or a "local" LAN segment or resource is the one which is directly connected by the communication medium 32 to the communicator 60 with regard to which the reference "local" is made.

Each communicator 60 preferably includes a LAN interface 36. The interfaces 36 in the nodes 34 and in the communicator 60 are the same, and they operate in accordance with the same network protocol. Communications over the local LAN segment between communicator 60 and each node 34 occur through the interfaces 45 36 and the communication medium 32 in accordance with the network protocol, just the same as communications between two nodes 34 on a local LAN segment. Because the interfaces 36 associated with the communicators 60 communicate with the interfaces 36 associated with the nodes 34 under the same protocol, the interfaces 36 associated with the communicators 60 must have an NID like the other LAN interfaces 36. However, the communicators 60 are not nodes 34, as that term is used to describe LAN functionality, because the communicator 60 achieves the administrative functions associated with bridging instead of the usual information processing functions associated with a resource 38. In the embodiment wherein the communicators 60 attach directly to the resources 38, the communicators 60 do function as nodes on the wireless network, and this RF network serves as the LAN, so there are not separate LAN interfaces 36 nor LAN NIDs.

To bridge the LAN segments 30, the communicators 60 transmit and receive radio frequency (RF) signals known as "frames." The communicator 60 which sends a frame is referred to as a transmitter communicator or "transmitter," and the communicator 60 (or communicators in the case of broadcast or multicast frames) which receives the frame is a receiver communicator or "receiver." Each frame is formed by a digital bit stream containing information and/or data to accomplish the bridging functions, the LAN functions and/or the MAC protocol aspects of the present invention described below.

10

The number of communicators in the Group may depend on their radio transmission range. The range may be limited due to government regulations limiting the amount of the power of the transmitted RF signal, by obstacles and obstructions which may block or attenuate the RF signals, and/or by interference from other, nearby transmitters, for example. Accordingly, all of the communicators may be unable to establish direct RF communications with one another. For example, in the arrangement shown in FIG. 2, the communicator 60a is not within the transmission range of the communicator 60d, since the transmission range of the communicators 60a and 60d are represented by the circles 62a and 62d, respectively. Each communicator's transmission range will hereinafter be generally referred to by the reference number 62, while specific communicator transmission ranges shown in FIG. 2 will be referenced by an alphabetical identification in conjunction with the referenced numeral 62 as shown. Therefore, direct communications between the communicators 60a and 60d are not possible. However, under the MAC protocol technique of the present invention, all of the communicators of the Group need not be within range of every communicator in the Group in order to obtain effective communication.

In order to expand the transmission area beyond the transmission range of any particular communicator 60, one of the communicators 60 will function as a hub communicator or "hub" 64. The hub 64 will act as a central receiver for the communications transmitted among the other communicators 60 of the Group. The communicators 60 other than the hub 64 are designated as remote communicators or "remotes" 66. In addition to functioning as central receiver, the hub 64 also functions as a central relay station for relaying transmissions between the remote communicators 66 and for receiving messages from the remotes 66. As shown in FIG. 2, because both communicators 60c and 60f are within range of all the other communicators 60a, 60b, 60d and 60e, either would be a suitable choice for the hub 64 from the standpoint of communications range. However, in the situation where more than one communicator might adequately serve as a hub from the standpoint of transmission range, other factors (described below) determine allocation of hub status. In the example shown in Fib. 2, communicator 60f has been designated as the hub 64.

Thus, because of its central location, the hub 64 will be able to receive and relay transmissions from all the communicators 60a, 60b, 60c, 60d and 60e achieving communications between all communicators 60, including those which are not within range of each other for point-to-point or direct communications, such as communicators 60a and 60d. In receiving and relaying all transmission in the Group of communicators 60, the hub 64 allows for the single logical network to be larger than the transmission range 62 of a single communicator 60. The remotes 66 need not be within transmission range 62 of each other to communicate as long as the remotes 66 are within transmission range of the hub 64.

5,371,734

**11**

As shown in FIG. 2, the single logical network formed by the hub 64 and the remotes 66 represents a topology which is both a logical and a physical star. The physical star is found by the remotes 66 arranged around the more central hub 64, which permits the single logical network of a physical size greater than the transmission range of any one of the communicators in the Group. The logical star results from the individual communication paths between the hub and each of the remotes. Signals are transmitted from the hub to all of the remotes, and from each of the remotes to the hub. The logical communication path for all of the transmissions is to or through the hub, thereby establishing the star topology. The physical layer of the seven layer ISO reference model for data communications is represented by this logical and physical star topology. All physical layer communications are either bilateral transmissions between a remote 66 and a hub 64, bilateral transmissions between a hub 64 and a remote 66, or broadcast transmissions from the hub 64 to all remotes 66.

The operation of the communicators emulates the characteristics of a logical bus as viewed from above the link layer of the media access control (MAC) sublayer of the link layer of the seven layer ISO reference model for data communications. However, the physical and MAC layer functions are implemented using the star topology.

To achieve the MAC sublayer functionality, the hub 64 controls the communications to and from the remotes, using a MAC protocol according to the present invention. The foundation for this MAC protocol is allocation of media access for transmission (e.g. the right to energize the RF transmitters at the respective communicators) at appropriate, non-overlapping times and media access for reception (e.g. the need to energize the RF receivers at respective communicators), at appropriate times that RF frames may need to be received. These times, referred to as transmission opportunities (Txops), are controlled in the context of a communication cycle 70, shown in FIG. 3, which the hub establishes and which is repeated on a continuous basis as long as the hub is active. In contrast to conventional MAC protocols, the present invention is concerned with media access for reception as well as for transmission. The hub governs the sequence of its own frames which are contained in transfer units, transmitted outbound from the hub 64 to the remotes 66 during an outbound portion 72 of the communication cycle 70. The hub also controls the sequence and duration of frames which are contained in transfer units which are transmitted inbound from the remotes 66 to the hub 64 during an inbound portion 74 of the communication cycle. It is during the outbound portion 72 and inbound portion 74 of the communication cycle 70 that all frames are communicated.

During the outbound portion 72 of the communication cycle, as shown in FIG. 3, there is an initial information (info) interval 76 during which the hub 64 transmits control and other information to the remotes 66. This information allows each of the remotes 66 to recognize and participate in the communication cycle at the predetermined times. A broadcast interval 78 is also included in the outbound portion 72 to allow the hub 64 to broadcast the same information to all of the remotes 66 in the Group, using a single transmission that is expected to be received simultaneously by all remotes 66. A directed packet interval 80 is also provided to allow the hub 64 to transmit frames to specifically identified

**12**

remotes 66 in the Group. Because of the importance of the information communicated during the initial information interval 76, the information communicated in the initial information interval 76 is repeated in an alternative information (alt info) interval 82. By repeating the transmission of the control information in the alternative information interval 82, the chance for the remotes 66 to lose the synchronized nature of operation with the hub 64 is substantially diminished. In addition, during the information intervals 76 and 82, frames previously transmitted from the remotes to the hub during the inbound portion of previous communication cycle are acknowledged by the hub.

During the inbound portion 74 of the communication cycle 70, those remotes 66 which have requested a transmission opportunity (Txop) to transmit messages to the hub 64 are provided with an opportunity to do so. Generally, the hub 64 allocates to each remote 66 requesting one a Txop 84. The Txop 84, simply is a position in the order of other remotes 66 which have requested Txops 84 to transmit to the hub 64. The Txop is an amount of time during which the remote may transmit one or more frames to the hub. The Txops 84 are preferably allocated to the remotes 66 by the hub 64 in a predetermined order, and the hub may also vary the time durations of the allocated Txops 84, without varying their order. All remotes receive a Txop 84 with (at least) a predefined minimum duration on each communication cycle 70, whether or not they have any frames to transmit. The hub may adjust the duration of the Txops 86 by observing traffic patterns and in accordance with information received from each remote 66 relating to the amount of information which each remote has queued for transmission, among other factors. Besides using the allocated Txop to transmit frames from a remote 66 to the hub 64, the remote also acknowledges any directed frames communicated to it from the hub 64 during the communication cycle. If there is one or more outgoing frame, the remote 66 may "piggyback" these acknowledgements with these outgoing frames. In addition, if the Txop 84 is not used by the remote 66 for a predefined number of communication cycles 74, the hub 64 may determine that it is not necessary to preserve a Txop for a particular remote 66, and thereafter cancel the Txop 84 allotted to that remote 66.

After the series of Txops 84 are allocated, a Txop request interval 88 is provided. During the Txop request interval, communicators 60 which have recently joined the Group, or communicators 60 which have not previously been allocated Txops 84 in which to transmit messages are allowed to transmit messages to the hub 64 requesting that they be allocated a Txop. Upon receipt of the Txop request, the hub 64 will allocate a Txop 84, if any are available. The hub 64 will inform the requesting remote (and all other remotes) of this Txop allocation in the information intervals 76 and 82 of the next communication cycle. This dynamic allocation of Txops 84 is particularly beneficial in situations where portable communicators move into and out of range of the Group's hub at arbitrary times, and should neither burden the available aggregate bandwidth of the Group with an unused Txop when it is not present nor require user intervention when it rejoins the Group.

Thus the communication cycle 70 orders the transmission of communication control information to the remotes 66 (including acknowledgements to previous frames received from the remotes 66), allocates inbound

5,371,734

13                                                    14

Txops 84 in accordance with the amounts of transmission time requested by each remote (and other factors), transmits outbound frames (both broadcast and directed) to the remotes 66, and receives inbound frames from the remotes 66 pursuant to the previously-made Txop allocations. The remotes 66, in their allocated sequence of Txops 84, acknowledge previous frames received from the hub 64, and transmit inbound frames to the hub 64. In addition the remotes may request allocation of Txops when needed during the Txop request interval 86 of the inbound portion 74.

All intervals of the communication cycle 70 take place within the limits of predesignated assigned times established by the hub. Each interval is measured in terms of a number of basic time increments (BTIs) prespecified to all communicators in the Group. A BTI is a predefined unit of time (parameterized, default of 4 milliseconds, for example) that is the fundamental increment of communication cycle 70 time allocation, and is the metric by which intervals within the communication cycle 70 are measured. The hub 64 controls the duration and usage of the communication cycles 70. The time for the overall communication cycle 70, along with the specific interval allocations within the cycle 70, are broadcast by the hub 64 in during the information intervals 76 and 82 in the form of control information delivered in an information frame transmitted during the information interval 76.

Because all frames, both outbound and inbound, occur at predetermined times, the remotes 66 are able to determine in advance approximately when to expect frames transmitted from the hub and when to transmit frames to the hub. As a consequence of the predictable times when frames may be both received and transmitted, the remotes can power their radio interfaces down to preserve power at other times. Because radio circuits with radiated RF energy levels that comply with the rules in Part 15 of the FCC regulations consume about as much electrical power when receiving as when transmitting, this ability to power the radio off completely is a major benefit for battery-powered communicators. This MAC protocol control feature is of particular importance in facilitating portable computer attachment. When the remote battery-powered communicators are used, as would typically be the case when a personal, portable computer is the resource attached, this power down capability makes it possible to obtain an increase in useful battery life of over five times compared to the battery life if the radio interface was continuously powered for reception (or transmission).

The communication cycle features of the MAC protocol also provides efficient, low-latency support for typical LAN usage patterns, in which frame size distribution is strongly bimodal (one mode quite short, the other mode at or near the maximum frame size for that LAN protocol), and frame arrival rates are burst like (highly non-uniform, with shifting peak traffic locations). Only those communicators which transfer frames on a regular basis are regularly allocated Txops longer than one BTI, thereby reserving bandwidth for those more active remotes. In addition the relative allocation of the time among the remotes favors those which have requested and used more time for frame transmissions in the recent past, which again keeps with the shifting peak traffic patterns of LAN-like communications.

By controlling Txops in a timed sequence, the hub 64 serves a number of purposes, including: media access control, with specific Txops allocated to specific remotes; bandwidth allocation, in response to requests that indicate the amount of data awaiting transmission, thereby permitting adaptive allocations that favor the (dynamically changing) remotes 60 that have the most pending traffic; power management, as described; basic security, since each communicator 60 must be allocated a Txop before being able to participate in frame exchanges; MAC-layer frame acknowledgement (without a power consumption penalty), because acknowledgements can be piggybacked on subsequent frames with a known upper bound on the time delay from the original transmission attempt; and network administration, because all frames traverse the Group's hub 64.

Specific details concerning the communicators 60, the frames transmitted and received, the communication cycles and the functionality of the communicators in achieving the MAC protocol functionality of the present invention are described in greater detail below.

Details of the communicator 60 are shown in FIGS. 4 and 5. The communicator 60 combines radio hardware, interface hardware, and the necessary firmware to implement a transparent, wireless logical network between the communicators 60. The communicators preferably transmit and receive messages over a wireless physical layer provided by a direct-sequence, spread spectrum (DSSS) radio data link. A half-duplex, packet-oriented transfer medium is thereby established with sufficiently high data rate, sufficiently short transmit/receive turnaround time, sufficiently low power consumption and transceiver on/off speed, sufficiently low framing overhead requirements, and sufficiently high data reliability to support LAN-like operational characteristics between the separated LAN segments. Other packet-oriented, wireless data links that have adequate operational speed and related characteristics can be substituted for this DSSS radio link without changing the MAC protocol of the present invention. The communicator 60 also supports directly the logical-link control sublayer, network layer and all higher layers of communication, rendering the location-sensitive aspects of the wireless data link transparent to the attached resources. Each communicator 60 is not a node on the local LAN segment, but is a node on the wireless network.

The general nature of a communicator 60 is shown in FIG. 4. Each communicator 60 has a network interface 36, a microcontroller 90, a read only memory (ROM) 92, a random access memory (RAM) 94, and a RF modem 96, all of which are interconnected by a bus 98. The interface 36 is equivalent to that used by each node 34 on the LAN segments 30. The attachment of the interface 36 to the bus 98 and the microcontroller 90 is similar to that manner in which the interface 36 of a node 34 connects to its attached resource 38. The microcontroller 90, in its presently preferred form, is a Motorola 68HC16 microprocessor. The instructions controlling the operation of the microcontroller are stored as firmware in the ROM 92 and/or in software instructions in the RAM 94. These instructions implement the MAC protocol described herein. The RAM 94 contains a buffer to temporarily store information used when the communicator 60 is functioning. The information stored in the RAM 94 may be copies of LAN packets received from the interface 36 and awaiting transmission on the RF network, copies of frames received from the RF modem 96 and awaiting transmission on the LAN segment 30, or (for hub communicators) cop-

5,371,734

15                                                                                                    16

ies of frames received from one remote and addressed to another remote, awaiting transmission in an outbound interval of the communication cycle.

RF signals are transmitted to and received by the communicators at the RF modem 96. The RF modem 96 preferably has at least two antennas 100 and 102. The antennas are oriented in different configurations, to allow selection of the one which provides the best reception. Transmission of the signals usually does not require antenna selection, because signal transmission usually does not involve as many sensitive aspects as signal reception. At any physical location of a communicator, one of these antennas 100 or 102 is likely to offer better signal reception than the other. Selection of the best antenna is performed by software instructions in the RAM 94 as part of the signal acquisition process which the communicator 60 undertakes in conjunction with the receipt of RF frames. The time required to determine that the signal reception from one antenna is inadequate, and then to synchronize to the signal being received by the other antenna, is time during which transmissions cannot be successfully received by a communicator 60. Accordingly, the MAC protocol implementation involved in communicating the RF frames and the low-level radio control functionality in the microcontroller 90 cooperate to permit the selection of a better antenna.

The RF modem 96 accepts a digital data stream from the bus 98 at the transmitting communicator 60, produces and transmits the RF signal, and the RF modem 96 at the receiving communicator 60 receives the RF signal and produces a digital data stream corresponding to that supplied to the transmitting RF modem 96 (other than in the presence of errors due to RF interference or excessive RF signal attenuation). The transmitting and receiving RF modems 96 perform all of the necessary spreading, modulation, demodulation, and despreading functions to successfully transfer the frames between communicators. The transmitting RF modem 96 also generates a preamble at the beginning of each transfer unit (of one or more frames) that allows the receiving RF modem 96 to acquire and synchronize with the transmitted radio signal. However, all other data communication functions, including framing, formatting, address recognition, error detection, and link control, are imposed upon the physical layer digital data stream by the present invention at the MAC layer by non-RF modem hardware and microcontroller-based firmware of each communicator 60. At this MAC layer there is also a close interaction with the RF modem to achieve various control and calibration functions, including power consumption control, oscillator calibration and temperature compensation, receiver automatic gain control calibration, received signal acquisition, antenna selection for spatial diversity at the receiver; and transmitter power control (adaptive power management) associated with each communicator 60. Some of the calibration parameters provided by the RF modem 96 may also be used by the present invention for MAC layer control purposes, as well as by the RF modem 96 itself. In the preferred embodiment, the microcontroller 90 is also involved in processing the calibration parameters to calculate calibration responses to provide feedback to the radio.

The RF modem 96 in the preferred embodiment is a Model 100 DSSS RF Modem sold by Signal Technologies, Inc. of Longwood, Fla. The spread spectrum product operates a 191,176 baud, with a chip rate of 3.25

MHz at 17 chips per baud. The RF modem 96 is preferably programmed to operate on any or all four, non-overlapping frequency channels within the 902 to 928 MHz ISM frequency band defined by FCC rules. This RF modem 96 can support either binary phase-shift keying (BPSK), which achieves 1 bit/baud (for a data rate of 191 Kbps); or quadrature phase-shift keying (QPSK), which achieves 2 bits/baud (for a data rate of 382 Kbps). The BPSK functionally is identical to the QPSK functionally, other than for the data rate (half as fast), and synchronization time. The digital interfacing functions (spreading codes, etc.) and frequency synthesizer interfacing functions (frequency channels) are programmed in an identical manner for both BPSK and QPSK operation. One additional major difference concerns the calibration details, which must usually be separately established for each type of operation but in a manner that is independent of the MAC protocol that is the subject of the present invention.

The general nature of the RF modem 96 is shown in FIG. 5. The RF signals are transmitted from or received by antennas 100 and 102. A switch 103, controlled by the microcontroller 90, selects one of the (two or more) available antennas. The transmitted and received signals pass through a conventional RF filter 104. A selection switch 106 controls the signal path through the filter 104 and antennas 100 and 102. In one switch position illustrated in FIG. 5, signals are received. In the other switch position, the signals are transmitted. Preferably, the switch is a gallium arsenide field effect transistor (FET) switch. When not transmitting, the selection switch 106 is set to accept incoming signals.

With the selection switch 106 in the receive position, the received signals pass through the filter 104 and are applied to a low noise amplifier 108. The low noise amplifier 108 amplifies the signals and supplies them to another filter 110. The signals from the filter 110 are applied to a radio device 112 which performs both a radio receiving function as well as an amplifying function. Signals from the radio device 112 are applied to a coherent demodulator 114.

The coherent demodulator 114 extracts the base band data from the RF carrier signal which has been BPSK or QPSK modulated. The coherent demodulator 114 also functions as a coherent correlator for the spread spectrum sequence which modulates the data. A control signal for the coherent correlation or spread spectrum sequencing function is obtained from a spread spectrum controller 116. The coherent demodulator 114 includes a base band automatic gain circuit (AGC) which keeps the signal levels predictable when the AGC signal is applied to the radio device 112. The AGC circuit also forms part of a delay locked loop which interacts with the spread spectrum controller 116 during demodulation. A band gap reference signal is also supplied by the coherent demodulator 114 for use by other components. Since many of the signals in the coherent demodulator 114 are analog signals, the coherent demodulator 114 includes comparators to establish digital waveforms and provide in-phase and quadrature phase data outputs in a form compatible with the other digital components of the communicator. The coherent demodulator responds to the magnitudes of the in-phase, base-band and quadrature phase components of the received signal to establish a received signal strength indication (RSSI) signal representing the energy of the received demodulated signal. These signals are applied to the other compo-

5,371,734

17

nents of the RF modem **96** to assist in achieving the functionality of those components.

In general, the functionality of the coherent demodulator **114** is conventional and appreciated by a person having skill in the field of signal communications. For convenience, all of these functions are readily available on a single commercial integrated circuit designated as CSL-100 available from Signal Technologies, Inc. of Longwood, Fla.

One of the important features of the spread spectrum controller **116**, which results in beneficial message communication, is the ability to rapidly acquire and synchronize with incoming received signals. The shorter the time to acquire and synchronize adequately for correct demodulation, the smaller the portion of the frames that need be devoted to transmitting preamble signals necessary for synchronization, resulting in lower communication overhead and greater network efficiency. The ability of the spread spectrum controller **116** to quickly acquire and synchronize with received signals, may be advantageously achieved by employing the techniques described in U.S. Pat. No. 4,649,549. In the preferred embodiment, the spread spectrum controller **116** is a commercially available integrated circuit, having a designation AS-100, available from Signal Technologies, Inc. of Longwood, Fla.

In general, the components of the spread spectrum controller **116** include a timing distributor **118** which responds to a signal from an external clock oscillator **120** and distributes clock timing signals throughout the sections of the spread spectrum controller **116**. One of the major sections of the spread spectrum controller **116** is an interface **122**, which allows the exchange of control and data signals over the communicator bus **98** with the other components of the communicator **60**. Internal program registers **124** allow settings to be recorded therein through the interface **122** to configure the functionality of the spread spectrum controller **116** in many respects, for example to establish the polynomial sequence used in spreading and despreading the signals, controlling certain other elements in the RF modem **96**, selecting the type of modulation, maintenance functions and the like.

The interface **122** is connected to an internal bus **126**, and most of other components of the controller **116** are also connected to the internal bus. A transmitter/-receiver (Tx/Rx) power control **128** controls a number of elements within the RF modem **96** so that they can be properly power managed by selectively powering them down to save battery power, for example, if the communicator **60** is powered from a battery.

A spread spectrum generator and encoder **131** is a programmable device that allows for the implementation of a Galois polynomial sequence generator. An in phase, I-transversal filter **132** and a quadrature phase Q-transversal filter **134** receive signals from the spread spectrum generator and encoder **131** prior to RF modulation for transmission. For reception, a spread spectrum correlator and decoder **130** handles the demodulator **114** output to regenerate the unspread data. A baud synchronizer **136** allows a signal to be obtained which references to the data clock of the received data. The spread spectrum correlator and decoder **130** preferably employs the technology described in U.S. Pat. No. 4,649,549. A synthesizer interface **138** delivers signals to an RF synthesizer **140** which generates the various signals applied to the radio device **112** to down convert signals from the RF band and to up convert signals from

18

the communicator **60** and spread spectrum controller **116**, in the case of received signals or transmitted signals, respectively.

The spread spectrum controller **116** accepts data through the interface **122**, translates the data from parallel to serial four and applies the appropriate spreading sequence to the data so that it becomes a base band spread spectrum signal. This information in spread spectrum form is applied to the radio transmitter **142** where it is converted to the appropriate RF band. The radio transmitter **142** applies the RF signal through the selection switch **106** and the filter **104** to the selected one of the antennas **100** and **102** where it is transmitted.

The communicators **60** dynamically perform frequency channel selection upon initialization, with the objective of minimizing interference between Groups that have overlapping RF communication spaces. If Groups are assembled using multiple hubs **64** which support inter-hub handoffs, the frequency channels may be statically assigned to each hub in order to provide repeatable handoff performance.

The present invention can be extended to provide wireless network communication for a wider physical area by providing a plurality of communicators predesignated as hubs all configured as part of the same Group and able to communicate with each other via a common (preferably high speed) wired "backbone" network. In the presence of such a multi-hub Group, a portable communicator that leaves the transmission space **62** of one hub of the Group, but entered the transmission space **62** of an adjacent hub in the Group (generally operating on a different frequency channel to avoid interference at the region of overlap) will detect the second hub during the attempt to detect an active hub after losing contact with the first hub. If this other hub is detected, by virtue of its being part of the same Group, and sharing a common backbone network over which the plurality of hubs can exchange LAN packets, the remote can remain in communication as part of the same logical network as soon as that remote has obtained a Txop allocation from the second hub. This type of microcellular functionality can be implemented upon the remote communicators attempting to re-establish communication with a hub (termed "passive handoff" because the hubs do not play an active role in the process) or by negotiation between the adjacent hubs when the RSSI level drops below a predetermined threshold (termed "negotiated handoff" because the hubs initiate the process of checking the relative signal strengths and determine the best destination hub for the handoff).

In the case of RF communication overlap between hubs **64** of different Groups that must operate on the same frequency channel, a technique must be employed to permit such hubs **64** to share the available RF bandwidth in an orderly manner, as is discussed below.

In applying the spreading sequence to the data, the RF modems **96** can be programmed to use any one of a large number of spreading sequences (for example several thousand spreading sequences), each of which is referred to as a code. All members of a Group of communicators **60** must be programmed to use the same code in order to achieve successful communication. Communicators **60** operating in the same RF communication space, and using the same frequency channel but a different spreading code than the Group members, cannot receive transmissions from other communicators of the Group, and transmissions by such other communicators may interfere with RF communication among

5,371,734

**19**

the Group members. The potential for such interference
can be reduced, but cannot be eliminated, by selection
of spreading codes with adequate Hamming distance
from each other. Accordingly, a limited subset of the
available code space, for example 1000–4100 codes,
selected based on appropriate Hamming distances, will
be used to minimize the risk of inter-Group interference
and to maximize the degree of communication security
provided by the spreading.

The spreading sequence codes form the basis for a
level of communications security because unless a com-
municator 60 is utilizing the appropriate code, it cannot
participate in the communications. Certain codes may
be also reserved for special network control and diag-
nostic purposes. The code usage is identified by code
identification numbers that are used to index tables
within the communicator ROM 92 or RAM 94 that
contain the specific multi-byte sequences needed to
program the RF modem to generate these codes.

The potential for interference between adjacent
Groups is further reduced if each transmission by a
communicator 60 uses the minimum level of RF energy
required to achieve the needed signal strength at the
designated receiving communicator 60. Reducing trans-
mitted power may also improve the battery life of bat-
tery-powered communicators 60 by possibly consuming
less power during typical transmissions. The ability to
measure the received signal strength (RSS) at each end
of a communication activity, plus the inclusion of a
received signal strength indication (RSSI) parameter in
certain frames communicated permits this type of
adaptive management of transmitted power. Subse-
quent transmissions to a communicator that has re-
ported excessively high RSSI values can be made using
reduced transmit power. If RSSI levels are later re-
ported to have dropped below a predetermined thresh-
old, transmit power can be increased to compensate.

The digital data streams provided to the sending RF
modem 96 are included in transfer units 144, one of
which is illustrated in FIG. 6. The transfer unit 144
includes three components: a preamble 146, a payload
148 and a postamble 150.

The preamble 146 is a predetermined sequence of
binary values which are used by receiving communica-
tors 60 to acquire and synchronize to the incoming
transmission. The preamble 146 provides the necessary
amount of time with known information content for the
demodulation and despreading functions of the RF
modem 96 to acquire and synchronize with the signal
prior to the beginning of the payload 148. In the pre-
ferred embodiment, the preamble 146 consists of a se-
quence of alternating ones and zeros lasting at least 1
millisecond.

The length of the preamble 146 may be defined sepa-
rately for various types of transfer units 144. For trans-
fer units 144 containing information frames, which are
vital to maintaining the integrity of communications, a
longer preamble 146 is generally used to provide a
greater probability of acquiring the incoming signal,
and to allow switching to the alternate antenna with
enough preamble remaining to acquire and synchronize
via the alternate antenna if RSSI levels through the first
antenna prove insufficient. In addition, the preamble
146 for transfer units containing control information
and hub beacon frames sent during the communication
cycle is also generally longer than the minimum require-
ment to permit an alternate antenna to be selected mid-
way through reception of the preamble 146 and still

**20**

allow time for the RF modem 96 to synchronize to the
signal using the alternate antenna. For transfer units 144
containing only normal data packet or bridge frames, a
shorter preamble 146 is used because an error in a data
packet frame will not impact communications to the
same extent as an error in a control or information
frame, and the use of longer preambles on such transfer
units would increase network overhead. In the pre-
ferred embodiment, the default values for the length of
the preamble 146 are 192 bytes for transfer units 144
containing information frames, 96 bytes for transfer
units containing control frames, and 48 bytes for trans-
fer units 144 containing neither control nor information
frames. The preamble 146 is generated by the RF
modem 96 of the transmitting communicator 60, is used
by the RF modem 96 of the receiving communicator for
signal acquisition and synchronization, and is detected
and discarded by the microcontroller and its related
circuitry of the receiving communicator 60.

The postamble 150 marks the end of the transfer unit
144, and provides time (with RF signal activity) follow-
ing transmission of the payload 148 that may be needed
for the receiving communicator to complete successful
reception of the payload 148 prior to cessation of RF
signal activity. The postamble 150 also provides a per-
iod of non-communication of sufficient duration to pre-
vent destructive interference from overlap between
transfer units 144 transmitted by different communica-
tors. This non-communication period compensates for
the allowable degree of timekeeping uncertainty that
can accumulate between communicators 60 in the
Group during any communication cycle 70. The post-
amble 150 is generated by firmware in the microcon-
troller 90 of the communicator 60, and its length is a
predetermined constant to ensure a minimum separation
between transfer units 144.

The payload 148 of the transfer unit 144 carries the
substance of the communication. No restrictions are
imposed by any of the components of the RF modems
96 on the contents or format of the payload 148. The
payload 148 of each transfer unit, which is shown in
FIG. 7, is a sequence of one or more frames. Frames are
the fundamental data transfer entity of the present in-
vention. Each transfer unit comprises one or more
frames 152 separated by inter-frame gaps 154. The
frames 152 contain the substantive information transmit-
ted in the transfer unit. The number of frames in any
transfer unit is limited by the lesser of the amount of
information to be sent by the communicator 60, or for
inbound communications from remotes 66 to the hub
64, the maximum amount of time allocated to the re-
mote by the hub 64 for use as a Txop in the current
communication cycle. If the allocated Txop is insuffi-
cient to send all queued, outgoing frames, some number
of complete frames will remain unsent at the remote
until another Txop occurs in a subsequent communica-
tion cycle 70. Frames 152 are never split up in different
transfer units.

When multiple frames 152 are sent in a single transfer
unit, these frames 152 are sent in direct succession, sepa-
rated by inter-frame gaps (IFG) 154. The IFG 154 pro-
vides a sufficient amount of time for the receiving com-
municator 60 to complete handling of the preceding
frame 152 and to prepare for receipt of the following
frame 152. Each transfer unit thus contains an integral
number of frames 152 and an integral number of IFGs
154 which is equal to one less than the number of frames
152. The IFG 154 is generated by the microcontroller

5,371,734

<table>
<tr><td>21</td><td>22</td></tr>
</table>

90 of the transmitting communicator 60 and is discarded by the microcontroller 90 of the receiving communicator 60.

Each frame 152 has the same basic format, one of which is shown in FIG. 8. Each frame is formed by five fields: a starting flag 160, a header 162, a body 164, an ending flag 166, and a cyclic redundancy check (CRC) 168.

The starting flag 160 is a unique bit pattern that identifies the beginning of a frame 152. The starting flag 160 is generated under firmware control of the transmitting communicator 60 during frame transmission, and is detected by firmware or hardware at the receiving communicator 60 during frame reception. In the preferred embodiment, the starting flag is unambiguous, so that no other sequence of bits in any transfer unit has the same pattern. This avoids the risk of commencing frame reception based on an arbitrary data byte in the middle of a body field. To achieve this in the preferred embodiment, the starting flag 160 is six ones, preceded and followed by a zero. This value is distinct from the preamble 146 (alternating ones and zeros), the postamble 150 (all zeros), the IFG 154 (all zeros) and the ending flag 166 (seven ones preceded by a zero). The uniqueness of the starting flag value is assured without restricting the use of any data values within the header 162 and body 164 fields of the frame 152 by "bit stuffing" within frames.

Bit stuffing is a technique that renders a predefined pattern of bits unambiguous by inserting bits at defined locations in an outgoing bit stream. The inserted bits prevent a predetermined bit pattern from occurring in locations other than those desired. Bit stuffing is commonly used, as it is in this situation, to render unique the delimiters of the frame boundaries. The portions of the frame 152 subject to bit stuffing in the frame shown in FIG. 8 are the header 162 and the body 164 fields. These fields are made unique by detecting when sequences of five or more one-bits that occur in the raw data that makes up these fields, and to insert ("stuff") a zero after any such sequence of five successive one-bits. In the preferred embodiment, the starting flag 160 and ending flag 166 include six and seven successive one bits, and because zero bits are stuffed after all other sequences of five successive ones in the other fields, the bit patterns of the starting flag 160 and ending flag 166 are unique within the transfer unit. In cases where variable amounts of transmission time are not desirable, a higher-overhead but fixed-length form of bit stuffing is to insert a zero bit after every fifth data bit in the header and body fields of the frame.

When bit stuffing is employed as part of frame transmission, "bit stripping" must be performed as part of frame reception. Bit stripping is the inverse operation to bit stuffing, thereby restoring the original bit pattern to the received data stream. Typically bit stuffing and bit stripping are collectively referred to simply as "bit stuffing." Bit stuffing is performed under control of the microcontroller 90 at the transmitting communicator 60 and bit stripping is performed under control of the microcontroller 90 at the receiving communicator 60.

The header 162 includes a number of fields which are described in conjunction with FIG. 9. The fields of the header contain several components of information which describe the structure and content of the frame 152.

As shown in FIG. 9, the first field in the header 162 is an organizationally-unique identifier (OUI) 172,

which is three bytes in the preferred embodiment. The OUI 172 is a constant value which is globally unique to the manufacturer of the communicator 60 and is preferably the identifier assigned to that manufacturer by the IEEE project 802 for LAN standardization. The primary operational purpose of the OUI 172 is that its value can be treated as a constant for further qualifying the validity of frame reception, shortly after detection of the starting flag 160 (FIG. 8).

The OUI 172 is followed by a communicator destination address or identification (CDID) field 170 which specifies the communicator 60 to which the frame 152 is directed, or a predetermined bit pattern which signifies that the frame is a broadcast intended for all communicators 60. The CDID 170 is 3 bytes in the preferred embodiment. The address or identification (ID) of each communicator 60 may be uniquely established in many different ways, such as by allocating a unique serial number to each one manufactured.

The OUI 172 and the CDID 170 constitute a standard, 48-bit, IEEE 802 compatible network address. Because the OUI 172 is unique, if a frame 152 having an unanticipated OUI 172 or CDID 170 is received, the receiving communicator 60 is alerted that the transmission came from an invalid source and should be disregarded, or that there was a transmission error and the transmission should not be acknowledged so that the transmission will be repeated. In accordance with IEEE 802 address format rules, the low-order bit of the OUI is set to zero for directed frame addresses and is set to one for broadcasts and multicast addresses. When used in the preferred embodiment, multicasts are not needed and broadcasts are indicated by the low-order OUI bit set to one and the CDID set to all zeros.

The communicator source address or identification field (CSID) 174 follows the CDID 170, denoting the transmitting communicator 60. The CSID 174 contains the unique ID of the source or transmitting communicator 60 which sent the frame 152.

Next is a frame type field 176 which contains a code that identifies the usage of the information in the body 164 (FIG. 8) of the frame 152. Frames 152 received successfully that have unrecognized frame type codes are acknowledged by the receiving communicator 60, but the contents of the body 164 of such frames 152 are ignored. The types of frames 152 which valid codes in the frame type field 176 include, Txop request frames, Txop grant frames, Txop relinquish frames, initial or primary information frames, basic control frames (which have no body 164), alternate information frames, hub handoff request frames, hub handoff acknowledgment frames, hub beacon frames, hub beacon reply frames, data packet frames from the hub to the remote(s) and data packet frames from a remote to the hub.

A sequence number field 178 occurs next in the frame 152. The sequence number 178 is a counter value which is incremented every time a communicator 60 sends a frame 152. The sequence number 178 allows the receiving communicator 60 to specify which frame (or frames) 152 needs to be resent in the event a transmission error or other problem. In the preferred embodiment, the sequence number is incremented by 1, modulo-256, after every frame 152 transmitted by a communicator 60. Frame acknowledgements and retransmission requests are based on this sequence number, so no more than 255 unacknowledged frames 152 must be permitted to be outstanding at any time. Retransmissions of unac-

5,371,734

23

knowledged or negatively acknowledged frames reuse the same sequence numbers as the original frame being retransmitted. Remotes 66 maintain one sequence value which is used and incremented for each transmitted frame 152. Hubs 64 maintain sequence number values for the maximum number of communicators 60 allowed in the Group. One of these sequence values is used for information frames, outgoing broadcast data packet frames, and beacon frames, and the other sequence values are used for directed frames transmitted to each of the remotes 66 with allocated Txops.

An ending frame number field 180 follows the sequence number field 178. The ending frame number field 180 is used in frames 152 sent from remotes 66 to hubs 64 to acknowledge the successful reception of a contiguous block of sequenced frames from the hub 64. The value in the ending frame number field 180 is the highest (e.g., modulo-256 with wrap-around) sequence number value of all successfully received frames 152 up to the latest sequence number that has been successfully received. The ending frame number field 180 is not used in frames 152 sent from hubs 66 to remotes 64, because frames 152 sent by remotes 66 to the hub 64 during the inbound portion 74 of the communication cycle 70 (FIG. 3) are acknowledged in the information frame sent by the hub 64 to the remotes 66 during the information interval 76 of the outbound portion 72 (FIG. 3) of the next communication cycle 70. These acknowledgements in the information frame use the same format as this field (ending frame number).

A missing frame number field 182 follows the ending frame number field 180. The missing frame number field is used in frames sent from remotes 66 to hubs 64 to indicate exceptions to the reception status reported in the ending frame number field 180. The primary usage for the missing frame number field 182 is in cases where a Group of frames 152 in a transfer unit 144 has been successfully received, with the exception of one frame 152 somewhere prior to the end of the transfer unit. Under this circumstance, the ending frame number field 180 reports the sequence number of the last frame 152 within the transfer unit which was successfully received, and the missing frame number field 182 reports the sequence number of the single frame 152 prior to the reported last frame that was received in error. This permits significantly improved network efficiency in cases where only one frame 152 of a transfer unit is received in error, by permitting retransmission of only that one frame 152, and not requiring retransmission of all subsequent frames 152 that have been received successfully. In cases where no such erroneous reception occurs, or where multiple erroneous transmissions were received, both the ending frame number field 180 and the missing frame number field 182 contain the same value (the sequence number of the last successfully received sequence of frames with no preceding erroneous frames). The missing frame number field 182 is not used in frames 152 sent from hubs 64 to remotes 66, because frames sent from remotes 66 to the hub 64 during the inbound portion 74 (FIG. 3) of the communication cycle 70 are acknowledged in the information frame sent by the hub 64 to the remotes 66 during the information interval 76 of the outbound portion 72 of the communication cycle 70. These acknowledgements in the information frame use the same format as this field (missing frame number).

A bandwidth allocation request (BWAR) field 184 occurs next in the header 162. The BWAR field 184 is

24

used in frames 152 sent from remotes 66 to the hub 64 to indicate the amount of time needed to transfer all packets queued for transmission at that remote 66. The request value is in units of basic time increments (BTIs). The value in the BWAR field 184 is zero if there are no queued packets awaiting transmission, and is 255 if 255 or more BTIs are needed to transmit the queued packets. The BWAR field 184 is not used in frames 152 sent from hubs 64 to remotes 66, because all bandwidth allocation decisions are made at the hub 64.

A bandwidth request flag (BWRF) field 186 follows the BWAR field 184. The BWRF field 186 contains additional status information pertaining to the requested bandwidth allocation for frames to be sent from remotes 66 to hubs 64. This field is not used in frames 152 sent from hubs 66 to remotes 64, because all bandwidth allocation decisions are made at the hub 64. Codes used in this field signify, for example, whether any frames have been waiting for transmission for more than two communication cycles 70 for reasons other than retries due to negative acknowledgement, whether any of the frames awaiting transmission are retries, whether the remote 66 is within a predetermined threshold of exhausting the amount of buffer memory available to hold frames queued for transmission, whether packets are queued from more than two different nodes 34 on the remote's directly-attached LAN segment 30, and whether any broadcast frames are queued for transmission. These flags provide information useful to the hub's bandwidth allocation process, especially in cases where the network is saturated and not all bandwidth allocation requests can be granted.

The next field is a body length field 188 which signifies the length of the body field 164 (FIG. 8) of the frame 152. The code in the body length field 188 is an unsigned integer that indicates the number of data bytes in the body 164 of the frame 152. This value includes all bytes from the first byte following the header 162 (FIG. 8) to the last byte before the ending flag 166 (FIG. 8), and does not include any bytes in the header 162, starting flag 160, ending flag 166 or CRC field 168. Bits added by the bit stuffing (if any) are not counted in this length because they are added during transmission after the frame is formatted and are stripped at reception before the frame's fields are processed. The minimum body length is zero (for basic control frames), and the maximum body length is defined by the maximum number of bytes in the longest allowable frame, which is 1536 bytes in the preferred embodiment.

Next, a calibration parameters field 190 is used to transfer calibration parameter information between communicators 60. The values in this field reflect the current readings for autonomous parameters, such as temperature, or the values during the last frame 152 received from the other communicator 60 for receive-specific parameters, such as RSSI. In general, values for the various parameters mentioned herein to secure proper operation of the RF modem 92 (FIG. 5) may be contained in the calibration parameter field 190.

The firmware at a communicator supporting the functionality of the RF modem monitors a plurality of calibration parameters supplied by the RF modem, and generates corresponding calibration responses to ensure proper transmitting and receiving operation whenever the RF modem is active. The aspects of the calibration activities that are visible at the protocol level include the need to communicate certain of the calibration parameters to the partner communicator in frame headers

5,371,734

25 26

162, the need for hubs to maintain separate calibration response values for each of the remotes that are currently active, and the need for a newly-active remote to conduct a signal acquisition procedure prior to requesting a Txop allocation from a hub.

The information that is available from the calibration process that may be used includes an RF AGC loop parameter which provides information regarding the level of received RF energy from another communicator on the same frequency channel, whether or not that communicator is using the same spreading code; and a received signal strength indicator (RSSI) parameter which describes the strength of the demodulated, despread received signal. The relative values of RF AGC and RSSI are useful in discriminating receptions from other communicators using the same frequency channel but a different spreading code, from communicators on the same frequency channel that employ the same spreading code and hence are members of the Group. In addition, other calibration parameters include a Costas loop parameter, a RF synthesizer loop parameter, a temperature for the oscillator circuitry of the RF modem, an in-phase signal (I magnitude) parameter, a quadrature phase signal (Q magnitude) parameter, and a delay locked loop (DLL) parameter. Calibration parameter responses include: a Costas loop preset value, a RF synthesizer loop preset value, a RF AGC loop preset value, a RF oscillator bias value, a delay locked loop bias value, a baseband AGC preset value, a baseband AGC reference value, and a RF AGC reference value.

Several additional digital signals are defined for use as part of the signal acquisition process between the hub and the remotes, and these acquisition signals are presented in conjunction with the calibration parameter responses. The signal acquisition responses include one used to select between the two available antennas of the RF modem, two used to enable information for controlling the usage of the preset calibration parameter values by the RF modem circuitry and two weighting controls used to distinguish signal acquisition (during the preamble) from normal reception.

As shown in FIG. 8, the body 164 of the frame 152 follows the header 162. The body contains information specific to the particular frame type identified in the type field 176 (FIG. 9) of the header 162. In the case of data packet frames, the body will be an encapsulated LAN segment from the LAN segment 30 that is being bridged by the communicators 60 or a LAN packet directly from the attached resource in cases where the communicators are being used as network adapters rather than as bridges. In the case of control, information, and beacon frames, the contents of the body 164 provide control information to communicators 60 receiving the frames.

An ending flag 166 follows the body 164 of the frame 152 and, similar to the starting flag 160, the ending flag 166 is a unique bit pattern that provides unambiguous identification of the end of a frame 152. In the preferred embodiment, the value of the ending flag 166 is represented by seven consecutive one bits preceded by a zero bit and, thus, is distinct from the preamble 146 (alternating ones and zeros), the postamble 150 (all zeros), the IFGs 154 (all zeros) and the starting flag 160 (six ones preceded and followed by zeros). Like the starting flag 160, the uniqueness of the value of the ending flag 166 is guaranteed without restricting the use of any data values within the header 162 or body 164 fields of the frame 152 by bit stuffing within the header 162 and body 164 fields of the frame 154. The ending flag 166 is generated by the transmitting communicator 60 during frame transmission, and is detected by the receiving communicator 60 during frame reception.

The last field of the frame 152 is a cyclic redundancy check (CRC) field 168. The CRC field 168 provides for the detection of communication errors in the physical transmission by providing a CRC word generated by the transmitting communicator and checked by the receiving communicator 60. The value in the CRC field 168 covers all bytes from the first byte after the starting flag 160 through and including the ending flag 166. Cyclic redundancy checking is known in the art, but in the preferred embodiment, the CRC value is calculated by the polynomial $x^{16}+x^{15}+x^2+1$, also known as CRC-16. The CRC logic in the communicators 60 is designed in a manner that the CRC remainder value is zero after reception of an error-free frame. The use of a CRC code, which allows error detection but not error correction, is based on the high data reliability provided by the preferred form of the RF modems described above. In cases where data reliability on the RF link is worse than about one in 106, the use of an error-correcting code, such as a Reed-Solomon code, is recommended for the contents of the CRC field.

Four different types of frames are used to establish communications in accordance with the protocol of the present invention. The four types of frames are information frames, control frames, data packet frames and beacon frames. Information frames are used to broadcast communication cycle control information from the hub to the remotes. Control frames are used for bilateral transfer of protocol control information between communicators. Data packet frames contain substantive data, such as the LAN packets which are being bridged between LAN segments 30 or transferred between nodes 34 by the communicators 60. Beacon frames are transmitted by hubs 64 so that adjacent hubs can detect each other's presence. Each of these four types of frames is described in detail below.

There are two information frames. A primary information frame is transmitted during the information interval 76 of the communication cycle 70 shown in FIG. 3. An alternate information frame is transmitted during the alternative information interval 82 of the communication cycle. The primary and the alternate information frames are identical and are described below. However it should be noted that the portions of the information frames which specify usage during the broadcast interval 78 and the directed interval 80 will be meaningless if a remote first successfully receives the alternate information frame during the alternative information interval 82, because the broadcast and directed intervals will have passed before the information is available. Thus communicators which only receive the alternate information frame must ignore the information relating to the broadcast and directed intervals of the communication cycle.

In the case of an information frame, its frame type field 176 (FIG. 9) contains a value which distinguishes it from the other types of frames. The body field 164 (FIG. 8) of the information frame contains all of the information needed by remote communicators to participate in communication in accordance with the communication cycle 70 shown in FIG. 3. The body field of an information frame includes a number of different fields which provides information describing each of the following types of information: (1) the number of Txops 84

5,371,734

27                                                                                     28

which are currently allocated; (2) a security level estab-
lished for the communication with the Group, for exam-
ple, to allow any communicator to join or leave the
Group, to limit the size and participants of the Group to
a predetermined number or to predetermined ones of
communicators, or the like; (3) acknowledgement (end-
ing frame number/missing frame number) information
to each remote communicator which has been allocated
a Txop; (4) the number of BTIs in the present communi-
cation cycle; (5) the number of BTIs in the next commu-
nication cycle; (6) the number of BTIs in the communi-
cation cycle after the next communication cycle; (7) the
number of BTIs for the broadcast interval 78; (8) the
number of BTIs from beginning of the present communi-
cation cycle to the transmission time of for any di-
rected packets sent during the directed interval 80 to
each remote which has been allocated a Txop, including
a code for remotes which have allocated Txops but for
which the hub has no outbound directed packets pend-
ing for transmission; (9) the number of BTIs from begin-
ning of the present communication cycle until start of
inbound portion 74 of the communication cycle; (10)
the number of BTIs from beginning of alternative infor-
mation interval 82 until start of the inbound portion 74
of the communication cycle; (11) the number of BTIs
from beginning of inbound portion 74 of the communi-
cation cycle to the beginning of the allocated Txop for
each remote which has been allocated a Txop, including
an entry for all of the allowable Txops, regardless of
whether the Txop has been allocated to a remote; (12)
the number of BTIs of duration for each allocated
Txop; (13) the number of BTIs from beginning of the
inbound portion 74 (FIG. 3) of the communication
cycle to the start of the Txop request interval 86 of the
communication cycle; (14) the number of BTIs from the
beginning of the inbound portion 74 to the start of hub
beacon interval 88 of the communication cycle (FIG.
3), with an indication if the communication cycle will
not include a hub beacon interval; (15) a code indicating
characteristics of the hub, to be used for communicators
to arbitrate between one another to establish a new hub
or to confirm the selection of the existing hub, including
information describing whether the existing hub is oper-
ating from AC power or batteries, whether the commu-
nicator is configured as hub or has assumed hub opera-
tion due to lack of a better candidate communicator,
whether a resource attached to the local LAN segment
of the communicator is a LAN server; (16) the number
of active nodes on the local LAN segment attached to
the communicator; (17) the name of the Group; and (18)
a bit map of the LAN node IDs in use on all of the LAN
segments bridged together by the present invention
(only if bridging is being performed).

The various information in the body of the informa-
tion frame provides the remote communicators with the
basis for their RF communication activities for the re-
mainder of the communication cycle. Of special signifi-
cance are the various items that define the starting times
and durations of the subsequent intervals of the present
communication cycle and the lengths of the next two
communication cycles. The information frame, in addi-
tion to conveying the information described above, also
provides the information by which the remotes remain
synchronized with the hub for the purposes of turning
their RF transmitters and receivers on and off. The start
of the information frame (or alternate information frame
if the remote is unable to successfully receive the infor-
mation frame) serves as the datum from which the start-

ing times of all other intervals within the communica-
tion cycle are measured.

Each remote communicator uses an internal clock,
maintained by its microcontroller 90, to measure times
until significant events (such as the expected arrival of
frames to be received from the hub and the start of the
allocated Txop) relative to the time that the information
frame was received. The importance of correct mea-
surement of those times necessitates frequent resynchro-
nization of the remotes to the sense of time promulgated
by the hub. This is because the clock oscillators on each
of the communicators will necessarily will operate at
slightly different speeds, so the time measurement on
these communicators will "drift" apart the longer it has
been since they were last synchronized.

Commonly available, low cost quartz crystals pro-
vide oscillators that are accurate to ±0.01%, which can
result in up to 100 microseconds of clock drift per sec-
ond. A reasonable goal for inter-communicator syn-
chronization is not over 10% of the BTI duration. In the
preferred embodiment, the BTI is 4 milliseconds, so that
the permissible clock skew is 400 microseconds, allow-
ing communication cycles up to about 2 seconds in total
length.

This upper bound on the length of the communica-
tion cycle defines the worst case uncertainty as to when
receivers must be enabled to be sure to be active in time
to receive expected transmissions. By re-synchronizing
all communicators in the Group sufficiently often, this
uncertainty can be kept small enough to avoid reducing
network throughput due to extremely long delays to
combat timing uncertainty.

For each interval within the communication cycle of
interest to a particular remote, the remote must measure
the time, from receipt of the information (or alternate
information) frame until the interval of interest, using
the appropriate count of BTIs from the body of the
information (or alternate information) frame. Each re-
mote may make autonomous decisions about whether to
disable or power down portions of its circuitry based on
its own power consumption characteristics, power sup-
ply characteristics (AC vs. battery, amount of battery
charge remaining, etc.), and the amount of time be-
tween events of interest. As a minimum, each active
remote must attempt to receive each information frame,
and must attempt to receive the alternate information
frame whenever it is unable to successfully receive the
information frame, for a given communication cycle.

Another key reason that the receipt of information
frames is critical is that the lengths of communication
cycles are constantly changing, as is discussed below. In
order for a remote to remain in contact with its hub, the
remote must know the duration of the current commu-
nication cycle. This duration, as well as the durations of
the next two communication cycles, are reported in
each information frame. This provides a reasonable
margin for RF communication errors, since, at a mini-
mum, a remote must successfully receive one informa-
tion frame or alternate information frame out of every
two communication cycles (1 out of 4 such frames) to
remain synchronized with the hub. Because the remotes
all have their RF modems active to receive each infor-
mation frame, the hub also uses this frame to send all
acknowledgements and bandwidth allocations.

A number of different types of control frames are
employed. Those include a basic control frame, a Txop
request control frame, a Txop grant control frame, a
Txop relinquish control frame, a hub handoff request

5,371,734

29                                           30

control frame, and a hub handoff acknowledgement control frame. Each is described below in greater detail.

The basic control frame is used by remotes for non-piggybacked acknowledgements (acknowledgements to outbound directed frames when there are no inbound frames on which to piggyback these acknowledgements), bandwidth requests when the allocated Txop is too short to accommodate any of the messages which it has queued for transmission, and to prevent the loss of the allocated Txop due to inactivity when no LAN traffic is occurring on its attached LAN segment. The basic control frame utilizes the header field 162 (FIG. 8) with a zero-length body field. The acknowledgement and bandwidth request fields in the header ordinarily contain non-null information.

Each remote in the Group requests a Txop allocation from the hub when that remote becomes active or enters the communication space of the hub. Each remote must obtain a Txop allocation prior to engaging in data communication over the RF network. A Txop will be allocated by the hub on the next communication cycle unless all available Txops are in use. A Txop 84 (FIG. 3) is a fixed position in the order of Txops within the inbound interval 74 (FIG. 3), but a Txop is not a fixed amount of transfer bandwidth on any particular communication cycle. The hub allocates Txops to remotes in the order Txop requests are received. Once allocated, a remote retains its Txop until relinquished explicitly by a control frame from the remote to the hub or until relinquished implicitly from non-usage by the remote for a predetermined number of communication cycles. The maximum number of Txops which can be allocated by a hub is the maximum number of concurrently operable remote communicators in the Group. In the preferred embodiment, using RF modems with a 382 Kbps data rate, a reasonable maximum size is 16. With higher-speed RF modems, the number can be greater.

The Txop request frame is used by newly active remotes to request a Txop allocation from the hub. Since the remote does not have a Txop in which to send this request, the Txop request frame is sent in the Txop request interval 86 (FIG. 3). This interval occurs immediately after the completion of the last of the inbound Txop communication cycle.

Sending the Txop request control frame in the described manner during the Txop request interval 86 (FIG. 3) may result in successful communication between the remote and the hub, or may result in a destructive collision if multiple remotes are sending Txop request frames simultaneously. If the hub fails to respond with a Txop grant control frame (either positive, allocating a Txop, or null, indicating the unavailability of any Txops) within a predetermined number of subsequent communication cycles, the remote will repeat the Txop request frame after expiration of a random number (e.g., one to eight) of communication cycles. By retrying at random intervals, the probability of repeated collisions among multiple, concurrent requesters is reduced to an acceptably low level. In the case of Groups operating with a dynamically selected hub, the response of the hub to the Txop request frame may be a hub handoff request frame in cases where the hub arbitration fields of the Txop request frame indicate to the active hub that the new communicator sending the Txop request frame is a better choice to be the network hub.

The Txop request control frame utilizes a number of fields in the body 164 (FIG. 8) to convey the information necessary for performance in accordance with the present protocol. The body of the Txop request frame includes fields containing codes which convey the following types of information describing the characteristics of the communicator sending the Txop request frame: (1) hub arbitration information describing whether the communicator is operating on AC power or battery power; (2) whether the communicator is configured to operate as a hub; (3) whether any resource on the communicator's directly attached LAN segment 30 is a network server; (4) the number of active nodes on the directly attached LAN segment 30; (5) the name of the Group (to permit detection of name conflicts between Groups); and the name of the communicator (assigned by the user) to facilitate network statistics gathering and administration.

The Txop grant control frame is generated by the hub in response to a Txop request frame received by the hub during a previous communication cycle. The Txop grant frame also utilizes the body of the frame to hold a field containing a code indicating the transmission Txop number which the hub has allocated to the remote communicator sending the Txop request frame. A Txop number of zero indicates denial of the Txop request.

The Txop relinquish control frame is sent by a remote to the hub to indicate that the remote sending the Txop relinquish control frame will cease using its allocated Txop. This information is communicated solely by the header of this frame, so the body length field is zero.

The hub handoff request control frame is sent by the existing hub to a remote which the hub has determined is more suitable for acting as the hub for the Group. The hub handoff request frame is a request that the remote communicator addressed by this frame accept responsibility as the hub and to thereafter control communications by managing the communication cycles. The hub which sends the hub handoff request frame will have determined that the remote to which the this request is addressed is better configured to serve as the hub, based on the hub arbitration information contained in the Txop request frame previously sent by the communicator as compared to its own hub arbitration information, contained in its information frame. The hub handoff request control frame includes a sufficient number of fields in its body to convey the request and other information needed by the remote to accomplish the handoff of hub operation. This information includes various traffic and calibration parameter values.

The handoff acknowledgement control frame is sent by the remote to the hub in response to the receipt of a hub handoff request frame. The handoff acknowledgement frame indicates the fact that the remote will become the hub or the rejection by the hub of the handoff request.

The data packet frame is employed to convey network data in the body field of the frame. The data for the body of the data packet frame is usually a LAN packet being bridged to or from the local LAN segment or a LAN packet from the attached resource in cases where the communicators are serving as LAN adapters rather than network bridges. Directed data packet frames sent from a remote to a hub are addressed to the destination communicator (CDID). Broadcast data packet frames are sent by a remote to the hub when the hub is to retransmit the data packet frame as a broadcast or a multicast to all communicators in the Group. The CDID of a directed packet frame sent by a remote is that of the hub if the ultimate destination is to a node on the local LAN segment directly connected to the hub.

5,371,734

31

The CDID of a directed data packet frame sent by a remote to the hub is that of another remote communicator if the ultimate destination is to a node on another remote LAN segment and the hub is only to serve as a frame repeater in conveying the data packet frame to its ultimate destination. The source address (CSID) of the data packet frame sent by a remote to the hub is always the ID of the remote. For data packet frames sent by the hub to a remote, these frames are addressed to the remote destination communicator, or if the data packet is to be broadcast or multicast, to an address indicating a broadcast or a multicast. The destination address (CDID) of the directed data packet frame to the remote is the address of the remote communicator for all non-broadcast data packet frames. The source address (CSID) is unmodified if the hub is repeating a data packet frame previously received from another remote. The CSID is the address of the hub communicator if the body portion of the data packet frame originated from the LAN segment directly attached to the hub.

Two different types of hub beacon control frames are employed in the protocol of the present invention. A hub beacon frame is transmitted to identify the fact that the existing hub is functioning as a hub for the Group. The body portion of the hub beacon frame contains sufficient information to present all of the relevant information concerning the characteristics and the functionality of the hub. The hub beacon frames are sent using a special inter-hub spreading code used solely for this purpose and never used for hub-to-remote transmissions. Upon receipt of the hub beacon frame by another hub operating on the same frequency channel within the RF range of the first hub, the other hub will transmit a beacon reply frame. The beacon reply frame constitutes a recognition of a possible conflict in operation between the two hubs. The beacon reply frame sent by the other hub also contains the relevant information concerning the characteristics and the functionality of the other hub and is also sent on the special inter-hub spreading code. Based on the information contained in both the hub beacon frame from the first hub and the beacon reply frame from the other hub, the hubs will attempt to adjust their operational characteristics to avoid RF transmission conflict. Because each newly-active hub seeks a clear frequency channel prior to listening for hub beacon frames, the detection of and reply to the hub beacon frame will only occur if the hubs must share a single channel. Upon establishing such communication, the two hubs attempt to negotiate a sharing of the available bandwidth on the single channel by adjusting the length of their respective communication cycles to place their information intervals 76 at different times and by assigning limited (roughly half) of the time in their inbound portions 74 to Txops such that the unassigned portions are free for allocation by the other hub for remotes in the Group.

Acknowledgements are generated for all directed data packet frames. Broadcast data packet frames, information frames, and beacon frames are not acknowledged. Control frames are implicitly acknowledged through control activity, such as bandwidth allocation, Txop assignment or frame re-transmission. The acknowledgements from hub to remote are sent in the information frames. The acknowledgements from remote to hub are piggybacked on subsequent data packet or control frames if possible, but are conveyed in basic control frames if no other pending frames are available.

32

Positive acknowledgements and negative acknowledgements must be generated during the communication cycle immediately following the communication cycle in which the frame which is being acknowledged was transmitted. Non-acknowledgement for two communication cycles is treated as equivalent to negative acknowledgment by the source communicator. Retransmission of negatively acknowledged frames is the highest priority for allocated bandwidth. Retransmissions must occur during the first available Txop (of sufficient length) following the negative acknowledgement.

The information, control, data packet and hub beacon frames are employed in the communication cycle 70 in a manner that is more readily understood from FIG. 10. The communication cycle 70 shown in FIG. 10 is the same as that previously shown in FIG. 3, but is presented in an elongated form in FIG. 10. As shown in FIG. 10, the communication cycle 70 is subdivided into the outbound portion 72 used for transmission by the hub to the remotes and the inbound portion 74 used for transmissions by the remotes to the hub. Since all transfer units pass through the hub 64, remotes 66 only need to have their RF modems 96 enabled for frame reception during the relevant segments of the outgoing portion 72 of the communication cycle 70, and then need to have their RF modems 96 enabled for frame transmission only during the allocated Txops of the inbound portion 74. As a result, power may be conserved, which is especially important when the communicators 60 are powered by batteries.

As is shown in FIG. 11, the frames transmitted by the hub 64 during the information interval 76, the broadcast interval 78 and the directed interval 80 are all sent as a single transfer unit 144. The preamble 146 and postamble 150 introduce and conclude the transfer unit 144. The information frame 200, sent during the information interval 76, the broadcast data packet frames 202 destined to all of the remotes, sent during the broadcast interval 78, and the directed data packet frames 204 addressed to specific remotes 66, sent during the directed interval 80, constitute the payload 148 (FIG. 6) of the first transfer unit 144 sent by the hub 64 during the outbound portion 72 of each communicator cycle 70. By including the frames of the information interval 76, broadcast interval 78 and directed interval 80 together in one transfer unit 144, power consumption is optimized at the remotes 66 and network overhead for preambles and postambles is minimized. Since each remote 66 is required to enable its RF modem 96 to receive the communication cycle information during the information interval 76, each remote 66 simply leaves its RF modem 96 enabled for the duration of the outbound broadcasts (if any) and directed packets to its address, based on the appropriate fields from the information frame 200.

The second transfer unit 144 sent during the outbound portion 72 is a one frame transfer unit containing the alternate information frame, that repeats the information from the information frame 200 sent earlier during this communication cycle. The alternate information frame is sent in a separate transfer unit to permit the RF modems 96 at each remote to be able to re-acquire and re-synchronize to the incoming RF signal, thereby minimizing the risk of errors in receipt of the alternate information frame 206. The information defining the communication cycle is repeated in the alternate information frame due to its importance in synchronizing all

5,371,734

33

34

of the remotes 66 to the hub's clock for proper timing of the start of events occurring during the communication cycle 70, thereby assuring the integrity of communication during the communication cycle 70. Remotes 66 that successfully received the information frame 200 for the current communication cycle 70 do not have to receive the alternate information frame 206.

The information interval 76 includes the preamble of the first transfer unit 144 sent during the outbound portion 72 and the primary information frame 200 which contains the communication cycle information, as shown in FIG. 12. The information frame 200 contains all of the information needed by remote communicators 66 to participate in the communication defined by the MAC protocol of the present invention. Information in the information frame 200 includes the length of the outbound and inbound portions of the communication cycle 70 measured in BTIs, the duration and destinations of outgoing frames sent during this communication cycle 70, acknowledgements to incoming frames received during the previous communication cycle 70, allocation of Txops to the remotes 66 during the inbound portion 74 of this communication cycle 70, and calibration parameters of the hub communicator 64 that permit adjustment of the remote communicators 66 to receive hub transmissions with the best achievable reliability.

Based on the information conveyed in the information frame 200, all remotes 66 enable their RF modems 96 at the time of the expected arrival of each information frame 200. Also based on the contents of the information frame 200, each remote 66 is able to determine when to enable its RF modem 96 for receiving transmissions, during the broadcast interval 78 and appropriate portions of the directed interval 80, and when to enable its RF modem 96 for transmissions, during its allocated Txop of the inbound portion 74. Acknowledgements of successful receipt of frames sent from the remotes 66 to the hub 64 occurring during the preceding communication cycle 70 are also included in the information frame 200. These acknowledgements inform the remotes 66 of the need to retransmit some of the frames that were sent during the preceding communication cycle 70, or indicate that the remotes 66 can reclaim the buffers holding those frames because the hub successfully received them.

Because many items in the information frame 200 must be interpreted by the remotes 66 in real time, a longer IFG 154 is used between the information frame 200 and the next frame in the hub's transfer unit.

Broadcast data packet frames received by the hub 64, either from its locally attached LAN segment 30 or from a frame sent by a remote during the preceding communication cycle, are sent in broadcast frames 202 by the hub 64 immediately after the IFG 154 following the information frame 200. This optimizes power utilization at the remotes 66, because each remote 66 must enable its RF modem 96 to receive the information frame 200, and can leave the RF modem 96 enabled for the immediate reception thereafter of the outbound 60 broadcast frames, if any, as indicated by the information frame.

Packets received by the hub 64 that are not addressed to nodes 34 on its local LAN segment 30 are transmitted during the directed interval 80 to the designated remotes 66 in directed frames 204 during the outbound portion 72 of the communication cycle 70 immediately following the cycle during which they were received.

The outgoing packets in the directed frames 204 are ordered by Txop 84 allocations. All directed data packet frames being sent to a particular remote 66 during any communication cycle 70 are transmitted sequentially (and in the order received). The information frame 200 indicates the relative starting time and absolute duration of the directed frames 204 to each remote 66 in the Group.

Remotes 66 with no pending directed data packet frames to receive, as indicated in the information frame, may disable their RF modems 96 after the outgoing broadcast interval 78, leaving them disabled until the anticipated arrival time of the next information frame 76. A determination is made at each remote 66 having directed packets pending to be received whether to leave the RF modem 96 enabled for reception, or to disable the RF modem 96 after the broadcast interval 78 and then to re-enable the RF modem 96 at the assigned time to receive directed packets addressed to them. This determination may be based on the type of active power source, for example, batteries or commercial power, and the power consumption versus time characteristics of the communicator 60.

Because of the critical nature of some of the contents of the information frame 200, especially the communication cycle duration, frame acknowledgement, directed frame timing, and Txop timing, and Txop allocation data, there is a potentially significant impact upon communications efficiency if one or more remotes 66 in the Group do not successfully receive an information frame 200. To reduce the risk of such non-reception, with little added overhead, the alternate information frame 206 is broadcast during the alternate information interval 82. The alternate information frame contains the same information as the primary information frame 200, is transmitted by the hub 64 in a separate transfer unit after the transfer unit containing the information from the information, broadcast and directed intervals has been sent.

A predetermined minimum time separation of the information frame 200 and alternate information frame 206 is provided, even in the absence of any outgoing broadcast or directed packets. This time period is determined to enhance the probability that a remote communicator which did not successfully receive the first information frame 200 receives the alternate information frame 206. Sending the alternate information frame 206 in its own transfer unit 144 with a separate preamble 146 achieves some of this time separation and may be needed to achieve reliable signal acquisition in some RF environments. Although the alternate information frame 206 is an exact copy of the primary information frame 200, the information conveyed during the broadcast and directed intervals will not be available to any remotes that utilize the alternate information frame 206. The information transmitted during the broadcast and directed intervals will have been lost prior to the remotes 66 obtaining the necessary information from the information frame 200 to participate in the communication cycle 70. Nonetheless, the lost information relevant to that remote from the directed interval 80 can be retransmitted pursuant to negative acknowledgement or lack of acknowledgment from this remote, which involves considerably less risk of overall communication failure than if the remotes 66 do not operate as expected during their portions of the communication cycle 70.

**35**

At the conclusion of these intervals of the outbound portion 72 of the communication cycle 70, the remotes 66 are permitted to transmit transfer units to the hub 64 during the inbound portion 74. FIG. 12 illustrates the separate transfer units from the remotes 66 transmitted during their allocated Txops 84. When the time for the Txop 84 of a remote 66 arrives, that remote 66 may send as many frames as permitted by the time allocated for this Txop in this communication cycle. In the absence of any frames awaiting transmission, the remote 66 may leave its Txop unused, or may send a control frame. The purposes of such control frames include acknowledging previous frames received from the hub 64 (although such acknowledgements normally would be piggybacked on inbound frames directed to the hub 64 from the remote 66), requesting a change in bandwidth allocation from the hub 64, and preventing this remote's Txop allocation from being expunged due to inactivity. At the conclusion of the Txop intervals 84 during the inbound portion 74 of the communication, remotes which have just joined the Group may request a Txop allocation. The Txop request is made in a one frame transfer unit shown in FIG. 13. This transfer unit includes the preamble 246, a Txop request frame 151, and a postamble 150.

At predetermined time intervals, for example every five seconds, a additional interval known as a hub beacon interval 88 is added at the end of the communication cycle. This interval is used for communication among nearby Groups in an attempt to avoid destructive interference between adjacent hubs that must use the same frequency channel. At the beginning of the hub beacon interval, a hub beacon frame 149 is transmitted in the transfer unit shown at the beginning of the hub beacon interval shown in FIG. 14. This transfer unit is sent using a special inter-hub spreading code. The remainder of this interval is used to listen on the same inter-hub spreading code for hub beacon reply frames 145 from other, nearby hubs. Thus, the transfer units transmitted during the hub beacon interval may be both inbound and outbound. The hub beacon intervals are inserted periodically at the end of communication cycles to occur so that not more than predetermined number of seconds elapse between the transmission of successive hub beacon frames by each hub.

There are a number of different operational aspects of the MAC protocol of the present invention which pertain to the communication cycle. Many of these operational aspects involve variations in the amount of time for the communication cycle itself and the intervals within the communication cycle. Details regarding these operational aspects are discussed below.

The duration of each communication cycle is adjusted to vary from the duration of the preceding and following cycles. The duration is adjusted by the hub following the rules outlined below. Each hub adjusts the duration of communication cycles such that successive cycles are never of equal length, in order to avoid possible interferences with a hub's transmissions created by regularly occurring noise and to minimize periodic interference with other RF devices due to this hub's transmissions. The adjustment rules seek to create the greatest amount of useful communication bandwidth while permitting the remotes to operate with their RF modems energized for minimum transmission and reception on-time. It is necessary for battery operated remotes to recognize when to expect the beginning of the next communication cycle, in order to power-up

**36**

their RF modems to receive the information frames at the beginning of each cycle. To facilitate this knowledge, the hub transmits the lengths of each of the next two communication cycles as part of the information frame at the beginning of each communication cycle. Including the lengths of the next two cycles in each information frame permits remotes to remain adequately synchronized with the hub in cases where up to three successive information and alternate information frames are not successfully received.

The adjustments to the communication cycle involve the use of a coarse adjustment rule set and a fine adjustment rule set, operating simultaneously. The coarse adjustments establish the base cycle time duration of the communication cycle, using parameters such as the number of Txops allocated, the aggregate amount of traffic during recent cycles, and the number of remotes involved in sending that traffic. The fine adjustments establish the random variations in the length of successive communication cycles. These variations are relative to the base cycle time duration set by the coarse adjustment. The fine adjustment creates the time diversity for communication. With the resulting length randomization, interference between nearby Groups that cannot detect each other using the hub beacon and hub beacon reply frames or from a noise source having cyclic, but non-continuous transmissions, is not catastrophic to communication within the Group.

The time duration of each communication cycle is determined by the addition of a base time component and a fine random component. Latency adjustment rules establish the base time component and the fine random component is established relative to the base component. Both adjustment rules are described below.

The coarse adjustment involves changing the base cycle duration based on information relating to the number of remotes with allocated Txops and the subset number of those remotes that are requesting, or have recently used, communication bandwidth. The goal of the latency adjustment rules is to reduce power consumption by remotes during periods of little communication, while accepting the associated increase in communication latency during such periods of low usage. Dynamic compensation reduces this latency when the demand for communication bandwidth increases. This start-up latency at an increase in traffic levels is analogous to the spin-up delay that occurs prior to handling hard disk accesses on a portable personal computer that has stopped its disk drive motor as a power conservation measure.

The coarse latency adjustment of the base cycle duration is determined using a piecewise function whose default values are listed in the Table below. The vertical axis of this Table is Nfree, which is the number of unallocated Txops, using the example of 16 possible communicators in the Group. Generally the value Nfree is 15 minus the number of allocated Txops, since the hub will be one of the communicators is the Group. However, there are certain cases, such as conferences and managed Groups using roster security, where there can be a known total of allocatable Txops that is less than 15. The horizontal axis of this table is Nactv, which is the peak number of remotes that have requested a Txop allocation longer than the default duration during the present communication cycle or which have sent or received one or more directed data packet frames within a predetermined number of previous communication cycles.

5,371,734

37

The values obtained from the Table are the number of coarse adjustment units in the base communication cycle. Each coarse adjustment unit is a predefined (parameterized, with a default value of 16) number of basic time increments (BTIs).

38

message traffic at the hub may well cause a subsequent increase in the outbound portion of the communication cycle to compensate for this increase.

If the maximum time duration of a communication cycle is insufficient to send all pending frames, the situa-

| | LATENCY ADJUSTMENT TABLE | | | | | | | | | | | | | | |
| | Nactv | | | | | | | | | | | | | | |
| Nfree | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 9 | 7 | 5 | 5 | 5 | 6 | 6 | 8 | 8 | 8 | 10 | 10 | 10 | 12 | 12 | 12 |
| 1 | 9 | 7 | 5 | 5 | 5 | 6 | 6 | 8 | 8 | 8 | 10 | 10 | 10 | 12 | 12 | — |
| 2 | 10 | 7 | 5 | 5 | 5 | 6 | 6 | 8 | 8 | 8 | 10 | 10 | 10 | 12 | — | — |
| 3 | 10 | 7 | 5 | 5 | 5 | 6 | 6 | 8 | 8 | 8 | 10 | 10 | 10 | — | — | — |
| 4 | 11 | 8 | 5 | 5 | 5 | 5 | 6 | 7 | 8 | 8 | 10 | 10 | — | — | — | — |
| 5 | 11 | 8 | 5 | 4 | 5 | 5 | 6 | 7 | 8 | 8 | 10 | — | — | — | — | — |
| 6 | 12 | 8 | 5 | 4 | 5 | 5 | 6 | 7 | 8 | 8 | — | — | — | — | — | — |
| 7 | 12 | 8 | 5 | 4 | 4 | 5 | 6 | 7 | 8 | — | — | — | — | — | — | — |
| 8 | 13 | 9 | 5 | 4 | 5 | 5 | 6 | 7 | — | — | — | — | — | — | — | — |
| 9 | 13 | 9 | 5 | 5 | 5 | 6 | 6 | — | — | — | — | — | — | — | — | — |
| 10 | 14 | 9 | 5 | 5 | 5 | 6 | — | — | — | — | — | — | — | — | — | — |
| 11 | 14 | 9 | 5 | 5 | 5 | — | — | — | — | — | — | — | — | — | — | — |
| 12 | 15 | 10 | 5 | 5 | — | — | — | — | — | — | — | — | — | — | — | — |
| 13 | 15 | 10 | 5 | — | — | — | — | — | — | — | — | — | — | — | — | — |
| 14 | 15 | 10 | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| 15 | 15 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |

The fine adjustment involves lengthening the current communication cycle by a randomly selected number of basic time increments, subject to limitations that keep this variation to be less than one coarse adjustment unit. For each communication cycle, the randomization value is a random number between 0 and one less than the number of BTIs in a coarse adjustment unit.

An allocation decision made within any communication cycle is the division between the outbound portion 72 and the inbound portion 74. The overall restrictions on the division between the outbound and inbound portions include the recognition that the communication cycle must never exceed a predetermined maximum amount of time and must never be less than a predetermined minimum amount of time. The maximum predetermined amount of time is established in accordance with the objectives of how frequently it is desired that a communication cycle occur, and in recognition that timing requirements particular to the higher layer LAN functionality of the LAN protocols in use on the attached network segments 30 must be met with respect to the bridging of LAN segments. The minimum length of time that must be provided for the inbound portion of any communication cycle is one BTI per Txop for transmission of a basic control frame to send acknowledgements and bandwidth requests. When a hub beacon interval is provided, the time available for this interval is obtained by reducing the time allocated for inbound Txops, even though the hub beacon frames are sent by hubs.

If the maximum time duration of a communication cycle is sufficient for transmitting all of the queued frames at the hub, plus all requested Txops for the remotes, plus a defined number (typically 1–4) BTIs per allocated Txop for remotes that are not requesting Txops, plus the hub beacon interval if needed, the outbound portion is allocated to be the length needed to transmit all of the queued frames at the hub. This condition is referred to as a non-saturated condition. By allocating the extra time to inbound portion with preference to the remotes with the largest magnitude of pending transmission requests, a rapid increase in inbound message traffic to the hub might generate a backlog of frames awaiting transmission at the hub. The increase in

tion is described as a saturated condition. In the case of a saturated condition, a determination must be made as to which frames will be transmitted first. The priorities for making such decisions are described below, generally in descending order of importance. In other words, attempts will be made to satisfy the first itemized considerations prior to satisfying the last itemized considerations.

First of all, it is mandatory that sufficient time be allocated for the transmission of the complete information 200 and alternate information 206 frames during their intervals in the outbound portion 72 of the communication cycle 70, and for the hub beacon interval 88 (if needed during that communication cycle), and for at least one BTI per allocated Txop during the inbound interval. Secondly, sufficient time must be provided for transmitting all directed data packet frames already queued at hub during the directed interval 80 of the communication cycle 70. Third, sufficient time should be provided during the remote Txops for at least four BTIs per remote requesting a Txop, plus if possible, time to handle the full requested Txop length for one or more of the remotes requesting more than this amount of time (e.g. greater than 4 BTIs). These longer inbound allocations are granted to the remotes in order of descending request length. Fourth, sufficient time should be provided to transmit all queued broadcast data packet frames during the broadcast interval 98. Lastly, time will be provided for any other transmissions, including outbound directed data packet frames queued at hub after the saturation occurred.

Another adjustment which occurs within the inbound interval is the bandwidth allocation to each remote during its Txop 84. This bandwidth allocation controls the time duration length of the Txop. Even if a remote has requested and been allocated a Txop, the hub may adjust the length of the Txop during each communication cycle based on a number of different factors, including the aggregate traffic levels during recent communication cycles, the amount of data awaiting transmission at each remote with an allocated Txop, the elapsed time since the last Txop of the remote. Both the number and length of Txops are under control of the

5,371,734

39

hub, and may be allocated in a manner that provides most of the available bandwidth to the communicators with the most traffic at each point in time. The allocation should provide an approximately fair sharing of bandwidth during periods of network saturation, while not limiting the burst nature of typical, nonsaturated LAN traffic patterns.

During any communication cycle, some remotes with allocated Txops may not be allocated any extra time for its Txop although every remote has, at least, the minimum-length Txop described above for the purpose of sending a control frame to acknowledge frames received from the hub and/or to request the allocation of a longer Txop to transmit queued, outgoing data packet frames.

When a remote's Txop arrives, that remote may send a single transfer unit that contains as many frames as the allocated Txop permits. In the absence of any frames awaiting transmission, the remote may leave its allocation unused, or may send a control frame. The purposes of such control frames include acknowledging previous hub transmissions in cases where there is no frame traffic in the direction of the remote to the hub on which to piggyback the acknowledgement, requesting a change in bandwidth allocation by the hub, and preventing the allocation from being expunged due to non-use.

The protocol of the present invention is preferably implemented as a state machine through the use of the microcontroller 90 and instructions contained in the memory of each of the communicators, the ROM 92 and the RAM 94 (FIG. 4). A state diagram representing the overall operation of a communicator is shown in FIG. 15.

Upon being first powered on, the communicator will reside in an initialization state (Listen RF) 250 with its RF modem activated for reception to "listen" for RF activity on predesignated possible frequencies and codes. Operational states of the communicator occurring prior to the Listen RF state are primarily activation and inactive states which have relevance to the communication occurring on the local LAN segments, and these states have been described in the aforementioned application which is incorporated herein by reference.

Generally in the Listen RF state 250, the communicator operates with the RF modem in a receiving mode, active to receive incoming transfer units. The communicator attempts to acquire a signal from a transmitting communicator and to detect a valid starting flag and frame header. If any such frame header is received, the communicator is aware that a hub is present, otherwise no communication would be taking place. Upon successfully receiving any frame and upon examination of the contents of the header of the frame, the communicator detects from the frame type field whether the message is inbound or outbound to determine whether the source or the destination of the frame is acting as the hub.

If no hub is detected in the Listen RF state 250, the communicator automatically will become the hub as the result of determining no other hub 64 exists, and will enter the Hub Active state 252. In the Hub Active state 252, the self-designated hub awaits transmissions from other communicators. If no transmissions are received for a predetermined period of time which is much longer than a communication cycle, the communicator acting as a hub enters an Idle state 254, in which the communicator powers down its RF modem. The communicator will remain in the Idle state 254 for a prede-

40

termined period of time, after which it will resume the Listen RF state 250 to determine the presence of network communications. If the communicator is connected to a LAN segment, it may return to the Listen RF state 250 upon receipt of a LAN packet from the local LAN segment, if it is determined that the LAN packet is directed to a node on a remote LAN segment. Details of how the communicator may discern this is described in the above referenced invention which is incorporated herein.

On the other hand, if an active hub is detected while in the Listen RF state 250, the communicator enters a Request Txop state 258, in which a Txop request frame is sent to the active hub during the next Txop request interval 86. The Txop request frame may elicit a number of responses from the hub. If the response is a Txop grant frame that allocates a Txop, the communicator enters the Remote Active state 260 and uses the allocated Txop. If the response is a Txop grant frame that denies the Txop allocation, the communicator returns to the Listen RF state 250. If the response is a hub handoff request frame, indicating that the present hub has determined from the arbitration values contained in the Txop request frame, that the requesting communicator would make a better hub than the present communicator acting as the hub, the communicator responds by sending a hub handoff reply frame and then enters the Hub Active state 252. Upon receipt of the hub handoff reply frame, the communicator acting as the hub ceases doing so and becomes a remote, using the last allocated Txop in the communication cycle.

The functionality of the communicators in each of the states 250, 252, 258 and 260 is discussed more specifically below in conjunction with FIGS. 16 to 19.

In the Listen RF state 260, the communicator performs the functions shown in the FIG. 16, which are referenced there with separate reference numbers. The communicator scans all useable frequency channels listening for the presence of a hub by "listening" to each of the predetermined, useable frequencies, starting by selecting the next available frequency channel as shown at 251. Having selected the available channel at 251, the communicator activates its receiver for a duration equal to 110% of the predetermined maximum permitted time duration of a communication cycle as shown at 253. By activating the receiver on each channel for 110% of the maximum time duration of a communication cycle, the communicator is certain to receive 100% of any communication cycle occurring, including the important information frames transmitted during the information interval 76 and the alternate information interval 82.

If no RF activity is detected, as determined at 255, the communicator then determines at 257 whether it has checked all available frequency channels. If the determination at 257 is that it has checked all available frequency channels, the communicator has made the determination that there are no other communicators active. Therefore, as the only active communicator, it becomes the hub, and enters the Hub Active state 252 (FIG. 15). On the other hand, if the determination is made at 257 that there are as yet other unchecked frequency channels, the communicator selects the next available frequency channel at 251, continuing in the Listen RF state.

Alternatively, if RF activity detected at 255, the communicator further determines at 259 whether the detected RF activity represents a valid frame, or whether the detected RF activity represents an irrelevant RF

5,371,734

41                                                42

communication or interference. If the detected RF activity is a valid frame, the communicator enters a wait state at 261, remaining with its receiver active on that same frequency channel until it receives an information frame transmitted during the information interval 76 or the alternate information interval 82. Once an information frame is successfully received, the communicator will be able to determine the time of the next Request Txop interval 86 to request a Txop, and the communicator enters the Request Txop state 258.

However, if the detected RF activity is determined at 259 not to be a valid frame, but before concluding that the RF activity is irrelevant, the communicator adjusts the calibration parameters of the receiver as shown at 263. As discussed above, the communicator may adjust various calibration parameters to attempt to improve reception. The changed or improved reception allows another opportunity to determine whether the RF activity is a valid frame. Following the calibration adjustments at 263, the determination is made at 265 if the RF activity presents a valid frame. If so, the communicator returns to the wait state at 261 to await reception of an information frame, at which time the communicator will transition to the Request Txop state 258. If the determination made at 265 is that, even after adjusting the calibration parameters, the RF activity detected does not present a valid frame, the communicator makes a determination at 257 whether there are additional available channels to be checked. If there are additional channels to be checked, the communicator selects the next channel at 251. If all available channels have been checked, as determined at 257, the communicator transitions to the Hub Active state 252.

In the Request Txop state 258, the communicator performs the functions shown in the FIG. 17, which are referenced there with separate reference numbers. The communicator enters the Request Txop state 258 after detecting the presence of a hub. From the information frame received during the Listen RF state 250, the communicator determines the anticipated arrival time of the next Request Txop interval at 267, at which time the communicator transmits a Txop request frame to the hub at 269. The communicator then awaits a reply to its Txop Request frame from the hub, leaving its receiver active to receive the next communication cycle as shown at 271. The communicator then makes a determination at 273 whether and what type of reply it has received from the hub in the next communication cycle.

If the determination is made at 273 that the communicator has received no reply from the hub, the communicator waits a random number of communication cycles as shown at 275, and then determines at 267 the anticipated arrival time of the next Txop request interval 86. The communicator waits a random number of cycles because its Txop request may have been interfered with by another Txop request from another communicator. Because it is possible that the hub did not properly receive the interfering Txop request frames and thus replied to none of them, waiting for a random number of communication cycles to send another Txop request reduces the chances of continued possible interference from another Txop request frame.

If the determination is made at 273 a Txop grant frame was received in response to the Txop request frame, a further determination is made at 277 as to whether the Txop number in the body of the Txop grant frame is zero or non-zero. A zero Txop in to the Txop grant frame indicates that the hub has denied a

Txop to the communicator. A Txop denial will cause the communicator to transition to the Lister RF state 250. On the other hand, if the Txop has been allocated, the communicator transitions to the Remote Active state 260.

Alternatively, if the determination is made at 273 that a hub handoff frame has been received, the hub has decided that the requesting communicator is a better choice for the Group hub than the current hub. This occurs from an implicit hub arbitration process conducted at the active hub when each Txop request frame is received.

The arbitration criteria are stored in the ROM 92 or RAM 94 of each communicator and constitute a part of the MAC protocol of the present invention. The hub arbitration criteria are described in descending order of importance. First, the hub will consider whether either one of it and the new requester are powered by continuous AC power or whether each is battery powered. Because the hub's RF modem is continuously active for transmitting and receiving, it is highly desirable to have a communicator powered by continuous power. Second, if the first criterion is not dispositive because either both or neither of the communicators are continuously powered, the hub will consider whether one of these communicators has been preselected to act as a hub. Preselection may occur if, for example, it is known that a particular communicator is more centrally located or tends to encounter less interference than other communicators 60, or if one communicator tends to remain stationary while other communicators are more frequently moved, etc. If one of the communicators has been preselected as a hub, that communicator will be selected as the hub. If this criterion is not dispositive because neither or both of the communicators has been predesignated as a hub, the third criterion will be employed. The third criterion involves whether there is a node on the local LAN segment attached to each communicator which is designated as a LAN server. Assuming that a communicator attached to a server will be involved in more LAN traffic and that the data transfer will be more efficient if it is accepted from a directly connected server, the communicator directly connected to the LAN server will be given priority as a hub. The fourth criterion gives priority to the communicator which is directly attached to the LAN segment having the greater number of active nodes. It is again assumed that the communicator attached to the LAN segment having the most active nodes will be involved in more LAN traffic than others, hence it will be designated as the hub. Finally, if all the functionally-based criteria fail to singularly designate the hub, that communicator having the lower OUI will become the hub.

It should be noted that more than two communicators could be involved in a hub arbitration, and the same criteria would be established to determine which of the plurality of communicators will be designated as the hub. The active hub either confirms its own selection and sends Txop grant frames to all those communicators sending Txop request frames, or designates the superior hub candidate by responding to the Txop request frame with a hub handoff request frame. Upon receipt of the hub handoff request frame the communicator in Request Txop state 258 utilizes the data in the body field of the hub handoff request frame, responds to the (outgoing) hub with a hub handoff reply frame at 279, and enters the Hub Active state 252. In this case the previous hub becomes the user of the last Txop (typi-

5,371,734

**43**

cally 15) of the communication cycle, as it enters the Remote Active state 260.

In the Hub Active state 252, the communicator performs the functions shown in the FIG. 18, which are referenced there with separate reference numbers. The hub first allocates Txops based on Txop request frames received from the previous communication cycle as shown at 262. Then, based upon the length and number of pending broadcast and directed frames and requested Txops, the communicator determines at 264 a coarse duration of the communication cycle, and the communicator then adjusts this duration at 266 with a randomly-selected fine duration adjustment.

Once the duration of the communication cycle has been established at 264 and 266, the communicator assembles the information frame and transmits it to all of the remotes as shown at 268. The hub determines at 270 if broadcast frames are pending and, if so, transmits the pending broadcast frames to all remotes as shown at 272. After pending broadcast frames are sent or if the determination is made at 270 that there are no broadcast frames pending, the communicator determines at 274 if there are any pending directed frames. If there are, the directed frames are transmitted to the remotes as shown at 276. After the directed frames are sent at 276 or if the determination is made at 274 that there are no directed frames to be sent, the communicator retransmits at 278 the information frame as the alternate information frame to all remotes. Next, if the determination made at 280 indicates that Txops have been allocated, the communicator receives the pending incoming frames from the remotes as shown at 282. After receiving all the pending incoming frames, or if it is determined at 280 that there are no Txop allocations, the hub communicator then allows a predetermined interval of time to pass for remotes to transmit Txop request frames to the hub as shown at 284, in the event that there may be newly active remotes which have not yet requested a Txop. After awaiting transmission of Txop request frames during the Txop request interval, the hub determines at 286 whether there is a need for a hub beacon frame in this communication cycle at 286. If not, the hub returns to 262 to begin the next communication cycle. Otherwise, the hub sends a hub beacon frame at 288, waits for possible hub beacon reply frames at 290, and returns to 262 to begin the next communication cycle.

In the Remote Active state 260, the communicator performs the functions shown in the FIG. 19 which are referenced there with separate reference numbers. The communicator activates its RF modem to receive the information frame from the hub as shown at 290. The remote, based upon the information contained in the information frame, then makes a determination at 292 whether broadcast frames are pending and, if broadcast frames are pending, the remote receives the broadcast frames and queues them for transfer to the local LAN segment as shown at 294. After the broadcast frames have been received at 294 or if the determination at 292 indicates that there are no broadcast frames pending, the communicator, based on the information contained in the information frame, makes the determination at 296 whether any directed frames are pending for transmission to it. If directed frames are pending, the communicator determines to activate its RF modem to receive the directed frames. The directed packet frames are received and the LAN packet portions thereof are queued for transfer to the local LAN segment as shown at 298. If the determination is made at 296 that no di-

**44**

rected frames are pending, the communicator can power off its RF modem, as shown at 300, until it needs to be activated again.

After the directed frames are received from the hub as shown at 298 or the determination is made at 296 that there are no directed frames intended for the remote, the remote makes a determination at 302 whether its Txop is pending immediately. If the Txop is not immediately pending, the remote remains with its RF modem powered down until its Txop time arrives as shown at 304. Once the Txop time arrives, the remote will determine whether it has any pending frames to send to the hub as shown at 306. If inbound frames are pending, the remote activates its RF modem and transmits the pending frames to the hub as shown at 308. On the other hand, if is determined at 306 that there are no pending frames, the remote sends a control frame to preserve its allocated Txop for use in later communication cycles as shown at 310. Whether the remote transmits pending inbound data packet frames or a control frame to reserve its place, the remote will notify the hub in the BWAR field 184 and BWF field 186 of the header 162 of the number and size of pending frames it requests to send during the next communication cycle. The absence of such a frame, or a frame with a value of zero in the BWAR field yields a minimum length Txop for the next communication cycle.

Once the pending inbound frames are sent or the control frame is sent, the remote powers down its RF modem as shown at 312 and then returns to 290 to await the information frame at the start of the next communication cycle.

The previous description demonstrates the significant aspects of the MAC protocol of the present invention in providing efficient communication between communicators without the need for a wired communication medium and to accommodate communicators on a basis which permits them to join the Group on a non-specified basis, among other things. In addition, the protocol of the present invention offers significant advantages and improvements for use with battery powered communicators in allowing substantial power conservation, thereby extending the use time period for such communicators to a time period comparable to the use time period of the of a battery powered portable computer, thereby facilitating the use of such battery powered portable computers for information and resource sharing purposes though the single logical network available from the protocol of the present invention. Many other advantages and improvements will be apparent after comprehending the significant aspects of the present invention.

A presently preferred implementation of the MAC protocol of the present invention and many of its improvements have been described with a degree of particularity. This description has been made by way of preferred example, but the scope of the invention should not necessarily be limited by this exemplary description. What should be understood, however, is that the scope of the present invention is defined by following claims.

The invention claimed is:

1. A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and

Federal Circuit Appendix

A135

5,371,734

45

a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each communication cycle having intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting cycle establishing information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the hub transmitting a frame containing the cycle establishing information which establishes both an outbound portion of the communication cycle when the hub transmits frames to the remotes and an inbound portion of the communication cycle when the remotes transmit frames to the hub, the frame containing the cycle establishing information also establishing the predetermined intervals during the outbound and inbound portions of the communication cycle when each remote is allowed to transmit and receive;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the cycle establishing information transmitted from the hub; and

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the cycle establishing information transmitted from the hub.

2. A communicator as defined in claim 1 wherein the predetermined functions further comprise:

the hub assigning transmission opportunities to the remotes, each transmission opportunity being an interval for a remote to transmit frames to the hub; and

the hub transmitting transmission opportunity allocation information in the frame containing the cycle establishing information transmitted by the hub.

3. A communicator as defined in claim 2 wherein the predetermined functions further comprise:

the hub transmitting the frame containing the cycle establishing information to the remotes to establish a transmission opportunity request interval during the communication cycle when the remotes may transmit transmission opportunity request frames to the hub to request transmission opportunity allocations; and

the remotes transmitting transmission opportunity request frames to the hub during the transmission opportunity request intervals.

4. A communicator as defined in claim 3 wherein the predetermined functions further comprise:

the hub allocating a transmission opportunity to the remote within a predetermined number of subsequent communication cycles after the transmission opportunity request frame is received by the hub; and

46

the hub transmitting transmission opportunity allocation information during the communication cycle after the hub has received the transmission opportunity request.

5. A communicator as defined in claim 2 wherein the predetermined functions further comprise:

the hub allocating a predetermined amount of time for each transmission opportunity, the predetermined amount of time of the transmission opportunity being for a remote to transmit frames to the hub; and

the hub transmitting the frame containing the cycle establishing information which contains the transmission opportunity allocation information during the communication cycle.

6. A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

the hub assigning transmission opportunities to the remotes, each transmission opportunity being an interval for a remote to transmit frames to the hub;

the hub transmitting transmission opportunity allocation information in a frame transmitted by the hub; and

the hub allocating a number of transmission opportunities during at least one communication cycle which is at least one less in number than the number of remotes in the Group.

7. A communicator as defined in claim 6 wherein the predetermined functions further comprise:

the hub changing the transmission opportunity allocations in a subsequent communication cycle compared to a previous communication cycle by allocating a transmission opportunity to a remote which had previously not been allocated a transmission opportunity.

8. A communicator as defined in claim 7 wherein the predetermined functions further comprise:

5,371,734

**47**

the hub further revoking a previous transmission opportunity allocation of a remote to provide the transmission opportunity allocation to the remote which had previously not been allocated a transmission opportunity.

9. A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

the hub assigning transmission opportunities to the remotes, each transmission opportunity being an interval for a remote to transmit frames to the hub;

the hub transmitting transmission opportunity allocation information in a frame transmitted by the hub;

the hub transmitting information to the remotes to establish a transmission opportunity request interval during the communication cycle when the remotes may transmit transmission opportunity request frames to the hub to request transmission opportunity allocations;

the remotes transmitting transmission opportunity request frames to the hub during the transmission opportunity request intervals; and

the hub transmitting information in a frame which requires a remote having a previously allocated transmission opportunity to relinquish the transmission opportunity.

10. A communicator as defined in claim 9 wherein the predetermined functions further comprise:

the remote relinquishing its previously allocated transmission opportunity by transmitting a frame containing the acknowledgement during its allocated transmission opportunity request interval.

11. A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames

**48**

respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

the hub assigning transmission opportunities to the remotes, each transmission opportunity being an interval for a remote to transmit frames to the hub;

the hub transmitting transmission opportunity allocation information in a frame transmitted by the hub;

the hub monitoring the frames transmitted by each remote during its transmission opportunity; and

the hub revoking a previous transmission opportunity allocation of a remote which has not transmitted more than a predetermined number of frames during a previous number of communication cycles.

12. A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

5,371,734

**49**

the hub assigning transmission opportunities to the
remotes, each transmission opportunity being an
interval for a remote to transmit frames to the hub;

the hub transmitting transmission opportunity alloca-
tion information in a frame transmitted by the hub;

the hub allocating a predetermined amount of time
for a transmission opportunity in each transmission
opportunity, the predetermined amount of time of
the transmission opportunity being for a remote to
transmit frames to the hub;

the hub transmitting a frame containing the transmis-
sion opportunity allocation information during the
communication cycle;

the hub adjusting the length of at least one transmis-
sion opportunity of at least one remote during at
least one of a plurality of subsequent communica-
tion cycles; and

the hub transmitting a frame containing the informa-
tion establishing the adjusted length of the trans-
mission opportunity prior to the time of the ad-
justed transmission opportunity in a communica-
tion cycle.

13. A communicator as defined in claim 12 wherein
the predetermined functions further comprise:

the hub monitoring the frames transmitted by each
remote during its transmission opportunity; and

the hub further adjusting the length of the transmis-
sion opportunity relative to the number of frames
transmitted by each remote during its transmission
opportunity.

14. A communicator for wirelessly transmitting
frames to and receiving frames from a least one addi-
tional communicator in accordance with a predeter-
mined medium access control protocol, the communica-
tors which transmit and receive the frames constituting
a Group, each communicator including a transmitter
and a receiver for transmitting and receiving the frames
respectively, the medium access control protocol con-
trolling each communicator of the Group to effect pre-
determined functions comprising:

designating one of the communicators of the Group
as a hub and the remaining the communicators of
the Group as remotes;

the hub establishing repeating communication cycles,
each of which has intervals during which the hub
and the remotes transmit and receive frames;

the hub transmitting information to the remotes to
establish the communication cycle and a plurality
of predeterminable intervals during each communi-
cation cycle, the intervals being ones when the hub
is allowed to transmit frames to the remotes, when
the remotes are allowed to transmit frames to the
hub, and when each remote is expected to receive
a frame from the hub;

the remotes powering off their transmitters during
times other than those intervals when the remote is
allowed to transmit frames to the hub, by using the
information transmitted from the hub;

the remotes powering off their receivers during times
other than those intervals when the remote is ex-
pected to receive a frame from the hub, by using
the information transmitted from the hub;

the hub establishing the length of each communica-
tion cycle; and

the hub transmitting a frame containing information
describing the length of the communication cycle
prior to the end of the communication cycle whose
length is established.

**50**

15. A communicator as defined in claim 14 wherein
the predetermined functions further comprise:

the hub adjusting the length of a communication
cycle relative to the length of a previous communi-
cation cycle.

16. A communicator as defined in claim 15 wherein
the predetermined functions further comprise:

the hub continually adjusts the length of the commu-
nication cycles.

17. A communicator as defined in claim 15 wherein
the predetermined functions further comprise:

the hub allocating transmission opportunities to the
remotes, each transmission opportunity being an
interval for a remote to transmit frames to the hub;
and

the hub adjusting the length of a communication
cycle relative to the number of transmission oppor-
tunities allocated.

18. A communicator as defined in claim 17 wherein
the predetermined functions further comprise:

the hub allocating a predetermined amount of time
for a transmission opportunity for a remote to
transmit frames to the hub;

the hub monitoring the frames transmitted by each
remote during its transmission opportunity; and

the hub further adjusting the length of a communica-
tion cycle relative to the number of frames trans-
mitted by each remote during its transmission op-
portunity.

19. A communicator as defined in claim 17 wherein
the predetermined functions further comprise:

the hub further adjusting the length of the communi-
cation cycle by a randomly generated factor.

20. A communicator as defined in claim 19 wherein
the maximum length of communication cycle with the
randomly generated factor is less than two times the
maximum length of the communication cycle without
the randomly generated factor.

21. A communicator for wirelessly transmitting
frames to and receiving frames from a least one addi-
tional communicator in accordance with a predeter-
mined medium access control protocol, the communica-
tors which transmit and receive the frames constituting
a Group, each communicator including a transmitter
and a receiver for transmitting and receiving the frames
respectively, the medium access control protocol con-
trolling each communicator of the Group to effect pre-
determined functions comprising:

designating one of the communicators Of the Group
as a hub and the remaining the communicators of
the Group as remotes;

the hub establishing repeating communication cycles,
each of which has intervals during which the hub
and the remotes transmit and receive frames;

the hub transmitting information to the remotes to
establish the communication cycle and a plurality
of predeterminable intervals during each communi-
cation cycle, the intervals being ones when the hub
is allowed to transmit frames to the remotes, when
the remotes are allowed to transmit frames to the
hub, and when each remote is expected to receive
a frame from the hub;

the remotes powering off their transmitters during
times other than those intervals when the remote is
allowed to transmit frames to the hub, by using the
information transmitted from the hub;

the remotes powering off their receivers during times
other than those intervals when the remote is ex-

5,371,734

**51**

pected to receive a frame from the hub, by using the information transmitted from the hub;

the hub transmitting two frames containing information to establish the plurality of predeterminable intervals during each communication cycle, the second frame containing the information to established the plurality of predeterminable intervals occurring before the intervals in which the remotes are allowed to transmit frames to the hub.

**22.** A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, wherein the communicators are adapted to be connected to a resource to obtain data from and to supply data to the resource, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

a first remote transmitting a first frame containing data to the hub during an interval established in a first communication cycle, the first frame containing data obtained by the one remote from the resource connected to the one remote; and

the hub transmitting a second frame to a second remote during an interval established in a second subsequent communication cycle, the second frame containing the data contained in the first frame.

**23.** A communicator as defined in claim 22 wherein the physical distance between the first and second remotes is greater than the distance which either the first or second remote may reliably transmit frames.

**24.** A communicator as defined in claim 22 wherein the frames are transmitted by radio frequency signals and are received from radio frequency signals.

**25.** A communicator as defined in claim 24 wherein each remote further includes a plurality of antennas for receiving the radio signal, and the predetermined functions further comprise:

each remote selecting one among the plurality of antennas with which to receive the radio frequency signals during each communication cycle.

**52**

**26.** A communicator as defined in claim 25 wherein the predetermined functions further comprise:

each remote evaluating the strength of the received radio frequency signals with one antenna before selecting another antenna.

**27.** A communicator as defined in claim 26 wherein the predetermined functions further comprise:

the hub transmitting information to the remotes in a transmission unit which contains at least one frame, the transmission unit including a preamble; and

each remote evaluating the strength of the received radio frequency signals in the preamble before selecting another antenna prior to the end of the preamble.

**28.** A communicator as defined in claim 27 wherein the predetermined functions further comprise:

each remote further receiving a portion of the preamble with the other antenna after selecting the other antenna.

**29.** A communicator as defined in claim 24 wherein the Group is established by those communicators which transmit and receive the radio frequency signals on the same radio frequency channels.

**30.** A communicator as defined in claim 29 wherein the communicators transmit and receive the radio frequency signals using direct sequence spread spectrum modulation established by a predetermined spreading code, and the Group is established by those communicators which modulate and demodulate the radio frequency signals using the same predetermined spreading code.

**31.** A communicator as defined in claim 24 wherein the predetermined functions further comprise:

the hub transmitting the information to the remotes in a transmission unit which contains at least one frame, the transmission unit including a preamble; and

each remote synchronizing its receipt of signals transmitted from the hub during the communication cycle from the signal transmitted during the preamble.

**32.** A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is

5,371,734

53                                                    54

allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using 5 the information transmitted from the hub;

the hub transmitting information to the remotes to establish a first interval in the communication cycle during which a frame containing the information establishing the communication cycle and the plu- 10 rality of predeterminable intervals is transmitted and a second interval during which the hub is allowed to transmit other frames to the remotes; and

each remote determines whether to power off its receiver during the second interval based on the 15 information transmitted during the first interval.

33. A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communica- 20 tors which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect pre- 25 determined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, 30 each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communi- 35 cation cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub; 40

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times 45 other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

the hub transmitting a frame containing information to establish a first interval in the communication 50 cycle during which the information establishing the communication cycle and the plurality of predeterminable intervals is transmitted, and a second interval during which the hub is allowed to transmit broadcast frames to the remotes, and a third 55 interval in the communication cycle during which the hub is allowed to transmit directed frames to the remotes;

each remote powers its transmitter during the second interval; and 60

each remote determines whether to power off its receiver during the third interval based on the information conveyed during the first interval.

34. A communicator for wirelessly transmitting frames to and receiving frames from a least one addi- 65 tional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting

a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined function comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

the hub transmitting information to the remotes during a first communication cycle to establish the length of the first communication cycle and to establish the time for the beginning of the next subsequent second communication cycle; and

the remotes powering on their receivers at approximately the anticipated beginning of the second communication cycle after having powered their receivers off during the first communication cycle, by using the information transmitted from the hub during the first communication cycle.

35. A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is ex-

5,371,734

55

pected to receive a frame from the hub, by using the information transmitted from the hub;

the hub transmitting information to the remotes to establish a predeterminable hub beacon interval during one of a predetermined plurality of sequential communication cycles; and

the hub transmitting a hub beacon frame during the hub beacon interval, the hub beacon frame containing information indicating that the hub is functioning as a hub for the Group and describing predetermined operational characteristics of the hub, the hub beacon frame being transmitted to another second hub of another second Group.

36. A communicator as defined in claim 35 wherein the predetermined functions further comprise:

the second hub receiving the hub beacon frame sent by the first aforesaid hub and in response thereto transmitting a hub beacon reply frame to the first hub during the hub beacon interval of the communication cycle of the first hub, the hub beacon reply frame containing information describing predetermined operational characteristics of the second hub; and

the first hub and the second hub responding to the information in the hub beacon reply frame and the hub beacon frame to adjust their respective transmissions of frames and to adjust the communication cycles established to avoid conflict in transmissions.

37. A communicator as defined in claim 36 wherein the predetermined functions further comprise:

the first and second hubs each adjusting their communication cycles so they do not overlap one another.

38. A communicator as defined in claim 37 wherein the frames are transmitted by radio frequency signals and are received from radio frequency signals, and the predetermined functions further comprise:

the first and second hubs transmitting the hub beacon and the hub beacon reply frames on the same predetermined radio frequency channel which is different than the radio frequency channels which the first and second hubs use for transmitting frames to and receiving frames from their remotes.

39. A communicator as defined in claim 37 wherein the frames are transmitted by radio frequency signals and are received from radio frequency signals, the communicators transmit and receive the radio frequency signals using direct sequence spread spectrum modulation established by a predetermined spreading code, and the predetermined functions further comprise:

the first and second hubs use different spreading codes for transmitting frames to and receiving frames from their remotes than the spreading codes used for transmitting the hub beacon and hub beacon reply frames.

40. A communicator as defined in claim 39 wherein the predetermined functions further comprise:

the first and second hubs transmit and receive the hub beacon frame and the hub beacon reply frame using a predetermined spreading code which is different that the spreading code used by each hub to transmit frames to and receive frames from the remotes of their respective Group.

41. A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting

56

a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

the hub assigning transmission opportunities to the remotes, each transmission opportunity being an interval for a remote to transmit frames to the hub;

the hub transmitting transmission opportunity allocation information in a frame transmitted by the hub;

the hub transmitting information to the remotes to establish a transmission opportunity request interval during the communication cycle when the remotes are allowed to transmit transmission opportunity request frames to the hub to request transmission opportunity allocations;

the remotes transmitting transmission opportunity request frames to the hub during the transmission opportunity request intervals to request transmission opportunities, the transmission opportunity request frames containing information describing predetermined operational characteristics of the remote transmitting the transmission opportunity request frame;

the hub responding to the information in the transmission opportunity request frame and determining if the remote is better suited to act as the hub based on a comparison of the operational characteristic information of the hub and the remote transmitting the transmission opportunity request frame;

the hub transmitting a hub handoff frame to the remote transmitting the transmission opportunity request frame if the hub has determined that the remote is better suited to act as the hub;

the remote responding to the hub handoff frame by transmitting a handoff acknowledgement frame and commencing to act as the hub after transmitting the handoff acknowledgment frame; and

the hub receiving the hub acknowledgement frame commencing to function as a remote after receiving the hub acknowledgement frame.

42. A communicator as defined in claim 41 wherein the communicators are adapted to be connected to a resource to obtain data from and to supply data to the resource, wherein the at least some of the communica-

5,371,734

57

58

tors are battery powered, and wherein the predetermined functions further comprise:

the hub determining if the remote is better suited to act as the hub by evaluating predetermined criteria describing operating characteristics obtained from the information of the transmission opportunity request frame and obtained from the hub, the operational characteristics including whether the hub or the remote is battery powered; and

the hub determining that the remote is better suited to act as the hub if the remote is not battery powered and the hub is battery powered.

43. A communicator as defined in claim 42 wherein the operating characteristics also include whether the hub or the remote is connected to a resource functioning as a server, and wherein the predetermined functions further comprise:

the hub determining that the remote is better suited to act as the hub if the remote is not connected to a resource functioning as a server and the hub is connected to a resource functioning as a server, after the hub has determined that both the hub and the remote are both connected to or both not connected to battery power.

44. A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

the communicators transmitting a transfer unit from one communicator to another which contains a plurality of frames;

the remotes transmitting a transfer unit having a header having at least one field containing information describing at least one frame of a previous transmission unit which was not successfully received by the hub; and

the hub responding to the field information describing the frame which was successfully received by transmitting in another subsequent transfer unit

those remaining frames of the previous transfer unit which were not successfully received.

45. A communicator as defined in claim 44 wherein the frame has two fields containing information describing at least one frame of a previous transmission unit which was not successfully received, one field containing information describing the ending frame number of the last successfully received frame of the transfer unit, and the other field containing information describing a single frame in the plurality of frames in the transfer unit which was not successfully received.

46. A communicator for wirelessly transmitting frames to and receiving frames from a least one additional communicator in accordance with a predetermined medium access control protocol, the communicators which transmit and receive the frames constituting a Group, each communicator including a transmitter and a receiver for transmitting and receiving the frames respectively, the medium access control protocol controlling each communicator of the Group to effect predetermined functions comprising:

designating one of the communicators of the Group as a hub and the remaining the communicators of the Group as remotes;

the hub establishing repeating communication cycles, each of which has intervals during which the hub and the remotes transmit and receive frames;

the hub transmitting information to the remotes to establish the communication cycle and a plurality of predeterminable intervals during each communication cycle, the intervals being ones when the hub is allowed to transmit frames to the remotes, when the remotes are allowed to transmit frames to the hub, and when each remote is expected to receive a frame from the hub;

the remotes powering off their transmitters during times other than those intervals when the remote is allowed to transmit frames to the hub, by using the information transmitted from the hub;

the remotes powering off their receivers during times other than those intervals when the remote is expected to receive a frame from the hub, by using the information transmitted from the hub;

the remotes transmitting frames to the hub during the communication cycle which contain predetermined operational characteristic information of the remote transmitting the frame;

the hub responding to the operational characteristic information in the frame transmitted from each remote and determining if the remote is better suited to act as the hub based on a comparison of the operational characteristic information of the hub and the remote transmitting the frame;

the communicator functioning as the hub transferring the hub functionality to the remote having operational characteristics better suited to act as the hub; and

the remote receiving the hub functionality thereafter becoming the hub for the Group and the communicator previously functioning as the hub commencing to function as a remote.

47. A communicator as defined in claim 46 wherein the predetermined functions further comprise:

the hub transmitting information to the remotes to establish a transmission opportunity request interval during the communication cycle when the remotes are allowed to transmit transmission op-

5,371,734

59

portunity request frames to the hub to request transmission opportunity allocations;

the remotes transmitting transmission opportunity request frames to the hub during the transmission opportunity request intervals to request transmission opportunities, the transmission opportunity request frames containing information describing the predetermined operational characteristics of the remote transmitting the transmission opportunity request frame;

60

the hub transmitting a hub handoff frame to the remote transmitting the transmission opportunity request frame if the hub has determined that the remote is better suited to act as the hub;

the remote responding to the hub handoff frame by transmitting a handoff acknowledgement frame and commencing to act as the hub after transmitting the handoff acknowledgment frame; and

the hub receiving the hub acknowledgement frame commencing to function as a remote after receiving the hub acknowledgement frame.

* * * * *

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of October, 2014, I electronically filed the foregoing BRIEF OF PLAINTIFF-APPELLANT ATLAS IP, LLC using the CM/ECF system of the Court, which will send a notice of electronic filing to the following counsel of record:

Akshay D. Deoras  Akshay.deoras@kirkland.com

Appellant will hand deliver six paper copies of this document, as filed with the CM/ECF system of the Court, to the Clerk of the Court of Appeals for the Federal Circuit in Washington D.C. pursuant to ECF-10(B).

*/s/ George C. Summerfield*
George C. Summerfield

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 3,777 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


October 22, 2014                                  */s/ George C. Summerfield*
                                                       George C. Summerfield